KA8TPDVC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  PDV USA, INC.,

4               Plaintiff,

5          v.                          20 CV 3699 (JGK)

6  INTERAMERICAN CONSULTING INC.,

7               Defendant.

8  ------------------------------x
                                      New York, N.Y.
9                                     October 8, 2020
                                      11:30 a.m.
10
   Before:
11
                        HON. JOHN G. KOELTL,
12
                                      District Judge
13

14                    APPEARANCES (Telephonic)

15 WILLKIE FARR & GALLAGHER LLP
        Attorneys for Plaintiff
16 BY:  JEFFREY KORN
        PIA KEEVIL
17
   HECHT PARTNERS LLP
18      Attorneys for Defendant
   BY:  KATHRYN LEE BOYD
19      ALAN ALVELA

20 FELDMAN & LATHAM LLP d/b/a TRAILBLAZER
        Attorneys for David Rivera
21 BY:  JEFFREY FELDMAN

22

23

24

25

1      (Via telephone)

2      (Case called)

3      LAW CLERK:  Please state your appearances, starting

4  with the plaintiff.

5      MR. KORN:  Thank you, this is Jeffrey Korn on behalf

6  of PDV USA.  I'm with the law firm of Willkie Farr & Gallagher.

7  With me on the line is my colleague, Pia Keevil.

8      THE COURT:  Good morning.

9      MS. BOYD:  On behalf of defendant Interamerican, this

10  is Kathryn Lee Boyd of Hecht Partners LLP.  And joining me also

11  from our firm is Alan Alvela, also of Hecht Partners.

12      Good morning, your Honor.

13      THE COURT:  Good morning.  So this is a breach of

14  contract suit in which the defendant seeks to make a motion to

15  dismiss for lack of standing and failure to state a claim.  I

16  read the letters.  Several things jump out at me.  The first

17  is, having read the defendant's letter, does the plaintiff want

18  to file an amended complaint?

19      It appears, just from reading the letters, that the

20  plaintiff hasn't attached the complaint.  The plaintiff says --

21  the plaintiff may be right -- that they don't have to attach

22  the complaint.  But if the plaintiff is alleging the violation

23  of specific provisions in the agreement and the defendant says,

24  "That's just not right, here's the agreement, and what you have

25  alleged is not a violation of the specific portions of the

1    agreement that you're citing," what will happen?  Well, the

2    likely result of that might well be that the complaint is

3    dismissed without prejudice to repleading, and that would mean

4    we're six months down the line and the plaintiff hasn't

5    accomplished very much.

6         So reading the letters, it would appear that the

7    better course of valor would be the plaintiff to file an

8    amended complaint, attach the agreement, and plead specifically

9    what provisions of the agreement the plaintiff alleges have

10   been violated, as well as to make an adequate assertion of why

11   the plaintiff has standing.

12        It's a little strange, I have to say, after reading

13   the letters, for the plaintiff to say -- well, defendant says:

14   Plaintiff doesn't have standing because there was an

15   assignment.  And the plaintiff responds:  Yes, yes, there was

16   an assignment, but you never thought that the assignment was

17   valid.  So the plaintiff made an assignment which the defendant

18   has said was not valid, but the plaintiff now, having made the

19   assignment, relies on the defendant's assertion that the

20   assignment was not valid.  Well, that's an interesting posture,

21   to say the least.

22        My penultimate point is the defendant makes various

23   other allegations; for example, failure to specify the damages,

24   each of which could be cured, presumably, with an amended

25   complaint and we could move on.

1          My final point, though, is the plaintiff in its

2    responsive letter provide a few more details about the

3    contract.  It was for about 90 days of consulting services for

4    $50 million, of which apparently $15 million was paid to the

5    defendant, one of whose apparent principals said he never

6    received any of the money because it all went to the political

7    opposition in Venezuela.

8          Those allegations raise certainly significant issues

9    with respect to the legality, if you will, and the

10   enforceability of the contract from the get-go, as they say.

