Exhibit 2

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - -     X
                                                    :
PDV USA, INC.,                                      :
                                                    :
            Plaintiff,                              :       ~~AMENDED~~
            ~~COMPLAINT~~                            :
                                                    :
v.                                                  :       Case No. 20-cv-3699
                                                    :
INTERAMERICAN CONSULTING INC.,                      :
                                                    :
            Defendant.                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - -     X
```

### **SECOND AMENDED COMPLAINT**

Plaintiff PDV USA, Inc. ("PDV USA" or "Plaintiff"), by and through its undersigned counsel, Willkie Farr & Gallagher LLP, alleges as follows in its **Second** Amended Complaint against Defendant Interamerican Consulting Inc. ("Interamerican"):

### **NATURE OF THE ACTION**

1.      On March 21, 2017, PDV USA and Interamerican entered into a **purported** consulting agreement (the "Agreement") pursuant to which Interamerican**, a one-person consulting firm run by** ~~former U.S. Congressman David Rivera,~~ would be paid $50 million in six installments over a three-month period to provide purported "strategic consulting services" for **the benefit of** PDV USA's **ultimate** parent company, Petróleos de Venezuela, S.A. ("PDVSA"). A true and correct copy of the Agreement is annexed hereto as Exhibit 1.

2.      ~~At the time, PDV USA's corporate purpose was to provide U.S.-based shareholder support services for~~ PDVSA ~~is~~**,** the state-owned oil and natural gas company of the Bolivarian Republic of Venezuela, **and, at that time, was**~~then~~ controlled **entirely** by the regime of ~~Nicolas~~**Nicolás** Maduro.  PDV USA **was instructed by the parent company**

*55149655.1*

~~(PDVSA) of its parent company (is owned by~~ PDV Holding, Inc.~~)~~ **("PDV Holding"), which in turn is owned by PDVSA.  As part of PDV USA's shareholder services to PDVSA, on or around early March 2017, PDVSA issued written instructions to its U.S.-based subsidiaries** to enter into the Agreement for the purported purpose of improving PDVSA's "long-term reputation and standing" in the United States.  **PDVSA provided PDV USA with the funds to be used to retain Interamerican, as well as specific instructions regarding the retention, including the contract's total sum.**

**3. In January of** 2019, ~~the United States Government recognized Juan Guaidó, the President of Venezuela's National Assembly, as the Interim President of Venezuela, and at the same time derecognized the Maduro regime and designated PDVSA as a "Specially Designated National" with whom no U.S. person may do business absent a license from the U.S. Department of Treasury.  The Guaidó Government, in turn, appointed an Ad Hoc Board of Directors of PDVSA to oversee the U.S. operations of PDVSA's U.S.-based subsidiaries, including PDV~~ **USA.  In August of** 2019, ~~the Delaware Court of Chancery ruled that under U.S. law, the Guaidó appointments to the PDVSA Ad Hoc Board were presumptively valid.~~

**4. Under**__According to__ the ~~2017~~ Agreement, Interamerican was supposed to develop and implement over a three-month period a strategic plan to improve **PDVSA's**__an undefined "CLIENT's"__ reputation and standing among, and build relationships with, policy makers, opinion leaders, public officials, and targeted stakeholders.

**5.** **No matter who was intended to be the beneficiary of such services, such plan was ever developed, much less implemented.  In fact, after nearly a year of discovery in this matter, Defendant cannot point to a single written record of any supposed plans, meetings, or strategies Mr. Rivera claims he orchestrated and devised (or of *any***

2

services rendered by Interamerican).  The closest he can point to is a series of text messages between Mr. Rivera and persons who had no role with PDV USA about an attempted meeting that never occurred between senior officials in the Maduro regimeAmong other things, in exchange for $50 million, the Agreement required Interamerican to provide at least seven bi-weekly reports detailing the work carried out during the relevant period and a final report that would include recommendations for monitoring the strategies implemented.  Instead, Defendant provided just two reports, totaling no more than five pages, much of which is duplicated.  These reports refer generically to a "strategic plan," "meetings," and "recommendations," but do not describe a single element of the alleged plan, identify meeting participants or meeting discussions, or specify what recommendations were made or to whom.

            **3.**      6. Upon information and belief**,**, PDVSA and ExxonMobil ("Exxon").

Defendant performed **virtually** no services under the Agreement, and certainly did not perform the level of services that might **reasonably be expected forjustify** a fee of approximately $17 million *per month*.  **This was confirmed by Defendant's President,** former U.S. Congressman David Rivera, **after this lawsuit was filed.  According to Mr. Rivera, in statements he made to the press shortly after the filing of this lawsuit, Interamerican never intended to provide the strategic consulting services that were the subject of the Agreement, but instead the funds that were paid "went to the opposition for anti-Maduro protests in the summer of 2017."  (Jay Weaver and Antonio Maria Delgado,** *Rivera didn't register as a foreign agent in $50 million contract with Venezuela oil firm***, MIAMI HERALD, May 14, 2020).  Mr. Rivera's claim appears to be that the Maduro regime, which controlled PDVSA at the time, agreed to funnel tens of millions of dollars to finance protests being organized by its**

3

political adversaries. This claim defies credulity, and PDV USA has been unable to locate any evidence, of any kind, supporting it.

7. Mr. Rivera's claims in 2020 regarding the purpose of the Agreement are entirely inconsistent with Interamerican's two progress reports, which contain numerous representations concerning a consulting project for PDV USA to benefit PDVSA. Those 2020 claims also make clear that Interamerican falsely represented and warranted in Section 7 of the Agreement that "no portion of any payment to CONSULTANT by PDV USA pursuant to this Agreement shall be used as a bribe, kickback, rebate, illegal political contribution, or in violation of applicable foreign exchange control regulations, tax laws or regulations, or other laws or regulations of any jurisdiction."

8. There is one conclusion that can readily be drawn from Mr. Rivera's admissions: Interamerican did not, and never intended to, provide the consulting services for which it contracted with PDV USA in the Agreement.

4.      Something else was afoot. Shortly after receiving the first three installment payments from PDV USA—totaling $15 million—Interamerican transferred approximately 75% of that amount to three third parties: (1) Interamerican transferred $3.75 million to companies controlled by Hugo Perera, a convicted drug trafficker; (2) Interamerican transferred $3.75 million to a yacht company purportedly to pay the costs of maintaining a yacht owned by Raul Gorrín, a Venezuelan billionaire and fugitive from justice who was indicted by the United States in 2018 in connection with a multi-billion dollar money laundering and bribery scheme; and (3) Interamerican transferred $3.5 million to a firm named Communication Solutions owned by Esther Nuhfer, a long-

4

time associate of Mr. Rivera.  Mr. Perera and Ms. Nuhfer are currently under criminal investigation for their role in this scheme.