11   And so the allegations in the plaintiff's letter, the

12   responsive letter, suggest an additional defense that the

13   defendant hasn't even raised.  The question becomes -- and it's

14   an odd issue to be raised sub rosa by the plaintiff in the

15   case.  The issue becomes:  Is this an enforceable contract to

16   allegedly provide consulting services but in fact use the

17   contract as a way of providing substantial funds to the

18   political opposition in Venezuela?

19         As I say, it's odd in a way because the plaintiff,

20   which is seeking damages in the case, brings it up in

21   opposition to the motion to dismiss.  It's the plaintiff who

22   seeks to enforce and seek damages under this contract.  And

23   there are a series of troubling issues raised by the

24   allegations, which also raises the question, while the

25   plaintiff didn't have an obligation to include the contract as

1    part of the complaint, one wonders why the plaintiff did not.

2            So those were my observations.  At the basic level, I

3    think it would behoove the plaintiff to file an amended

4    complaint with the contract and make the allegations necessary

5    to survive a motion to dismiss, if that's possible.  And it

6    certainly would behoove the parties to discuss whether they

7    wish to proceed in court with an action for breach of this $50

8    million consulting agreement for 90 days.  I mean it raises all

9    sorts of issues which are just not explored in the letters.

10           So those were my observations after reading your

11   correspondence.  It was the defendant's request for a premotion

12   conference to make a motion to dismiss, so it's probably

13   appropriate for the plaintiff to respond to my comments.

14           MR. KORN:  Thank you, your Honor, this is Jeff Korn on

15   behalf of plaintiff, and I appreciate your comments.

16           I think, to answer your first and most fundamental

17   question, we will take your counsel and provide an amended

18   complaint that includes the contract.  We will take another

19   closer look at our allegations.  We think they are clear and

20   specific enough, but we will take the opportunity to re-review

21   them in light of the defendant's letter and your Honor's

22   comments.  But I think that addresses at least the first of

23   your comments.

24           The second I think has to do with the assignment

25   points, and there we have a position from the defendants that

1    there was never an assignment because there was no consent to

2    it.  We don't think the defense should be able to have it both

3    ways, that we, on behalf of PDV USA --

4                THE COURT:  Could I just stop you for a moment there?

5                MR. KORN:  Of course, your Honor.

6                THE COURT:  You say the defendant shouldn't be able to

7    have it both ways.  Of course the same thing could be said of

8    the plaintiff.  Because the plaintiff made the assignment,

9    undoubtedly the plaintiff has represented to the defendant that

10   the assignment was valid, despite what the defendant says.  And

11   this is not a case of judicial estoppel where a party takes one

12   position in the litigation and the Court relies on that

13   position and then the party reverses position, this is starting

14   afresh in this litigation.

15               There was, undoubtedly, an assignment, which the

16   plaintiff alleges, I assume, was a valid assignment, despite

17   what the defendant says, but now in the litigation ignores that

18   and says:  Even though we've been asserting this was a valid

19   assignment, never mind, even though it exists, it's invalid.

20   That's at least a problem, which of course could be cured by

21   simply adding the assignee as an additional plaintiff and

22   saying it doesn't make a difference whether the assignment is

23   valid or not, we've joined both the contracting party and the

24   assignee.

25               Go ahead.

1          MR. KORN:  Thank you, your Honor, and I will explore

2     whether that is a possibility here, given that the assignee is

3     PDVSA, which is a Venezuelan company that is currently, or at

4     least for U.S. purposes, controlled by an ad hoc board and is

5     the ultimate parent of the plaintiff.

6          But I take your point, your Honor, we did plead that

7     the consent that was sought in the assignment was not provided

8     and the defendant continued to demand payment as if there had

9     not been an assignment.  So we proceeded on that basis.  Again,

10    your Honor, I will see whether there is a way to moot the issue

11    by adding the additional assignee, if that is possible; and if

12    not, then we'll have an issue to address on the motion to

13    dismiss on the standing issue.