5.      Interamerican's explanation for these payments—totaling at least $11 million—is simply incredible.  At Mr. Rivera's deposition, and in Interamerican's interrogatory responses, Interamerican claims that Mr. Rivera made these transfers to pay "referral" fees of 25% of the Agreement value (*i.e.*, $12.5 million of the total $50 million consideration) to each of Mr. Gorrín, Mr. Perera, and Ms. Nuhfer.  When asked to explain this, Mr. Rivera testified under oath that he owed Mr. Gorrín a "referral" fee of $12.5 million because Mr. Gorrín had arranged a single meeting in the Dominican Republic that *may* have led to his engagement by PDV USA; he owed another "referral" fee of $12.5 million to Mr. Perera solely because he had previously introduced Mr. Rivera to Mr. Gorrín; and he owed yet another "referral" fee of $12.5 million to Ms. Nuhfer solely because Ms. Nuhfer had originally introduced Mr. Rivera to Mr. Perera.

6.      The written record is directly contrary to Interamerican's story.  As PDV USA learned through discovery in this action—despite Mr. Rivera's efforts to destroy documents during the litigation—Interamerican documented its arrangements with Ms. Nuhfer's firm (Communication Solutions, Inc. ("Communication Solutions")) and with Mr. Perera's firm (PG & Associates, Inc. ("PGA")) concerning the Agreement as subcontracts in which Communication Solutions and PGA were designated as Interamerican's "subcontractors" that would provide consulting services to PDV USA and/or assist Interamerican in doing so.  At his deposition, Mr. Rivera testified that these subcontracts were created in connection with the preparation of Interamerican's 2017 tax return.  He further testified that they were signed by him, Mr. Perera, and Ms. Nuhfer,

5

respectively, at the end of 2017, but then backdated to March 20, 2017—the day before the Agreement was executed.  Mr. Rivera also asked Interglobal Yacht Management LLC ("IYM"), Mr. Gorrín's yacht manager, to sign a similar subcontract, but IYM refused to do so because it was never a subcontractor to Interamerican and never provided any such services.[1]

7.    9. In short, PDV USA was injured by the Defendant's breach of the Agreement.  PDV USA paid the first three invoices issued by Defendant, a total of $15 million, but did not receive the required services and has received no evidence that any services were ever performed on behalf of PDV USA or PDVSA.received nothing from Interamerican in exchange for making payments of $15 million.  Most of that sum was transferred to third parties that are either indicted fugitives from justice or under criminal investigation in connection with those payments.  The Agreement is either a void instrument of illegality—which PDV USA entered into at the direction of PDVSA when it was controlled by the Maduro regime—or a contract whose plain and unambiguous terms

---

[1] This is not the first time that Mr. Rivera has engaged in deceptive activity.  A federal court in Florida recently fined Mr. Rivera $450,000 for violating the United States campaign finance laws.  The court observed in particular that Mr. Rivera's "omissions . . . leave the Court with the *inescapable conclusion that Defendant is, once again, being less than honest and forthright,*" that evidence from the Federal Election Commission "*further undermines [Mr. Rivera's] veracity in this case,*" that Mr. Rivera's "assertions *lack credibility,*" and that Mr. Rivera had attempted to "*subvert justice and avoid the repercussions of his unlawful acts throughout . . . the proceedings before this Court.*"  *FEC v. Rivera,* 2022 WL 1400874, at *5 & n.2–4 (S.D. Fla. Mar. 24, 2022) (emphases added).

were breached by Interamerican in numerous respects detailed below.  Either way, PDV USA paid $15 million to Interamerican and is entitled to the return of its money.

8.    In January 2019, the United States Government recognized Juan Guaidó, the President of Venezuela's National Assembly, as the Interim President of Venezuela, and at the same time derecognized the Maduro regime and designated PDVSA as a "Specially Designated National" ("SDN") with whom no U.S. person may do business absent a license from the U.S. Department of Treasury.  Mr. Gorrín has also been designated an SDN.  The Guaidó Government, in turn, appointed an Ad Hoc Board of Directors of PDVSA to oversee the U.S. operations of PDVSA's U.S.-based subsidiaries, including PDV Holding, PDV USA, and also Citgo Petroleum Corporation ("Citgo")—another subsidiary of PDV Holding.  In August 2019, the Delaware Court of Chancery ruled that under U.S. law, the Guaidó appointments to the PDVSA Ad Hoc Board were presumptively valid.  Therefore, PDV USA no longer provides services for PDVSA.

10. Notwithstanding its failure to perform under the Agreement, Defendant insists that PDV USA owes it the remaining $35 million contemplated by the $50 million Agreement.

11. In addition, Interamerican explicitly committed in Section 10 of the Agreement to indemnify PDV USA from and against any breach of the Agreement perpetrated by Interamerican, including by paying any expenses, court costs, and attorneys' fees associated with enforcing PDV USA's rights under the Agreement.

9.    12. Accordingly, PDV USA brings this action to recover the $15 million (plus interest) it has already paid Defendant, for a declaration that PDV USA does not owe Interamerican the remaining $3530 million contemplated under the Agreement, and to recover any

7

other compensatory damages in an amount to be addressed at trial, as well as all expenses, court costs, and attorneys' fees associated with enforcing its contractual rights.

**10.**    ~~13.~~ In the alternative, to the extent **that Mr. Rivera's statements in 2020 to the press are true, and the money paid to Interamerican was paid** at ~~the direction of PDVSA~~ **for a purpose other than the consulting services that are set forth in** the Agreement**, then is void as a matter of public policy and** no enforceable contract exists ~~and~~**,** Interamerican should be required to disgorge the $15 million it was paid under the doctrine of unjust enrichment and PDV USA should be entitled to a declaration that it does not owe Interamerican any further payments in relation to the Agreement.

## THE PARTIES

**11.**    ~~14.~~ PDV USA is a company incorporated in Delaware with its principal place of business **located at 1293 Eldridge Parkway, Houston, Texas 77077.  PDV USA is a** ~~wholly-owned subsidiary of PDV Holding, which in turn is a wholly-owned subsidiary of PDVSA.~~ **At the time of the Agreement, PDV USA operated out of an office** located at 65 East 55th Street, Floor 21, New York, New York 10022.  PDV USA ~~is a wholly-owned subsidiary of PDV Holding, **Inc.,** which in turn is a wholly-owned subsidiary of PDVSA~~**, which as noted above is the state-owned petroleum corporation of the Bolivarian Republic of Venezuela.had (and has) no independent employees or independent business operations.  It existed solely to provide shareholder support services in the United States to PDVSA.  In fact, at the time, most of the executives of PDV USA held simultaneous positions at PDVSA, and lived and worked at PDVSA in Caracas.   In 2019, following U.S. sanctions against Venezuela and PDVSA, the PDVSA Ad Hoc Board took control of all U.S.-based subsidiaries of PDVSA,**

8

including PDV Holding and PDV USA.   As such, PDV USA no longer provides shareholder services to PDVSA.