14         Then I believe your third point concerned the

15    statements that we provided to your Honor that was reported by

16    the press that were made by the principal of the defendants,

17    and those are the statements that the defendant made in the

18    press.  We do not have a basis to know whether they are true or

19    not.  We took them as a concession that the defendant did

20    not -- had no intention of providing the services for which he

21    contracted.  I agree with your Honor that it does raise some

22    troubling issues, but those are factual issues, and we do not

23    know whether the allegations that the defendant made to the

24    press are accurate or inaccurate.  And we provided --

25         THE COURT:  Whoa, whoa.  You're representing a client

KA8TPDVC

1   who entered into a consulting agreement to provide consulting

2   services for 90 days –- contracting to pay $50 million to the

3   defendant for consulting services for 90 days.  So putting

4   aside what the defendant says, or one of the principals of the

5   defendant or the founder of the defendant says about the true

6   purpose of the contract, your client must know what the client

7   was paying $50 million for.  And whether those alleged

8   consulting services were true services or sham services, and

9   whether the money that was being paid was, in fact, for, quote,

10  "consulting services;" and if so, what truly were those

11  services?  All of which, putting aside what the defendant may

12  say, are known to your client and will eventually have to be

13  fleshed out if the motion to dismiss is denied.  So there would

14  be depositions under oath about what the consulting services

15  were and why they were worth $50 million and what your client

16  was truly paying for.

17        Surely, I mean, just reading the letters, apparently

18  your client paid $15 million of the $50 million and expected to

19  get some services.  The question is:  What were those services?

20        Now the suggestion in the letter is they weren't

21  really consulting services, they were payments to the political

22  opposition in Venezuela.  Now there are other possible

23  suspicious uses of millions of dollars paid to a consulting

24  firm.  All of that would be established, if the motion to

25  dismiss is not granted, through sworn testimony.  And all I

1    know is what I have read in the correspondence, the two letters

2    that are before me.

3           The suggestion, obviously, is also that this has been

4    a subject of inquiry from the press, and so there are likely

5    press reports about this agreement and its purposes.  But those

6    are things that would have to be explored to find out whether

7    the agreement itself is legal, and, if legal, what was the

8    consideration for all of this money being paid and what was to

9    be done.  And how do you measure the, quote, "damages" if in

10   fact there was a breach of the agreement?  Not easy questions,

11   at least on the basis of the correspondence before me, but all

12   of that would surely be the subject of sworn testimony.

13          This is also a situation in which, at least as I

14   understand the correspondence, the plaintiff was supposed to

15   pay $50 million for alleged consulting services and did in fact

16   pay $15 million.  So the plaintiff, on the face of the

17   correspondence, saved $35 million.  So you have partial

18   performance, and one would have to question what the plaintiff

19   got for $15 million and what the plaintiff expected under the

20   agreement to get for $15 million.  But the plaintiff did,

21   apparently, save 35 million which was never paid.

22          Do I at least understand the allegations correctly at

23   this point?

24          MR. KORN:  I think you do, your Honor, and I think

25   you're right that the questions that you have identified here

1   that are raised by both the allegations in the complaint and

2   the response from the defendant's principal and the press raise

3   interesting questions to be explored in discovery.

4         What we have on the plaintiff's side is a Delaware

5   corporation that entered into a contract that paid $15 million,

6   did not pay the other 35, and didn't get anything -- at least

7   that is the allegation and this is what we will prove -- for

8   the $15 million, and certainly not what was bargained for and

9   provided for in the contract, which was services to plaintiff's

10   sole satisfaction.  Those are issues that need to be explored

11   in discovery.

12         THE COURT:  Yes, but one at least questions the wisdom

13   of -- and obviously, this is public, the letters are public,

14   the press reports are public, so you have a plaintiff who

15   entered into this contract for $50 million but only paid $15

16   million, and the contract is apparently over, and the plaintiff

17   now wants to get back the $15 million.  One wonders why, with

18   looming sworn testimony about the details of this contract, the

19   plaintiff doesn't simply, literally or figuratively, sigh and

20   say that it saved $35 million because it didn't pay the rest of

21   the money on this contract for services that would be at least

22   difficult to explain in sworn testimony.