**12.**   ~~15.~~ Interamerican is a company incorporated in the State of Florida by former U.S. Congressman David Rivera ("Rivera").   Upon information and belief, Interamerican's principal place of business is~~Mr. Rivera.   It is a one-person consulting firm operated out of Mr.~~ Rivera's home, located at 10925 N.W. 43rd Lane, Miami, Florida~~,~~ 33178.   Interamerican claims to be in the business of providing "strategic consulting services." According to publicly available information, Interamerican has two employees: (1) Rivera, who serves as President and registered agent; and (2) Diana Rivera McKenzie (Rivera's sister), who serves as Vice President.

## JURISDICTION AND VENUE

**13.**   ~~16.~~ This ~~court~~Court has diversity jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1332.   The parties are citizens of different states and the amount in controversy exceeds \$75,000.

**14.**   ~~17.~~ Venue is proper in this Court because, pursuant to the Agreement, the parties agreed to "irrevocably submit to the exclusive jurisdiction of the State of New York" for the purpose of resolving disputes arising out of the Agreement.

**15.**   ~~18.~~ In addition, the parties specified in the Agreement that it "shall be deemed to be made under, and shall be construed in accordance with, the laws of the State of New York (without reference to choice of law doctrine)." (Exhibit 1 at § 16).

## FACTUAL BACKGROUND

The Formation and Terms of the Agreement

9

**16.**   ~~19.~~ On March 21, 2017, PDV USA ~~(at the direction of PDVSA)~~ and Interamerican entered into the Agreement, pursuant to which PDV USA agreed to pay Interamerican **$50 million** in exchange for certain "strategic consulting services." **PDV USA did so at the express written instruction of PDVSA, and played no role in the decision to retain Interamerican or in deciding the key terms of the Agreement.**

**17.**   **The formation of the Agreement was highly irregular for many reasons. According to Mr. Rivera, an executive from Citgo called him and simply offered him a $50 million engagement without any prior discussions. Interamerican never submitted a request for proposal. Mr. Rivera never pitched for the Agreement. No due diligence was conducted on Interamerican before it was hired.**

**18.**   **For that matter, Mr. Rivera was hardly the type of established, go-to consultant who could pull in multi-million dollar contracts with major corporations out of the blue. He was a fairly unknown consultant who had served a single term in Congress from 2010 to 2012. In 2016, the year prior to the Agreement, Interamerican (Mr. Rivera's only source of income) made $9,500. From 2013 (Interamerican's first year in existence) to 2015, it never made more than $100,000 in a single year.**

**19.**   ~~20.~~ The Agreement had a three-month term, beginning on the date of execution, March 21, 2017, and terminating on June 21, 2017. (Exhibit 1 at § 2).

**20.**   ~~21.~~ The services to be provided by Interamerican were set forth in Exhibit A to the Agreement ("Exhibit A"), "which, with any addendums or schedules thereto, [were] integrated into and made a part of" the Agreement. (Exhibit 1 at § 4).

10

*55149655.1*

**21.**     ~~22.~~ Exhibit A, **which was drafted by Mr. Rivera,** provides that, "[i]t shall be the CONSULTANT's duty to provide strategic consulting services to the CLIENT as the CLIENT deems necessary and appropriate." (Exhibit 1 at 6).

**22.**     ~~23.~~ "CONSULTANT" is defined in the Agreement to mean Interamerican. "CLIENT" is not defined, but the parties understood that the services were intended for the benefit of PDVSA, not PDV USA. The defined term for PDV USA, Inc. in the Agreement is "PDV USA" and the rest of the Agreement, including Exhibit B, which sets out the payment terms, refers to "PDV USA" throughout.

**23.**     ~~24.~~ Only Exhibit A, concerning the services to be provided by Interamerican, refers to the "CLIENT." The parties understood that PDVSA was the CLIENT. Indeed, Pio Gonzalez, a PDVSA employee **with a PDVSA email address**, was identified in the Agreement as the "authorized representative" for PDV USA (Exhibit 1 § 14) and the two progress reports that were produced by Interamerican were sent **directly** to him. **The Agreement was signed by Guillermo Blanco, who held the title of president of PDV USA, but functionally served in the Office of the President of PDVSA and had a PDVSA email address. And, the same day the Agreement was executed, Mr. Rivera was directed by Mr. Blanco, and Mr. Rivera agreed, to provide all reports going forward to Mr. Gonzalez.**

**24.**     ~~25.~~ Pursuant to Exhibit A, Interamerican agreed to: (1) "provide CLIENT with strategic consulting and assistance developing strategies to inform policy makers and opinion leaders regarding CLIENT initiatives and achievements;" (2) "develop and work with CLIENT to organize and implement a multi-faceted strategy to reinforce CLIENT's standing among important public officials and opinion leaders;" (3) "support CLIENT in the planning and execution of a strategic plan directed at targeted stakeholders to assist CLIENT with the development and

11

*55149655.1*

implementation of a program to support efforts that will enhance the long-term reputation and standing of CLIENT;" and (4) "identify opportunities to build long-term relationships among key third-parties, opinion leaders and public officials." (Exhibit 1 at 6).

25.     26. Exhibit A enumerated specific "deliverables" that were to be provided by Interamerican.  Specifically, Interamerican was required to provide: (1) "updates regarding the strategic consulting services;" (2) "supporting documentation" for all invoices submitted, as well as "adequate and complete details of the Services rendered;" (3) **written** "bi-weekly report[s]" detailing the activities that it has carried out during that period to achieve the stated goals and purposes of the Agreement;" and (4) "a final report integrating all work product including recommendations for monitoring and following up on the strategies implemented" pursuant to the Agreement. (Exhibit 1 at 6).

26.     27. Exhibit B to the Agreement set out a payment schedule, pursuant to which PDV USA was to pay Interamerican a total of $50 million. (Exhibit 1 at 7).

27.     28. Under the payment schedule, PDV USA was to pay Interamerican an "Initial Payment Installment" of $5 million on March 21, 2017. (Exhibit 1 at 7).

28.     29. The payment schedule further instructed that, starting on April 4, 2017, another $20 million be paid in $5 million "Consecutive Payment Installments" every two weeks and that a "Final Payment Installment" of $25 million be paid before June 15, 2017.

29.     30. However, the Agreement only required PDV USA to pay Interamerican as compensation for the "completion" of the services to PDV USA's "sole satisfaction." (Exhibit 1 at § 3).

*55149655.1*

**30.** **The Agreement provided that Interamerican "may not subcontract any portion of" its services under the Agreement "without the prior written consent of the PDV USA Authorized Representative," Pio Gonzalez.  (Exhibit 1 at § 18).**

31.     **Finally,** Interamerican **represented and** warranted **and covenanted** to PDV USA that "no portion of any payment to [Interamerican] by PDV USA pursuant to this Agreement shall be used as a bribe, kickback, rebate, illegal political contribution, or in violation of applicable foreign exchange control regulations, tax laws or regulations, or other laws or regulations of any jurisdiction."  (Exhibit 1 at § 7).