23         But these are issues to be explored between counsel

24   and their respective clients.  And it's not necessarily an

25   answer to say the client paid $15 million and tells us that

1    they were supposed to get consulting services and we didn't and

2    so we filed this lawsuit.  Well, one would think that after all

3    of the allegations, a more searching conversation with the

4    client would be useful.

5         Okay.  I have been discussing all of this with

6    plaintiff's counsel, defense counsel has been justifiably

7    quiet, politely quiet, so I am happy to hear from defense

8    counsel.  Ms. Boyd.

9         MS. BOYD:  Thank you, your Honor, this is Katherine

10   Lee Boyd for Interamerican.

11        My understanding, as a matter of logistics, is that

12   there will be an amendment that we can expect, and so I'm

13   available to discuss right now timing for that.  And we would

14   just request some time to review the complaint for the pleading

15   deficiencies that we've identified and then to maybe send a

16   letter to the Court to request, if needed, another motion to

17   dismiss briefing schedule as a matter of procedure.

18        As a matter of substance, on the issue of standing, I

19   don't think that the law that we set out has been controverted

20   or disputed in any way that standing has been stripped of the

21   plaintiff here by --

22        THE COURT:  Hold on.  That may or may not be true.  If

23   in fact the assignment is invalid because it required the

24   defendant's consent, which was never given, certainly the

25   plaintiff could argue that the assignment was ineffective,

KA8TPDVC

1    invalid.

2                MS. BOYD:  You this true, your Honor.

3                THE COURT:  Whatever the parties' positions were

4    outside the litigation, now they're in litigation, so was

5    consent required and did your client not consent?

6                MS. BOYD:  Your Honor, our client did not consent to

7    the assignment, but as a matter of law, it is our position that

8    the assignment was made to enforce the contract.  This was done

9    after a performance term was over, had been made, and therefore

10   standing was stripped.  We put that in our letter.

11               Our position as to the performance and obligations

12   under the contract that were prior to the assignment, those

13   remained with and do remain with PDV USA, the party to the

14   contract.  So that's our position based on the law that we

15   researched and cited, but I do believe that these are issues

16   that would be further briefed by both parties in a full motion

17   to dismiss briefing to explore the issues that your Honor

18   raises.

19               THE COURT:  It's interesting.  I'm not sure whether

20   that could be decided on a motion to dismiss as opposed to a

21   motion for summary judgment.  I just don't know.  Obviously I

22   don't decide anything until it's briefed on the facts and the

23   law, but it's a question.  I don't know whether there are any

24   factual issues involved in the validity of the assignment.

25               Okay, go ahead.

KA8TPDVC

1    MS. BOYD:  So, your Honor, I wanted to clarify our

2    position on the assignment, which, in our opinion, would be the

3    subject of a 12(b)(1) motion, not a 12(b)(6) motion.

4    THE COURT:  You are right, it is subject matter.

5    MS. BOYD:  So that being said, the statements that

6    were quoted in the responsive letter, they were not in the

7    complaint, we would have to review those as to their

8    sufficiency under the pleading requirements and how they meet

9    the standards that we believe apply to 12(b)(6) setting forth a

10   contractual claim.

11   So I think at this point there's really not much to be

12   said except to wait for the amendment and then revisit, your

13   Honor, with your indulgence, the motion to dismiss.

14   THE COURT:  Yes, of course.  And there won't have to

15   be another set of letters.  The defendant would be given the

16   opportunity to file a motion to dismiss against the amended

17   complaint without going through the premotion conference

18   procedure.

19   Do you want to comment with respect to the substance

20   of the agreement and any questions with respect to the legality

21   of the agreement and what services the defendant was allegedly

22   providing for $50 million over 90 days?