**32.  Finally, Interamerican represented and warranted to PDV USA in the Agreement that "in connection with performing the Services, [Interamerican] and its Personnel [would] not violate any applicable laws or regulations of any jurisdiction." (Exhibit 1 at § 7)** Interamerican also **promised** **warranted and covenanted** in the Agreement that it "shall comply with all federal, state and local laws, regulations and ordinances."  (Exhibit 1 at § 17).

**Interamerican Failed to Perform Under the Agreement and Breached Numerous Provisions of the Agreement**

**32.**     **33.** Interamerican failed to provide the services and deliverables set out in the Agreement.  **In short, Interamerican provided no services to PDV USA.** **and breached numerous provisions.  Indeed, Mr. Rivera by his own admission never even visited the offices of Citgo or PDV USA and never met in person with anyone from Citgo or PDV USA during the term of the Agreement.**

**33.**     Interamerican did not perform any of the services that it contracted to perform, much less to PDV USA's satisfaction:

13

a. Interamerican did not "provide CLIENT with strategic consulting and assistance developing strategies to inform policy makers and opinion leaders regarding CLIENT initiatives and achievements." (Exhibit 1 at 6)

b. Interamerican did not "develop and work with CLIENT to organize and implement a multi-faceted strategy to reinforce CLIENT's standing among important public officials and opinion leaders." (*Id.*)

c. Interamerican did not "support CLIENT in the planning and execution of a strategic plan directed at targeted stakeholders to assist CLIENT with the development and implementation of a program to support efforts that will enhance the long-term reputation and standing of CLIENT." (*Id.*)

d. Interamerican did not "identify opportunities to build long-term relationships among key third-parties, opinion leaders and public officials." (*Id.*)

34.     Discovery in this action has confirmed that Interamerican performed none of these services.   Mr. Rivera never prepared or provided any written presentations or memoranda (aside from the two deficient and incoherent progress reports discussed *infra*).  Mr. Rivera never prepared a written summary, outline or other report documenting the "strategic plan" he now claims he created.   There are no presentations, talking points, agendas, or calendar invitations documenting any of the meetings that Mr. Rivera claims he attended (either internally within Citgo/PDV USA or externally with public and private stakeholders).  As Mr. Rivera would have it, as part of a $50 million consulting agreement with one of the world's leading petroleum companies, he conveyed virtually all of his reports and services over the phone in a series of ad hoc conference calls for which there were not even calendar invites.

14

55149655.1

35.     Simply put, the written record is bereft of any evidence that Interamerican performed any of the contracted services.  PDV USA does not have any such evidence, nor does Interamerican.  There is not a single email, a single PowerPoint presentation, a single outline, a single memorandum, a single calendar entry, or anything else suggesting that Interamerican ever performed any of the services set forth in Exhibit A to the Agreement.  And, while much of the written record of Mr. Rivera's activities during 2017 appears to have been deleted from Interamerican's files, Interamerican did produce thousands of text and WhatsApp messages (though Mr. Rivera also attempted to purge many of them after this litigation commenced).

36.     Aside from funneling money to third parties, the contemporaneous evidence of Mr. Rivera's activities during the term of the Agreement—namely the WhatsApp messages produced by Interamerican and a handful of emails—shows that his time was spent coordinating with Mr. Gorrín to arrange a meeting for senior officials of the Maduro regime—Nelson Martinez, Venezuela's Energy Minister, and Delcy Rodriguez, Venezuela's Foreign Minister at the time—with executives at PDVSA and Exxon.  He did this with the help of Congressman Pete Sessions.  This meeting had nothing to do with Citgo, and no Citgo executives were even contemplated to be on the invite list according to the documents produced in this case.

37.     In any event, the meeting with Exxon never occurred.  Mr. Rivera understood at the time that his "client"—whether it was PDVSA or its owner, the Republic of Venezuela—were dissatisfied with Interamerican's work in this regard.  In fact, on May 29, 2017, Mr. Rivera drafted an email to be sent to Mr. Gorrín, in which he

admitted that his "client" was "concern[ed]" and "frustrat[ed]" with Mr. Rivera's lack of performance.

38.    34. Interamerican also breached the Agreement in several other ways.  To begin with, Interamerican failed to provide the seven bi-weekly reports "detailing the activities that it ha[d] carried out" during the each applicable two-week period and the final report "integrating all work product including recommendations for monitoring and following-up on the strategies implemented," as required by Exhibit A.  (Exhibit 1 at 6).

39.    35. Instead, Mr. Rivera submitted only two reports in total: (1) one "bi-weekly" report on May 1, 2017, almost a month after the first report was due on April 4, 2017; and (2) a "final" report on December 31, 2017, more than six months after the Agreement's June 21, 2017 termination date.    These reports were not submitted to PDV USA, but to Mr. Pio GonzálezGonzalez, an employee of PDVSA.

40.    36. The reports totaled no more than five pages (collectively), much of which was duplicated, and failed to describe any meaningful work done on behalf of PDV USA or PDVSA (or Citgo) or provide any evidence that work was actually performed.  For example, the reports make numerous references to developing and implementing the "strategic plan," but do not describe what that plan entailed or how it was allegedly implemented.

41.    37. The reports also refer generically to meetings and discussions with "important policy makers and opinion leaders in the United States," "key public officials," "target stakeholders," "public sector stakeholders," and "private sector stakeholders," but fail to describe the purpose of those meetings, who attended, what was discussed, or what makes any of these leaders, officials or stakeholders important to Interamerican's "strategic plan."

16

**42.**     ~~38.~~ Similarly, the purported final report refers to recommendations, but does not explain what those recommendations are.

**43.**     ~~39.~~ While the reports do not show that Interamerican provided the services for which it was engaged, neither do they support Mr. Rivera's ~~2020 claims~~theory as to the purpose of the Agreement.  Nothing in any report claims, or remotely suggests, that the money provided to Interamerican was being used for the purpose of ~~making political contributions to opposition figures or leaders in Venezuela.  Nor is PDV USA aware of any communication to, from, or copying any representative of PDV USA suggesting that the payments to Interamerican were contemplated for such purpose.~~separating Citgo from Venezuela or PDVSA.

**44.**     ~~40.~~ Interamerican also failed to provide "supporting documentation" and "adequate and complete details of the Services rendered" with each invoice submitted to PDV USA, as required by Exhibit A.  (Exhibit 1 at 6).  Indeed, Interamerican provided no supporting documentation or detail whatsoever ~~with~~within the ~~sparse, one-~~page invoices submitted for payment.  ~~The invoices, which range from $5 to $25 million, contain a total of three words describing the purported services: "strategic consulting services."~~

**45.**     ~~41.~~ As a result of these multiple failures and breaches, Interamerican failed to perform any services "to PDV USA's sole satisfaction."  (Exhibit 1 at § 3).  ~~To be clear,~~ PDV USA never expressed satisfaction with the services provided by Interamerican, and is not satisfied with Interamerican's services.