23   MS. BOYD:  Well, your Honor, on the merits, our

24   position is that Interamerican did provide the services

25   contracted for.  If you have the contract in front of you,

1  which I assume you will on the amended complaint, our position

2  is that those services -- the terms for the services were met.

3  And it was a very short contract.  It was expected that there

4  would be only three months of services provided for $50

5  million.  And our position is that the plaintiff here failed to

6  perform its side of the bargain and can't plead that it did

7  fully perform, which is a requirement under New York law.

8          So regardless of what comments in the press have been

9  made, those are outside the four corners of the contract and

10  the complaint, and it's hard to comment on how those are even

11  relevant to the question of legality as a matter of law.

12          THE COURT:  No, tell me what services the defendant

13  was allegedly providing for $50 million over 90 days.  What was

14  the substance of the services that the defendant was providing?

15          MS. BOYD:  These service --

16          THE COURT:  Consulting services.

17          MS. BOYD:  -- were consulting services.

18          THE COURT:  Yes, consulting services.  What does that

19  mean?

20          MS. BOYD:  Well, your Honor, it's hard for me to

21  answer because I'm not a party to the contract, but there was

22  certainly an agreement here under the contract that we have.

23          THE COURT:  Whoa, whoa.  I'm sorry, you're

24  representing a client who entered into a contract to provide

25  services over 90 days for $50 million.  Now if you want to tell

1    me that you can't answer these questions because that would get

2    into attorney-client privilege matters or work product, okay.

3    Okay.  But on its face, one would raise an eyebrow at a

4    consulting agreement for $50 million over 90 days without a

5    specification of what services were being performed that would

6    plausibly justify $50 million over 90 days.

7         Does the contract, which will eventually be before me,

8    plausibly detail who the consultants are who are working and

9    what specific services they're performing for $50 million over

10   90 days?  How many consultants are there?  What are they doing

11   that could possibly justify $50 million?  Is that laid out in

12   the agreement?

13        MS. BOYD:  Well, our position is that the terms of the

14   agreement were agreed to and that we performed under those

15   services, which include things like -- sorry, I'm not

16   understanding what your Honor is getting at here.

17        THE COURT:  I think it's obvious.

18        MS. BOYD:  Your Honor, these parties have -- the

19   amount of money, to me, is exorbitant, but I'm an individual.

20   The parties here, especially the plaintiff, are billion dollar

21   companies.  So I can't comment on $50 million for three months

22   except that $50,000 for three months is a lot to me.  But they

23   had a right to contract for that, and they did, and they didn't

24   make good under their obligation to pay that $50 million in

25   three months, which is in the terms that the plaintiff agreed

1    to.

2            So I agree, it will come out in discovery the contours

3    of the meetings of the mind and the contours of the services

4    that Interamerican provided, but as a matter of pleading, which

5    is where we focused, we think it was woefully insufficient to

6    meet basic plausibility standards.

7            THE COURT:  Could you tell me -- again, I'm not asking

8    you to breach any attorney-client privilege, could you tell me

9    what the defendant did for the $15 million?

10           MS. BOYD:  He did everything that was required of him

11   under the contract and in conversation with the plaintiffs at

12   that time, because these were -- this was an ongoing

13   relationship.  So that is my understanding.  Do I have details

14   that I could provide the Court without waiving privilege here?

15   No, I cannot, because I cannot testify against my client.

16           THE COURT:  Okay.  Is the defendant -- how many

17   employees does the defendant have?  Is that public?

18           MS. BOYD:  I may speak out of school here, at least

19   two, maybe more.

20           THE COURT:  Okay.

21           MS. BOYD:  But I can't answer with any specifics

22   because I haven't explored that question on how many they have.

23           THE COURT:  Okay.  But that would mean, assuming that

24   there are two, maybe more, that's something like $7 million for

25   consulting per individual over -- how long was the contract in

KA8TPDVC

1    existence for the 90-day term before it was allegedly breached?

2              MS. BOYD:  Well, there was never notification of

3    breach by plaintiff, so the contract lasted for 92 days.  It's

4    our position, we put it in as a matter of pleading, there's a

5    waiver here because dissatisfaction was never noticed to us.