~~42. Simply put,~~ Interamerican did not perform any of the services that it contracted to perform, much less to PDV USA's satisfaction:

> a. Interamerican did not "provide CLIENT with strategic consulting and assistance developing strategies to inform policy makers and opinion leaders regarding CLIENT initiatives and achievements." (Exhibit 1 at 6).
>
> b. Interamerican did not "develop and work with CLIENT to organize and implement a multi-faceted strategy to reinforce CLIENT's standing among important public officials and opinion leaders." (*Id.*)
>
> c. Interamerican did not "support CLIENT in the planning and execution of a strategic plan directed at targeted stakeholders to assist CLIENT with the development and implementation of a program to support efforts that will enhance the long-term reputation and standing of CLIENT." (*Id.*)
>
> d. Interamerican did not "identify opportunities to build long-term relationships among key third-parties, opinion leaders and public officials." (*Id.*)

46.     Although not known to PDV USA until discovery in this action, Interamerican also breached Section 18 of the Agreement, which provides that Interamerican "may not subcontract any portion of the Services without the prior written consent of the PDV USA Authorized Representative." (Exhibit 1 at § 18).

47.     Without prior written consent, Interamerican subcontracted its services, as evidenced by written subcontract agreements signed by Mr. Rivera and the subcontractors, payments made by Interamerican to the subcontractors in accordance with the terms of the signed subcontracts, and contemporaneous communications between Rivera and the subcontractors demonstrating that the subcontractors at least attempted to perform services under the Agreement and/or assist Interamerican in performing its services.

55149655.1

48.     The three subcontractors were Raul Gorrín, Esther Nuhfer, and Hugo Perera.

49.     Raul Gorrín is a Venezuelan billionaire and owner of Globovisión, a major news network in Venezuela. Mr. Gorrín maintained high-level political connections in Venezuela, including with the Maduro regime. Mr. Gorrín was indicted in 2018 in connection with a multi-billion dollar money laundering and bribery scheme and he remains a fugitive of the United States. He is currently an SDN.

50.     Esther Nuhfer claims to be a Florida political consultant. Ms. Nuhfer is a long-time associate of Mr. Rivera's. Ms. Nuhfer is currently under criminal investigation for her involvement as a subcontractor.

51.     Hugo Perera claims to be a Florida businessman. Mr. Perera is currently under criminal investigation for his involvement as a subcontractor. He was previously convicted in the United States for drug trafficking. In response to questions about his receipt of PDV USA's funds from Interamerican (as well as questions about his relationship with Mr. Rivera more generally), Mr. Perera invoked his Fifth Amendment rights and declined to answer.

52.     As detailed below, PDV USA paid Interamerican $15 million under the Agreement between March 24, 2017 and April 19, 2017. Interamerican, in turn, made the following subcontract payments:

> a. $3.5 million to Esther Nuhfer between March 27, 2017 and April 24, 2017.
>
> b. $3.75 million to Raul Gorrín between March 31, 2017 and April 21, 2017.

19

      c. **$3.75 million to Hugo Perera between March 30, 2017 and April 24, 2017.**

53. **These payments were later documented as made pursuant to subcontract agreements with firms owned by or connected to Mr. Gorrín, Ms. Nuhfer, and Mr. Perera.  These firms were:**

      a. **Communication Solutions, Inc., a one-person company owned by Esther Nuhfer.**

      b. **Krome Agronomics LLC ("Krome") and PGA, one-person companies owned by Hugo Perera.**

      c. **IYM, a yacht management company that managed yachts for Mr. Gorrín.  Payments by Interamerican to IYM were intended exclusively for Mr. Gorrín.  The owner of IYM refused to counter-sign the subcontract with Mr. Rivera.**

54. **The subcontracts between Interamerican and Communication Solutions, Inc., PGA, and IYM, each provided that the "subcontractor" would "provide [Interamerican] and [PDV USA] with" consulting services "to best serve [Interamerican's] ability to fulfill its agreement with" PDV USA (referring to the Agreement).  In exchange, the "subcontractor" would "receive from [Interamerican] 25 percent of net fees received from [PDV USA] in fulfillment of [Interamerican's] agreement with [PDV USA]."  Interamerican signed a "marketing" agreement with Krome that contained similar terms.**

55. **Mr. Rivera contemporaneously described Krome, PGA, Communication Solutions, Inc., and IYM as "sub-contractor[s]."  He also described these**

payments as "subcontractor invoice payments" to his accountant in connection with preparing Interamerican's 2017 tax return.

56.     The evidence shows that at least some of these subcontractors, namely, Raul Gorrín, did in fact provide or attempt to provide services to Interamerican and/or PDVSA in connection with the Agreement.  For example, Mr. Rivera exchanged dozens of text messages with Raul Gorrín about attempting to arrange a meeting between representatives of Exxon and PDVSA, which Mr. Rivera asserts represented the majority of the work he performed under the Agreement.

57.     PDV USA never knew about these subcontracts until discovery in this action because Interamerican never disclosed them to PDV USA.  PDV USA never provided "prior written consent" (or consent of any kind) and therefore Interamerican breached Section 18 of the Agreement when it entered into these subcontracts.

58.     ~~43. Finally, to the extent that Mr. Rivera's press statements are true or that the money Interamerican received under the Agreement was used for other purposes, then~~ Interamerican also ~~violated its representations and warranties under~~breached its warranty and covenant in Section 7 ~~of the Agreement~~ that "no portion of any payment to ~~CONSULTANT~~[Interamerican] by PDV USA pursuant to this Agreement shall be used as a bribe, kickback, rebate, ~~. . .~~ illegal political contribution, or in violation of ~~applicable foreign exchange control regulations, tax laws or regulations, or~~. . . other laws or regulations of any jurisdiction.~~"~~" as well as the warranty and covenant in Section 17 that Interamerican "shall comply with all federal, state and local laws, regulations and ordinances."  Mr. Rivera used PDV USA's funds to commit a series of unlawful acts:

a) **Mr. Rivera used at least part of PDV USA's funds to compensate Raul Gorrín for purported legal services. (Mr. Rivera claims that Mr. Gorrín acted as his lawyer in connection with the Agreement.) Because Mr. Rivera's payment to Mr. Gorrín was provided in exchange for legal services rendered by Mr. Gorrín while Mr. Gorrín was an SDN—including services rendered to Mr. Rivera in person in Venezuela in 2020—Mr. Rivera conducted business with an SDN in direct violation of U.S. sanctions law. *See generally* "Notice of OFAC Sanctions Actions," 84 Fed. Reg. 2946 (Feb. 8, 2019); Exec. Order No. 13,850, 83 Fed. Reg. 55,2435 (Nov. 1, 2018).**

b) **Mr. Rivera back-dated agreements for purposes of deceiving Hugo Perera's bank, thereby defrauding a financial institution or conspiring to defraud a financial institution under 18 U.S.C. § 1344 (bank fraud).**

c) **Interamerican used at least part of the funds paid under the Agreement—its sole source of income in 2017—to defraud the Internal Revenue Service, deducting "expenses" that were in reality transfers from one account owned by Mr. Rivera to another account also owned by Mr. Rivera. Mr. Rivera's accountant testified that, after he was interviewed by criminal investigators from the IRS, he believed Mr. Rivera had committed tax fraud.**

d) **In connection with their attempt to arrange a meeting between Exxon and PDVSA officials, brokered by Congressman Pete Sessions, Mr. Rivera and Mr. Gorrín texted one another (translated to English): "the concert ticket is $15, not 20, as we said last night," a clear reference to a bribe. At deposition, Mr. Rivera was unable to explain what this text message meant, and testified that he did not remember attending any concerts at that time.**

e) **When asked why Interamerican paid him millions of dollars, Mr. Perera, another subcontractor, invoked his Fifth Amendment rights and declined to answer. Counsel for Ms. Nuhfer has indicated that she intends to do the same if deposed.**

59.    **In sum, Interamerican breached the Agreement by (1) failing to provide the strategic consulting services set forth in the Agreement, (2) failing to provide seven bi-weekly reports or a final report per the terms of the Agreement, (3) failing to supply adequate supporting details on invoices, (4) subcontracting its services without prior written consent of PDV USA's authorized representative, and (5) violating its warranties and covenants not to use the money received for illegal purposes or to otherwise violate the law.**

**PDV USA Paid Interamerican for Services that Were Never Performed**

**60.** ~~44.~~ Notwithstanding Interamerican's failure to provide the contracted-for services, PDV USA initially began making payments to Interamerican. **PDV USA had no visibility into what, if any, services Interamerican was providing to PDVSA. PDV USA made the payments to Interamerican because it was instructed to do so by PDVSA.**

**61.** ~~45.~~ Specifically, PDV USA paid Interamerican the "Initial Payment Installment" of $5 million on March 24, 2017.