6              And your Honor, just looking at the complaint itself,

7    there are allegations that reports were submitted which was

8    detailing the services being provided.  Those reports did not

9    have to be in writing, per the contract.  Those were done.  And

10   the complaint also states that high-level individuals and

11   officials were met by defendant during the term of the

12   contract.  So just looking at the complaint itself, as we've

13   stated in our letter, it concedes that services were provided

14   under the contract.  There's no breach.

15             THE COURT:  Yeah, well --

16             MS. BOYD:  Not pleaded, at least.

17             THE COURT:  That's, of course, the other more

18   questionable interpretation of the contract.  To pay

19   individuals, let's say two, $15 million over 90 days to meet

20   with other high-level officials on its face suggests a more

21   sinister interpretation.

22             MR. FELDMAN:  Your Honor --

23             MS. BOYD:  Well, your Honor --

24             THE COURT:  Yes, someone else wanted to talk?

25             MR. FELDMAN:  Your Honor, my name is Jeff Feldman.

KA8TPDVC

1    MS. BOYD:  Plaintiffs knew Interamerican, knew its

2    employees, and contracted for these services knowing all of

3    that and agreeing to the payment terms and agreeing to use this

4    particular consultant.  So I don't think we can speak to

5    anything beyond what was agreed to in the contract and what

6    plaintiff had at its disposal at that time, which was public

7    information.

8    THE COURT:  Okay.  I think counsel for the plaintiff

9    was attempting to interrupt a moment ago.

10    Was that you, Mr. Korn?

11    MR. KORN:  No, that was somebody else, Jeff Feldman, I

12    think I heard.

13    MR. FELDMAN:  Yes, that's right, your Honor.  May I

14    address the Court?

15    THE COURT:  And you are whom?

16    MR. FELDMAN:  I am David Rivera's counsel.

17    THE COURT:  Okay.

18    MR. FELDMAN:  Your Honor, thank you for allowing me to

19    talk.  I understand the questions the Court is asking and

20    perhaps even why the Court is asking them.  What I would tell

21    you is that the contract that's at issue here was drafted by

22    the plaintiff.  I would invite the Court, once it gets the

23    contract, to read it, because the questions to why this

24    transaction was structured the way it was began with the

25    plaintiff and the drafting of the contract as it was.

1          And the questions that the Court asks about the

2     dollars relative to the period of services legitimately raise

3     the questions that you're asking.  So what I'm suggesting,

4     without getting into disclosure of attorney-client privilege,

5     is that there's more to this story than what is on the face of

6     the agreement.  And I don't think that I can say much more than

7     that right now, other than to say that the plaintiff had a

8     reason for drafting the contract the way it did and for paying

9     the amount of money that it paid and for the period of time

10    that that contract covered.  And the only thing I would ask the

11    Court to do -- I obviously know a lot, and I'm asking the Court

12    to keep an open mind and to resist the temptation of drawing a

13    conclusion that Mr. Rivera and his company did anything wrong

14    here.

15         The real question is why did the plaintiff, as a

16    business entity, PDV Holdings -- or, sorry, PDV USA is a

17    wholly-owned subsidiary of PDV Holdings, which is the holding

18    company for Citgo.  Why would PDV USA hire a consultant for a

19    90-day period for $50 million?  Why?

20         And so that's where this question starts.  And they're

21    the ones, frankly, that the Court should be, I would suggest,

22    respectfully, putting the question to.  Who goes out and does a

23    90-day agreement for $50 million?  Why would PDV USA, an

24    affiliate of Citgo, find the need to hire somebody for $50

25    million over 90 days, and do it in the form of a contract that

1    is amorphous at best?  The fact that they drafted the agreement

2    as amorphous as it is and put a confidentiality clause in that

3    agreement so that at least Interamerican cannot disclose it

4    potentially without being potentially in breach of it, why?