**62.** ~~46.~~ PDV USA also began to pay Interamerican the "Consecutive Payment Installments" of $5 million on each of April 10, 2017 and April 19, 2017.

**63.** ~~47.~~ Together with the initial installment payment made on March 24, 2017, PDV USA paid Interamerican a total of $15 million by April 19, 2017. These payments all predated the receipt of any interim reports from Interamerican, the first one of which was not received until May 1, 2017. PDV USA made no further payments following receipt of these interim reports. PDV USA was not **at the time** and is not satisfied with any services purported to be rendered ~~to PDV USA~~ under the Agreement—which were **virtually** nonexistent.

**64.** ~~48.~~ In addition, PDV USA refused to pay the final three Interamerican invoices that **Mr.** Rivera submitted, which totaled $35 million.

**65.** **As Mr. Rivera's bank records produced in this action have shown, PDVSA subsequently paid Interamerican another $5 million in October 2017.**

**Notwithstanding ~~Its~~its Breach ~~Of The~~of the Agreement, Interamerican Insists ~~That~~that PDV USA Owes ~~The~~the Balance Under ~~The~~the Agreement**

**66.** ~~49.~~ Even though Interamerican did not provide services as required under the Agreement, Interamerican repeatedly requested payment for the outstanding invoices at various

24

times ~~throughthroughout 2018 and~~ 2019, including on September 11, 2018, December 18, 2018, and February 4, 2019.

~~50.   Interamerican continues to assert that PDV USA is liable to Interamerican for the $35 million balance under the Agreement.  Indeed, Defendant has represented to this Court that their "position as to the performance and obligations under the contract" is that those obligations "remained with and do remain with PDV USA, the party to the contract."  (Tr. 12:11-14, Oct. 8, 2020).  And Defendant asserts that PDV USA was obliged, and is still obliged, "to pay that $50 million." (*Id*. at 15:23-24).~~

67.   Interamerican brought a counterclaim in this action, claiming that it fully performed under the Agreement and is owed the unpaid $30 million.

**PDV USA ~~Has Not Assigned The~~Sought to Assign the Agreement Because of Compliance and Risk Management Concerns But the Assignment Was Never Consummated Because Interamerican Refused ~~To~~to Consent ~~To The~~to the Assignment**

68.   Beginning on or around May 2017, employees within Citgo (who were in charge of managing PDV USA) began pushing to have the Agreement assigned to PDVSA.   These employees, including Arnaldo Arcay, Gina Coon, and John Butts, felt highly uncomfortable with maintaining the Agreement—forced on PDV USA by PDVSA—on PDV USA's books.   They had also identified a number of red flags, including the large sum of payments made to a one-person consulting firm over a short period of time with no documented services, and the numerous press articles about Mr. Rivera's campaign finance violations and reports describing him as one of the most corrupt Congressmen.   In short, PDV USA did not like this highly questionable arrangement, and was not receiving any services, much less services to its satisfaction.

69.     Consequently, in May 2017, Citgo's Compliance Committee was informed about the Agreement, and Citgo's Controller (a member of the Compliance Committee) ordered that payments to Interamerican cease.  Around the same time, senior management at Citgo, PDV USA, and PDVSA also determined that the Agreement should be assigned to PDVSA.  On May 30, 2017, Mr. Rivera was informed that all further invoices should be directed to PDVSA, and he complied.

70.     51. On October 5May 31, 2017, in light of the fact that Defendant had not performed, and did not contemplate performing, any services on behalf of PDV USA, PDV USA and PDVSA jointly sought Defendant's consent to assign the Agreement from PDV USA to PDVSA.  To that end, PDV USA and PDVSA later both signed an "Assignment and Assumption Consent Agreement To 'Consulting Agreement, Dated March 21, 2017'" (the "Assignment and Assumption Consent Agreement").  Interamerican was identified as a third party to the Assignment and Assumption Consent Agreement for purposes of granting consent to its terms, which the parties agreed was to constitute a novation or release for PDV USA, and a signature block was provided for Interamerican's consent.  But Interamerican refused to consent to the Assignment and Assumption Consent Agreement and never signed it.  Accordingly, the Assignment and Assumption Consent Agreement was never fully executed.  A true and correct copy of the Assignment and Assumption Consent Agreement is annexed hereto as Exhibit 2.

71.     52. Interamerican's written consent was an essential condition of the formation of the Assignment and Assumption Consent Agreement.  Indeed, in the recitals of the Assignment and Assumption Consent Agreement, the parties stated as one of the underlying bases for their agreement that "Consultant has agreed to consent to the terms and conditions of this Assignment and Assumption Agreement, and therefore, fully release Assignor for all past, present,

26

*55149655.1*

and future obligations under the Agreement." (Exhibit 2 at 1). This made clear that the assignment would only become effective if Interamerican consented to its terms.

**72.**   53. Plaintiff did not, and would not have agreed to, assign its rights under the Agreement unless it received Interamerican's consent and a release from its obligations. Thus, in paragraph 1 of the Assignment and Assumption Consent Agreement, PDV USA stated that the "Assignment and Assumption shall be construed as a novation or a release of Assignor under the Agreement." *Id.* For that reason, Interamerican was required to execute the Assignment and Assumption Consent Agreement and a signature block was included on page 2 for its signature.