5    Why draft an amorphous agreement for $50 million over 90 days?

6    They know the reason for that.

7              THE COURT:  Okay, counsel.

8              MR. FELDMAN:  Thank you, Judge.

9              THE COURT:  Thank you.  You're representing

10   Mr. Rivera.  Is Mr. Rivera himself a party in this case?

11             MR. FELDMAN:  He is not.

12             MR. KORN:  No.

13             THE COURT:  All right.  You should give your

14   appearance to the court reporter afterwards so that the record

15   is clear.

16             The issues that I raised with respect to the contract

17   I raised with plaintiff's counsel initially as well as with

18   defendant's counsel.  And of course I have an open mind.  I

19   never decide anything until it's fully briefed on the facts and

20   the law.  And I told both parties that the issues with respect

21   to what is truly at issue with respect to this contract are

22   issues which will be explored if the motion to dismiss were

23   denied and the case went forward.  As I told both parties, this

24   is something that both parties should carefully consider with

25   respect to proceeding with the litigation.

1          As to the confidentiality of the underlying agreement,

2     the plaintiff said that the plaintiff would file an amended

3     complaint, and I thought that the plaintiff undertook to attach

4     the agreement to the amended complaint and to allege

5     specifically how the plaintiff alleges that the agreement was

6     violated.

7          So, of course, I keep an open mind, and I thought that

8     I had raised the questions about the contract with both sides.

9     And yes, I keep an open mind and I don't decide anything until

10    it's briefed on the facts and the law.  And as I've told both

11    sides, they should obviously explore these issues in detail

12    with their respective clients.  And what are the services

13    really being provided under this contract for this money,

14    neither side at this point was prepared to detail that for me,

15    so, of course, I can't reach any conclusions about that.  It's

16    important for both sides to carefully consider what effect that

17    will have on the ultimate outcome of the litigation.  Yes, I

18    keep an open mind, and the parties should talk out these issues

19    with their respective clients.

20          MR. KORN:  Your Honor?

21          THE COURT:  Is that Mr. Korn?

22          MR. KORN:  It is, your Honor.  Would it be permissible

23    for me to make a couple of quick observations?

24          THE COURT:  Yes, sure.

25          MR. KORN:  The first, in response to the comments that

KA8TPDVC

1   were made both by Mr. Rivera's counsel and Interamerican's

2   counsel -- and this is pled in our complaint and we discussed

3   it in our letter, the services here and the contract that was

4   really designed to provide services for the ultimate parent of

5   PDV USA, which is PDVSA, the Venezuelan national oil company.

6   And at the time of the contract, just to give additional

7   context, PDVSA was controlled by the Maduro regime, and it's

8   only since then that the Guaidó administration has, in 2019,

9   been able to take control.  And while these services and the

10  communications -- and this would be fully pleaded and I think

11  is pleaded -- were with PDVSA, the contract here was with the

12  U.S. subsidiary, PDV USA, and it paid $15 million -- and we

13  could detail this more in the amended complaint to the extent

14  that we can -- and got nothing in return.  And that is a lot of

15  money to be out in a contract like this.  And I certainly am

16  mindful of your Honor's comments and will discuss them with my

17  client.

18          MR. FELDMAN:  Your Honor, this is --

19          THE COURT:  Mr. Korn was speaking.  Go ahead.

20          MR. KORN:  Thank you.

21          The second observation goes to the standing.  I know

22  your Honor challenged me when I said the defendants were trying

23  to have it both ways.  I think I heard counsel for the

24  defendant say they want to hold PDV USA to the terms of the

25  contract, and presumably that is a foreshadowing of a

1    counterclaim against PDV USA, while at the same time saying

2    that PDV USA does not have standing to pursue affirmative

3    claims to recover the $15 million that it paid.  I don't see

4    how that can work, and we will address that in the amended

5    complaint, but the assignment here contemplated consent from

6    the defendant Interamerican.  It had a signature line for

7    Interamerican, it specified their consent was being provided,

8    and it never was.