**73.**   54. Because Interamerican never executed the Assignment and Assumption Consent Agreement, the agreement was never formed and the assignment and assumption reflected therein was never effective. The right to enforce the Agreement therefore belongs to PDV USA notwithstanding the Assignment and Assumption Consent Agreement.

**74.**   55. Until this lawsuit was filed, Defendant's position has also been that no assignment was ever effected and it has continued to demand payment from Plaintiff. A February 4, 2019 email from Mr. Rivera makes this clear:

> As you know, Interamerican Consulting never agreed to or consented to any assignment of the contract from PDV USA to PDVSA. In fact, any suggestion of a reassignment of the contract was specifically rejected on two occasions. Our legal counsel has now reviewed this matter in depth, including the documented role of Citgo attorneys and corporate officers, and has concluded indisputably and categorically that any assignment by PDV USA to PDVSA was a unilateral decision arranged between PDV USA and PDVSA and, under State of New York contract law governing the consulting agreement, in no way absolves PDV USA of its contractual obligations to Interamerican Consulting.

**75.**   56. In any event, for the avoidance of doubt, to the extent any rights, obligations or liabilities under the Agreement were transferred from PDV USA to PDVSA pursuant to the Assignment and Assumption Consent Agreement—which they were not— PDVSA has agreed to rescind such transfer and, if necessary, transfer such rights, obligations or liabilities

*55149655.1*

back to PDV USA.  Accordingly, on October 30, 2020, PDV USA and PDVSA entered into a

Rescission of Assignment and Assumption Consent Agreement To "Consulting Agreement, Dated

March 21, 2017," in which, "to the extent any rights, obligations or liabilities under the Consulting

Agreement were previously transferred from PDV USA to PDVSA pursuant to the Assignment

and Assumption Consent Agreement, PDVSA hereby transfers and assigns to PDV USA any such

rights, obligations and liabilities to PDV USA, and PDV USA hereby accepts this transfer and

assignment."  A true and correct copy of the Rescission Agreement is annexed hereto as Exhibit 3.

~~After This Lawsuit Was Filed, Interamerican Has Admitted That It Never Intended To~~
~~Perform Services Under The Agreement And Claims The Agreement Is A Sham~~
**In the Alternative, the Agreement Is Void as a Matter of Public Policy and Interamerican**
**Was Unjustly Enriched**

**76.**      **In the alternative, the Agreement was, unbeknownst to PDV USA, a**

**cover for illegal transactions by and among Mr. Rivera and his associates, and is**

**therefore void as a matter of public policy.**

~~57. After this lawsuit was filed, Interamerican's President made several~~

~~statements to the press about this lawsuit and the parties' Agreement.~~

~~58. In response to press inquiries, Mr. Rivera replied, "ask the boys of~~

~~Citgo 6," a reference to Citgo Petroleum Corporation executives detained by the Maduro~~

~~regime.   "They handled that entire operation, including all the money, in coordination~~

~~with the Venezuelan opposition . . . That's all I know." (*PDVSA denounces former U.S.*~~

~~*congressman for Payment of $US15M*, CE NOTIFICIAS FINANCIERAS ENGLISH, May 13,~~

~~2020).~~

28

77. ~~59.~~ Mr. Rivera ~~also told the Miami Herald: "All those funds went to the opposition for anti-Maduro protests in the summer of 2017. I never saw a penny of it." (Jay Weaver and Antonio Maria Delgado, *Rivera didn't register as a foreign agent in $50 million contract with Venezuela oil firm*, MIAMI HERALD, May 14, 2020).~~now claims (publicly and in this litigation) that the true purpose of the Agreement was to help Citgo "disengage" from its ultimate parent PDVSA as part of what Mr. Rivera claims was a rogue operation by Citgo executives in defiance of the Maduro regime.

78. This is false.  PDV USA could locate no evidence supporting this claim, and Interamerican has not provided any, other than the verifiably false testimony of Mr. Rivera.  It defies credulity to assert that PDVSA, which at the time was controlled entirely by the Maduro Regime, directed its U.S. subsidiary to hire Interamerican so that Interamerican could advise Citgo, PDVSA's primary U.S. operating entity, on how to disengage from PDVSA and the Maduro regime.  This claim is even more incredible in light of the fact that (a) PDVSA provided the $50 million earmarked for Interamerican, (b) PDV USA's authorized representative under the Agreement, as well as the signatory on behalf of PDV USA, were both PDVSA employees with PDVSA email addresses, (c) PDV USA's sole corporate purpose was to provide shareholder services to PDVSA, and (d) the intended participants at the Exxon meeting were PDVSA employees and members of the Venezuelan government and the meeting was going to have nothing to do with Citgo.

79. Mr. Rivera never provided *any* services to Citgo and, it appears, never intended to do so.  Instead, the true purpose of the Agreement was to cover up illicit transactions involving Mr. Rivera and his associates.  Mr. Rivera systematically funneled payments totaling approximately 75% of the payments he received from PDV

USA to associates who have nothing to do with Citgo, including the now-SDN Raul Gorrín (who also has ties to the Maduro regime), and the convicted drug trafficker Hugo Perera. The ultimate purpose of these payments remains unknown, but at least some of the funds were used in connection with numerous crimes, as detailed *supra*. Mr. Rivera plainly has no compunction about creating backdated, phony contracts, which is what he admits he did here in an effort to paper over the third-party payments and make them look like they were in service of the Agreement.

80. Accordingly, the Agreement was an instrumentality of illegality and is therefore void, invalid, or unenforceable.

81. Without knowledge of Mr. Rivera's money-funneling scheme and illegal conduct, PDV USA paid Interamerican $15 million and Interamerican was therefore unjustly enriched.

~~60. On information and belief, these statements are false. PDV USA could locate no evidence supporting these claims. The transfer of funds from PDV USA went directly to a bank account controlled by Interamerican. It defies credulity to assert that PDVSA, which at the time was controlled by the Maduro Regime, directed its U.S. subsidiaries to hire Interamerican to funnel millions of dollars to the political adversaries of the Regime.~~

~~61. To the extent that Interamerican did use the funds it received from PDV USA under the Agreement for the purpose of financing the political opposition of the Maduro Regime, that would prove that Interamerican did not and never intended to perform the strategic consulting services contemplated by the Agreement. It would further prove that the two progress reports submitted by Rivera to PDV USA contained~~

30

numerous false, material statements regarding purported services that Rivera claimed Interamerican had performed. For example, if Rivera's 2020 claims are true, then each of the following statements contained in the progress reports were knowingly and intentionally false when made to PDV USA to support Interamerican's claims for payment:

> a. April 18: "The Consultant organized meetings for the Client with important policy makers and opinion leaders in the United States as part of the strategy to build long-term relationships among key public sector stakeholders in the United States. These meetings allowed the Client to provide the Client's viewpoints and perspectives on current events in Venezuela and their interpretation in the United States, focusing on Client initiatives and achievements."