9              So our position, and the reason that we proceeded on

10   this basis, and it was certainly something that we flagged in

11   the original complaint, because we knew that there was an

12   assignment question, was that there was no assignment, there

13   was no valid assignment and we have standing.  But I don't

14   think we get to both hold you to the original obligations as if

15   you're still a party and nevertheless you can't sue us because

16   you don't have standing.

17             THE COURT:  Okay.  I plainly can't decide any of these

18   issues on the phone, all I intended to do was to raise them,

19   air them, make sure that the parties are considering all of

20   them, make sure that the plaintiff, when the plaintiff files an

21   amended complaint, has carefully taken all of these issues into

22   account so that the amended complaint may moot the defendant's

23   desire to file a motion to dismiss and that both sides have

24   considered all of the issues in the case.  To reiterate, I

25   don't decide anything until it's briefed on the facts and the

1    law.

2             So amended complaint.  How about October 23?

3    Mr. Korn?

4             MR. KORN:  That works for the plaintiff.  Thank you,

5    your Honor.

6             THE COURT:  Okay.  And please, in the amended

7    complaint plead everything that you believe is necessary to

8    meet all of the issues raised in the defendant's letter so that

9    you give me the best complaint possible so that, if there is a

10   motion to dismiss, you don't say in response to the motion to

11   dismiss:  If the complaint is insufficient, give us the

12   opportunity to amend.

13            I appreciate that you have a right to amend after a

14   first reasoned decision by me, but successive motions to

15   dismiss are really a waste of all of your clients' money and

16   expense and time.  So please give me as complete a complaint as

17   you can so that it may discourage a motion to dismiss, or if

18   there is a motion to dismiss, that will be the dispositive

19   pleading, which will either be granted or denied, even though,

20   as I say, I appreciate that if there were a dismissal, under

21   the current Second Circuit law you would have the opportunity

22   to ask for leave to amend.

23            So plaintiff will file an amended complaint by

24   October 23, defendant will move or answer by November 13.

25            MS. BOYD:  Your Honor, I don't know if this is the

1  time to request additional time for a responsive pleading or

2  another motion to dismiss.  There are, as identified by the

3  Court, many issues here, and we think we would need additional

4  time.

5          THE COURT:  Well, I gave you three weeks to move or

6  answer, from October 23 to November 13.  I will give you

7  another week, November 20.  That's four weeks.

8          MS. BOYD:  Much appreciated.

9          THE COURT:  Sure.  So defendant will move or answer by

10  November 20, but no premotion conference is required.  If a

11  motion, plaintiff will respond by December 18, and reply by

12  January 5.

13          If no motion, so if an answer, parties will submit a

14  Rule~26(f) report by December 4.

15          Okay?

16          MS. BOYD:  Your Honor --

17          MR. FELDMAN:  Your Honor --

18          THE COURT:  Whoa, whoa.  I think first of all I heard

19  Ms. Boyd.

20          MS. BOYD:  Yes, sir.  Just with the Court's

21  indulgence, because counsel for plaintiff made a point that we

22  really can't leave out there, this contract, when all is seen,

23  has nothing to do with this parent company PDVSA.  And our

24  position on assignment is commensurate with New York law that

25  consent was not required for enforcement but it would have been

KA8TPDVC

1    required under terms of performance.  And with that, that's in

2    our letter, we look forward to getting the amended complaint.

3                THE COURT:  Okay.  I know the parties have taken

4    different positions on the issue of assignment and I will

5    carefully review the amended complaint and any pleadings in

6    response.

7                Okay.

8                MR. KORN:  Thank you, your Honor.

9                THE COURT:  Anything else?

10               MR. KORN:  Not from the plaintiff.

11               MS. BOYD:  No, your Honor, thank you.

12               THE COURT:  Okay.  Good to talk to you all.  Thank you

13   for your letters, thank you for participating in the

14   conference.  Please stay well, be safe.  Bye now.

15               MR. KORN:  Thank you, your Honor.

16               MS. BOYD:  Thank you.

17               (Adjourned)

18

19

20

21

22

23

24

25