> b. May 16: "The Consultant has had multiple discussions with important interlocutors associated with the target private sector organizations and has advised these interlocutors as to the Client's desire and willingness to pursue reconciliation and resolution of outstanding issues."

> c. June 13: "The Consultant has held meetings and discussions with key public officials to express details as to the willingness of the Client to make good faith efforts and concessions in pursuit of

*55149655.1*

~~facilitating a positive relationship with interested parties in the United States."~~

~~62. To the extent that the position of Interamerican is that the Agreement was a sham from the outset, however, then Interamerican received payments to which it was not lawfully entitled and it would be unjustly enriched if it were permitted to profit from them.~~

**Interamerican Agreed to Indemnify PDV USA for its Breach of the Agreement**

**82.** ~~63.~~ Under the Agreement, Interamerican agreed to "indemnify . . . PDV USA . . . from and against any and all breaches of this Agreement by [Interamerican]," including "all such expenses, court costs, and attorneys' fees in the enforcement of PDV USA's rights" under the Agreement. (Exhibit 1 § 10).

## COUNT ONE: BREACH OF CONTRACT

**83.** ~~64.~~ PDV USA repeats and restates the allegations in all of the preceding paragraphs as though fully set forth herein.

**84.** ~~65.~~ Defendant Interamerican entered into the Agreement, pursuant to which Interamerican agreed to perform certain services identified above.

**85.** ~~66.~~ Defendant failed to perform those services and therefore breached its agreement with Plaintiff.

**86.** **Defendant entered into subcontracts without PDV USA's prior written consent, and therefore breached the Agreement.**

**87.** **Defendant falsely represented and warranted that it would not use the funds from PDV USA for illegal purposes or otherwise violate the law, and violated its covenants regarding the same.**

32

**88.** ~~67.~~ As a direct and proximate result of Defendant's ~~breach~~**breaches**, Plaintiff has incurred substantial damages.

**89.** ~~68.~~ Plaintiff is entitled to recover the \$15 million (plus interest) that it paid to Defendant and to be released from any further payment under the Agreement.

## COUNT TWO: INDEMNITY

**90.** ~~69.~~ PDV USA repeats and restates the allegations in all of the preceding paragraphs as though fully set forth herein.

**91.** ~~70.~~ Defendant Interamerican agreed to indemnify PDV USA for any damages resulting from its breach of the Agreement, including expenses, court costs, and attorneys' fees.

**92.** ~~71.~~ Defendant breached the Agreement.

**93.** ~~72.~~ Plaintiff is entitled to recover all damages resulting from Defendant's breach of the Agreement, including expenses, ~~courts~~**court** costs, and attorneys' fees.

## COUNT THREE: UNJUST ENRICHMENT

**94.** ~~73.~~ PDV USA repeats and restates the allegations in all of the preceding paragraphs as though fully set forth herein.

**95.** <u>To the extent the Agreement was intended and used as a cover for illegal transactions, it is a sham and no enforceable contract was formed between PDV USA and Interamerican.</u>

~~74. Mr. Rivera has stated publicly that the Agreement was a sham.~~

~~75. Although PDV USA disputes the accuracy of Mr. Rivera's claim regarding the purpose of the Agreement, to the extent that discovery shows that the~~

Agreement was a sham for the reasons he provided or for other reasons, then no enforceable contract was formed between PDV USA and Interamerican.

**96.**      ~~76.~~ Plaintiff paid Defendant Interamerican \$15 million.

**97.**      **Plaintiff had no knowledge of Interamerican's illicit conduct.**

**98.**      ~~77.~~ There is no justification for Interamerican to retain these payments, and its doing so is unjust and inequitable.

**99.**      ~~78.~~ Defendant Interamerican therefore has been unjustly enriched to the extent it obtained any payments from Plaintiff. **Equity and good conscience require restitution.** All such amounts should be returned to Plaintiff, with interest.

34

## COUNT FOUR:  DECLARATORY JUDGMENT

**100.**   ~~79.~~ PDV USA repeats and restates the allegations in all of the preceding paragraphs as though fully set forth herein.

**101.**   ~~80.~~ As alleged herein, an actual and ripe controversy exists between the parties in that Defendant has asserted, and will continue to assert, that Plaintiff breached the Agreement when it refused to pay the remaining $~~35~~**30** million contemplated by the Agreement and that Plaintiff therefore owes Defendant $~~35~~**30** million.

**102.**   ~~81.~~ Plaintiff's position is that no such money is owed in light of Defendant's ~~breach~~**breaches** of the Agreement.

**103.**   ~~82.~~ Accordingly, Plaintiff and Defendant have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment on the disputed matters raised herein.

**104.**   ~~83.~~ Plaintiff is therefore entitled to a declaration pursuant to 28 U.S.C. § 2201, C.P.L.R. § 3001, and Rule 57 of the Federal Rules of Civil Procedure that PDV USA does not owe Interamerican any money under the Agreement because Interamerican breached the Agreement.

**105.**   ~~84.~~ Alternatively, to the extent that discovery shows that the Agreement was **illegal and/or** a sham, Plaintiff is entitled to a declaration pursuant to 28 U.S.C. §2201, C.P.L.R. § 3001, and Rule 57 that PDV USA owes Interamerican no money under the Agreement because no enforceable contract was formed between PDV USA and Interamerican.

## PRAYER FOR RELIEF

WHEREFORE, PDV USA requests that the Court:

        a.      Adjudge and decree that Defendant is liable for breach of contract and unjust enrichment, as alleged herein;

        b.      Declare that PDV USA does not owe Defendant any money under the Agreement;

        c.      Enter a judgment against Defendant that awards PDV USA \$15 million (plus interest), relieves Plaintiff from any further payments under the Agreement, awards any further compensatory damages (plus interest) at an amount to be determined at trial; and awards expenses, costs, and attorneys' fees; and

        d.      Grant such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff PDV USA hereby demands a trial by jury on all issues raised in the Complaint herein.

*55149655.1*

Dated: New York, New York
~~October 30~~August ___, ~~2020~~2022


~~WILLKIEFARR~~WILLKIE FARR &
GALLAGHER LLP

By: /s/ Jeffrey B. Korn

Jeffrey B. Korn
**Brady M. Sullivan**
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
JKorn@willkie.com
**BSullivan@willkie.com**

Michael J. Gottlieb
~~Sarah Wastler~~
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
MGottlieb@willkie.com
~~SWastler@willkie.com~~

*Attorneys for Plaintiff PDV USA, Inc.*

37

| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 8/12/2022 6:39:48 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://NYCDMS/NewYork/55149655/1 | |
| **Modified DMS:** iw://NYCDMS/NewYork/55149655/9 | |
| **Changes:** | |
| Add | 265 |
| Delete | 182 |
| Move From | 16 |
| Move To | 16 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 1 |
| **Total Changes:** | 480 |