EXHIBIT A

FILED by MM D.C.

Nov 16, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
# 22-20552-CR-GAYLES/TORRES

CASE NO. _____

18 U.S.C. § 371
22 U.S.C. §§ 612(a) & 618(a)(1)
18 U.S.C. § 1956(h)
18 U.S.C. § 1957
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)

## UNITED STATES OF AMERICA

vs.

## DAVID RIVERA and
## ESTHER NUHFER,

Defendants.

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At various times relevant to this Indictment:

### Defendants and Related Individuals and Entities

1.     Interamerican Consulting, Inc. ("Interamerican Consulting") was a Florida corporation with its principal place of business in Miami, Florida.

2.     Defendant **DAVID RIVERA**, a former member of the U.S. House of Representatives and the Florida state legislature, was the president and registered agent of Interamerican Consulting.

3.     Florida First was a political action committee established by **DAVID RIVERA** in 2016.  **RIVERA** was the treasurer of Florida First and he had sole signatory authority over Florida First's bank account.

4.     **DAVID RIVERA**, starting in or around March 2017, was a candidate for State Representative in the November 2018 Florida election cycle.  **RIVERA** was the treasurer for his campaign and he had sole signatory authority over his campaign's bank account.

5.     Communication Solutions, Inc. ("Communication Solutions") was a Florida corporation with its principal place of business in Miami, Florida.

6.     Defendant **ESTHER NUHFER**, a resident of Miami-Dade County, Florida, was the president and registered agent of Communication Solutions.  **NUHFER** was a professional lobbyist and public relations and advertising consultant.

7.     Company 1 was a Florida corporation with its principal place of business in Coral Gables, Florida.

8.     Company 2 was a Florida corporation with its principal place of business in Coral Gables, Florida.

9.     Individual 1, a resident of Miami-Dade County, Florida, was the president and registered agent of Company 1 and the president of Company 2.

10.     Individual 2 was an Orlando-based business and government relations consultant.

11.     U.S. Oil Company 1 was a multinational oil and gas corporation headquartered in the United States.

12.     U.S. Senator 1 was a United States Senator from Florida.

13.     U.S. Congressman 1 was a United States Congressman from Texas.

2

14. White House Advisor 1 was a senior advisor to the President of the United States.

### Foreign Individuals and Entities

15. Petróleos de Venezuela, S.A. ("PDVSA") was the state-owned and state-controlled oil company of Venezuela. PDVSA and its subsidiaries and affiliates were responsible for the exploration, production, refining, transportation, and trade in energy resources in Venezuela and elsewhere.

16. CITGO Petroleum Corporation ("CITGO") was a wholly owned subsidiary of PDVSA. CITGO was PDVSA's primary operating subsidiary in the United States with its headquarters in Houston, Texas.

17. PDV USA Inc. ("PDV USA") was a wholly owned subsidiary of PDVSA. PDV USA was a non-operating subsidiary of PDVSA with an office in New York, New York.

18. Nicolas Maduro Moros ("President Maduro") was a Venezuelan national and the President of Venezuela.

19. Delcy Eloina Rodriguez Gomez ("Delcy Rodriguez") was a Venezuelan national, a high-ranking PDVSA executive, and the Minister of Foreign Affairs of Venezuela.

20. Foreign Individual 1 was a Venezuelan national and a prominent businessperson in Venezuela.

21. Company 3 was a Florida corporation with its principal place of business in Miami, Florida. Company 3 provided management services to the owners of high-end luxury yachts, including Foreign Individual 1.

22. Foreign Individual 2 was a Venezuelan national and an attorney for PDVSA and CITGO.

23. Venezuelan Politician 1 was a member of the Venezuelan National Assembly.

24. Venezuelan Politician 2 was a member of the Venezuelan National Assembly.

**The Foreign Agents Registration Act**

25. The Foreign Agents Registration Act ("FARA") was a disclosure statute that required any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General in connection with certain types of activities, such as political activities or public relations efforts or lobbying on behalf of the foreign principal. Such registrations were made with the National Security Division's Foreign Agents Registration Act Unit within the U.S. Department of Justice. It was a crime under FARA to willfully fail to register when acting as the agent of a foreign principal.

26. A purpose of FARA was to prevent covert influence by foreign principals. Proper registration under the statute allowed the United States government and the American people to evaluate the statements and activities of individuals who were serving as agents of foreign principals in light of their status as foreign agents. Among other things, a FARA registration required the registrant to reveal the identity of the foreign principal on whose behalf the registrant was performing services, the type of services the registrant was providing to the foreign principal, and the source and amount of compensation the registrant was receiving from the foreign principal. In addition to other requirements, FARA required any registrant to disclose the fact of his or her registration to any U.S. government official before conveying any political propaganda to or requesting any information from the official.

4

# COUNT 1
## Conspiracy to Commit Offense Against the United States
### (18 U.S.C. § 371)

1.　　Paragraphs 1 through 26 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.　　From in or around February 2017, and continuing through in or around December 2018, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**DAVID RIVERA**
**and**
**ESTHER NUHFER,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other to commit an offense against the United States, that is, to willfully act and cause others to act in the United States as an agent of a foreign principal, to wit, the Government of Venezuela, without registering with the Attorney General as required by law, in violation of Title 22, United States Code, Sections 612(a) and 618(a)(1).

## PURPOSE OF THE CONSPIRACY

3.　　It was the purpose of the conspiracy for the defendants to unlawfully enrich themselves by engaging in political activities in the United States on behalf of the Government of Venezuela, and by representing the interests of the Government of Venezuela before officials of the United States government, in an effort to influence United States foreign policy toward Venezuela, and to conceal these efforts by failing to register under FARA as agents of the Government of Venezuela and by creating the false appearance that they were providing consulting services to PDV USA.

5

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

4.      In or around early 2017, Individual 1 introduced **DAVID RIVERA** and **ESTHER NUHFER** to Foreign Individual 1.  In or around February 2017, Foreign Individual 1 sought the assistance of **RIVERA** and **NUHFER** to lobby certain United States politicians on behalf of the Government of Venezuela.  The ultimate goal of these efforts was to garner political support in the United States for a normalization of relations between the United States and Venezuela, to include resolving a legal dispute between U.S. Oil Company 1 and Venezuela and preventing the United States from imposing additional economic sanctions against President Maduro and other members of his regime.

5.      To compensate **DAVID RIVERA, ESTHER NUHFER**, Foreign Individual 1, and Individual 1 for their efforts on behalf of the Government of Venezuela, Delcy Rodriguez ordered CITGO executives to enter into a consulting contract with **RIVERA's** company, Interamerican Consulting.  The CITGO executives provided **RIVERA** with a draft contract between Interamerican Consulting and PDV USA, which was an entity used by CITGO to facilitate special projects that were ordered by executives from CITGO's parent company, PDVSA.  The draft contract provided to **RIVERA** did not specify the identity of Interamerican Consulting's client and it left blank the description of the consulting services to be provided by Interamerican Consulting.

6.      In the course of finalizing the contract, **DAVID RIVERA** and **ESTHER NUHFER** reviewed, at least in part, a number of FARA registration filings that were available

6

for public viewing on the Department of Justice's ("DOJ") FARA website. These FARA filings had previously been submitted to DOJ by several corporate entities that had registered with the Attorney General as agents of several foreign governments. **RIVERA** and **NUHFER** relied on the content in these FARA filings to draft the description of services Interamerican Consulting was to provide to its unidentified client pursuant to the PDV USA consulting contract. Ultimately, the description of services drafted by **RIVERA** and **NUHFER** based on these FARA filings was incorporated into the final PDV USA consulting contract in the "Scope of Services" section of the agreement.

7.     The final contract signed by **DAVID RIVERA** provided for five installment payments of $5,000,000 each and a final payment of $25,000,000, for a total of $50,000,000, over the course of three months. To bill PDV USA for these payments, **RIVERA** and **ESTHER NUHFER** prepared invoices on Interamerican Consulting letterhead for payment from PDV USA, which **RIVERA** sent to PDVSA executives in Caracas, Venezuela, using their official PDVSA email addresses.

8.     After the contract was signed, **DAVID RIVERA**, **ESTHER NUHFER**, Foreign Individual 1, and others arranged for U.S. Congressman 1 to travel to New York City in early April 2017 for separate meetings with Delcy Rodriguez and Venezuelan Politician 1 to discuss a process for normalizing relations between the United States and Venezuela that would have the support of both the Maduro regime and members of Venezuelan opposition parties.

9.     Following these meetings in New York City, **DAVID RIVERA**, **ESTHER NUHFER**, Foreign Individual 1, and others attempted to arrange a meeting between Delcy Rodriguez or other members of the Venezuelan government and executives of U.S. Oil Company

1, as requested and directed by the Government of Venezuela. U.S. Congressman 1 assisted **RIVERA, NUHFER**, Foreign Individual 1, and others in this effort. The purpose of this meeting that the Government of Venezuela was seeking was to resolve a longstanding legal dispute concerning the Venezuelan government's previous expropriation of U.S. Oil Company 1's assets in Venezuela and to offer U.S. Oil Company 1 new business opportunities in Venezuela. **RIVERA's** and **NUHFER's** efforts were not successful, however, and by early June 2017, U.S. Oil Company 1 declined the Government of Venezuela's request for a meeting.

10.     Between late March 2017 and mid-April 2017, Interamerican Consulting received three of the installment payments, totaling $15,000,000, under the PDV USA consulting contract through bank accounts controlled by CITGO and PDV USA. **DAVID RIVERA** divided these funds in approximately equal amounts with **ESTHER NUHFER**, Foreign Individual 1, and Individual 1, with a smaller amount paid to Individual 2 for her assistance in acting as a liaison with U.S. Congressman 1. Over time, **RIVERA, NUHFER**, Foreign Individual 1, and Individual 1 used their portions of these funds to pay for various personal and business expenses, such as the purchase of real estate, payment of expenses for luxury yachts, and, in **RIVERA's** case, contributions to his campaign account for state office.

11.     During the course of these events, **DAVID RIVERA, ESTHER NUHFER,** Foreign Individual 1, and Individual 1 used email and encrypted text messaging services to communicate with one another regarding their efforts on behalf of the Government of Venezuela. In so doing, they frequently attempted to hide the subject matter of their discussions by using code words to refer to certain individuals and other items. For example, **RIVERA, NUHFER,** Foreign Individual 1, and Individual 1 referred to President Maduro as "El Guaguero" (the "Bus

8

Driver"), U.S. Congressman 1 as "Sombrero" (the "hat"), money as "La Luz" ("The Light") and millions of dollars as "melones" ("melons").

12.    Beginning in or around June 2017, **DAVID RIVERA, ESTHER NUHFER,** Foreign Individual 1, and Individual 1 refocused their attention on lobbying and attempting to lobby U.S. government officials – including U.S. Senator 1 and White House Advisor 1 – in an effort to further the Maduro regime's goal of normalizing relations between the United States and Venezuela. Although **RIVERA** and **NUHFER** were not able to meet with White House Advisor 1, **RIVERA** and **NUHFER** did arrange two meetings with U.S. Senator 1. The first of these meetings involved **RIVERA** and U.S. Senator 1 at a private residence in Washington, D.C., during which **RIVERA** told U.S. Senator 1 that Foreign Individual 1 had persuaded President Maduro to accept a deal whereby he would hold free and fair elections in Venezuela. The second meeting was held at a hotel in Washington, D.C. and involved **RIVERA, NUHFER,** U.S. Senator 1, Foreign Individual 1, Venezuelan Politician 2 (by telephone), and others, during which matters relating to Venezuela were discussed. By mid-July 2017, however, Foreign Individual 1 informed **RIVERA, NUHFER,** and Individual 1 that President Maduro had refused to agree to hold free and fair elections in Venezuela in exchange for reconciliation with the United States.

13.    Following the imposition of additional sanctions against a number of Venezuelan individuals – including President Maduro and his wife's nephew ("Family Member 1"), a former Venezuelan National Treasurer and PDVSA executive – in late July and early August 2017, Foreign Individual 1 informed **DAVID RIVERA, ESTHER NUHFER,** and Individual 1 that President Maduro and members of his regime once again wanted to negotiate with the United

States to normalize relations and to obtain relief from the sanctions that had been imposed against them.  Accordingly, by September 2017, **RIVERA** and **NUHFER** resumed submitting invoices to PDVSA officials for payment pursuant to the Interamerican Consulting contract with PDV USA.  Shortly thereafter, **RIVERA** and **NUHFER** sought to identify legal counsel in the United States for Family Member 1.  As compensation for these efforts, in late October 2017, Interamerican Consulting received a transfer in the amount of $5,000,000 from a PDVSA account at Gazprom Bank in Russia.  **RIVERA** subsequently divided this money over time between himself, **NUHFER** and Individual 1.

14.     In March and April 2018, **DAVID RIVERA**, **ESTHER NUHFER**, Foreign Individual 1, and others helped arrange for U.S. Congressman 1 to travel to Caracas, Venezuela, to meet with President Maduro and other members of his regime.  As a result, on or about April 2, 2018, U.S. Congressman 1 met with President Maduro, **RIVERA**, Foreign Individual 1, and others to discuss a potential process for the normalization of the relationship between the United States and Venezuela.  As part of these efforts, U.S. Congressman 1 agreed to deliver a letter from President Maduro to the President of the United States requesting the United States' support for President Maduro's plan to normalize relations in exchange for a promise to hold free and fair elections in the future.  The following morning, U.S. Congressman 1, **RIVERA**, Foreign Individual 1, and others met with Venezuelan Politician 2 and officials from the U.S. Embassy in Caracas to discuss their meeting with President Maduro and his plan to normalize relations.  As with **RIVERA's** and **NUHFER's** earlier efforts, these attempts involving direct meetings between U.S. Congressman 1 and President Maduro and other Venezuelan politicians were not successful in normalizing relations between the United States and Venezuela.

15. At no time did **DAVID RIVERA** and **ESTHER NUHFER**, and the corporate entities they controlled, file a FARA registration statement with DOJ in connection with their activities on behalf of the Government of Venezuela. In addition, **RIVERA** and **NUHFER** never disclosed to any of the United States officials with whom they met that they were lobbying on behalf of the Government of Venezuela. Instead, **RIVERA** and **NUHFER** concealed from public scrutiny and United States officials the existence of the consulting agreement with PDV USA, and the millions of dollars they received to lobby on behalf of the Government of Venezuela, by failing to register as foreign agents.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the object and purpose thereof, at least one of the co-conspirators committed and caused to be committed in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

**A.** **The PDV USA Consulting Contract**

1. On or about February 23, 2017, **ESTHER NUHFER** used an encrypted text messaging service to create a chat group called "MIA" ("the MIA Chat Group"), which included **NUHFER, DAVID RIVERA**, Foreign Individual 1, and Individual 1.

2. On or about March 7, 2017, **DAVID RIVERA** sent an email to Foreign Individual 1 and **ESTHER NUHFER,** attaching a draft one-page contract between Interamerican Consulting and CITGO pursuant to which Interamerican Consulting would provide "strategic consulting to [CITGO] in connection with its business in the United States" for three months in return for $50,000,000.

11

3. On or about March 20, 2017, **DAVID RIVERA** received an email from Foreign Individual 2, attaching a copy of a draft consulting agreement between Interamerican Consulting and PDV USA with the "Scope of Services" section left blank.

4. On or about March 20, 2017, **DAVID RIVERA** sent an email to Foreign Individual 2 (with bcc copies to **ESTHER NUHFER**, Foreign Individual 1, and Individual 1), attaching a copy of the consulting agreement with the "Scope of Services" section revised to state that Interamerican Consulting would provide "strategic consulting services to the CLIENT as the CLIENT deems necessary and appropriate."

5. On or about March 20, 2017, **ESTHER NUHFER** sent an email to **DAVID RIVERA** titled "FARA Contracts" that contained (a) hyperlinks to FARA filings on DOJ's website that had been made by companies acting as agents for several foreign governments and (b) excerpts from these filings in the body of her email that described the goals of these companies' agreements with the foreign governments and the services the companies agreed to provide.

6. On or about March 20, 2017, **DAVID RIVERA** sent a reply email to **ESTHER NUHFER's** "FARA Contracts" email with a draft version of the "Scope of Services" to include in the PDV USA contract, which was based on the FARA filings **NUHFER** included in her email to **RIVERA**.

7. On or about March 20, 2017, **DAVID RIVERA** sent an email to Foreign Individual 2 (with bcc copies to **ESTHER NUHFER**, Foreign Individual 1, and Individual 1), attaching a copy of the draft consulting agreement with the "Scope of Services" section completed, which stated, in part, that Interamerican Consulting would "implement a multi-

12

faceted strategy to reinforce CLIENT's standing among important public officials and opinion leaders."

8.     On or about March 21, 2017, **DAVID RIVERA** sent an email (in Spanish) to **ESTHER NUHFER**, Foreign Individual 1, and Individual 1, attaching the signed consulting agreement, and stating (in translation): "I think we are almost ready.  Now I am just waiting for the first `retainer' in order to call [U.S. Congressman 1] and confirm the appointment in Dallas for hopefully this weekend.  We need to confirm the schedules and availability of the Foreign Minister and [Venezuelan Politician 1] at some point."

9.     On or about March 21, 2017, **DAVID RIVERA** sent an email to a PDVSA representative (with bcc copies to **ESTHER NUHFER**, Foreign Individual 1, and Individual 1), attaching a copy of "Invoice #1" on Interamerican Consulting letterhead and billing "PDV USA" for "Strategic Consulting Services" in the amount of $5,000,000.

**B.     New York City Meetings with U.S. Congressman 1**

10.     On or about March 24, 2017, Interamerican Consulting received $5,000,000 by wire transfer from a PDV USA bank account.

11.     On or about March 27, 2017, **DAVID RIVERA** caused Interamerican Consulting to transfer $750,000 to Communication Solutions.

12.     On or about March 27, 2017, **DAVID RIVERA** caused Interamerican Consulting to transfer $625,000 to Company 2.

13.     On or about March 28, 2017, **DAVID RIVERA** sent a text message (in Spanish) to Foreign Individual 1 stating (in translation): "Tell the Minister of Foreign Affairs that the White House is waiting for a report on this meeting.  It has to take place".

14.     On or about March 30, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "It's critical.  [U.S. Congressman 1] does not want to meet with the government if they are not going to meet with the opposition as well".

15.     On or about March 31, 2017, **DAVID RIVERA** sent an email to **ESTHER NUHFER**, attaching a draft itinerary for a trip to New York City for meetings with U.S. Congressman 1, Venezuelan government officials, and others on April 1-2, 2017.

16.     On or about March 31, 2017, **DAVID RIVERA** caused Interamerican Consulting to send a wire transfer of $625,000 to Company 3.

17.     On or about April 2, 2017, **DAVID RIVERA** met with U.S. Congressman 1 and Delcy Rodriguez in New York City.

18.     On or about April 2, 2017, **DAVID RIVERA, ESTHER NUHFER,** Foreign Individual 1, and others met with U.S. Congressman 1 and Venezuelan Politician 1 at Foreign Individual 1's apartment in New York City.

[INTENTIONALLY LEFT BLANK]

19.     On or about April 2, 2017, **ESTHER NUHFER** sent a text message to the MIA Chat Group containing a photograph of draft letters of introduction on behalf of Foreign Individual 1 including, in part, the following letter:

April 2017

Secretary of State []

This instrument serves to convey the sentiment of the Bolivarian Republic of Venezuela to empower [Foreign Individual 1] in the capacity as an emissary and in coordination with [U.S. Congressman 1] to engage in discussions with the United States Government in furtherance of normalizing the relationship between the Bolivarian Republic of Venezuela and the United States of America.

Sincerely

Delsy Rodriguez
Minister of Foreign Affairs

**C.      U.S. Congressman 1 and U.S. Oil Company 1**

20.     On or about April 4, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "Any effort that is unilateral in its nature or which does not include the elements of the opposition and of an electoral exit, will fail miserably".

21.     On or about April 4, 2017, **ESTHER NUHFER** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "This is very important so that they can understand that this has to be a Back Channel".

22.     On or about April 4, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "That has to be directly through [the U.S. Secretary of State]. And from [the U.S. Secretary of State] to [the President of the United States]".

23.     On or about April 4, 2017, **DAVID RIVERA** sent a text message to U.S. Congressman 1: "[Foreign Individual 1] just got word from Foreign Minister that the President

15

and First Lady have sent down orders that all [U.S. Oil Company 1] activity is to be coordinated between [Foreign Individual 1] and you only".

24.    On or about April 8, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "I spoke with [U.S. Congressman 1]. The meeting with [U.S. Oil Company 1] is on Monday at 3:00. I am going to Dallas on Monday to negotiate details with [U.S. Oil Company 1]. I think its about time they pay the second invoice."

25.    On or about April 10, 2017, **DAVID RIVERA** sent an email to a PDVSA representative, attaching a copy of "Invoice #2" on Interamerican Consulting letterhead and billing PDV USA for "Strategic Consulting Services" in the amount of $5,000,000.

26.    On or about April 10, 2017, **DAVID RIVERA** sent an email to Individual 2 with "Talking Points" for U.S. Congressman 1's meeting with [U.S. Oil Company 1] including that he was "working with individuals . . . designated by the Government of Venezuela at the highest level to serve as liaisons in facilitating the transfer of [U.S. Oil Company 1]'s assets back to [U.S. Oil Company 1]."

27.    On or about April 10, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "I won't know [how the meeting with U.S. Oil Company 1 went] until I talk to [U.S. Congressman 1]. But up to now you can tell him that [U.S. Congressman 1], and even so important, we, are fulfilling our commitment to Chancellor/client in transmitting the position of V[enezuela] to the highest level of [U.S. Oil Company 1] . . . ."

28.    On or about April 10, 2017, Interamerican Consulting received $5,000,000 by wire transfer from a PDV USA bank account.

29. On or about April 11, 2017, **DAVID RIVERA** caused Interamerican Consulting to transfer $750,000 to Communication Solutions.

30. On or about April 11, 2017, **DAVID RIVERA** caused Interamerican Consulting to transfer $625,000 to Company 2.

31. On or about April 11, 2017, **DAVID RIVERA** caused Interamerican Consulting to send a wire transfer of $625,000 to Company 3.

32. On or about April 15, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "It is essential that we meet this Thursday to prevent the invasion of troops of [the President of the United States] in Venezuela. And now I have to send the third invoice!"

33. On or about April 18, 2017, **DAVID RIVERA** sent an email to a PDVSA representative (with bcc copies to **ESTHER NUHFER**, Foreign Individual 1, and Individual 1), attaching "Invoice #3" on Interamerican Consulting letterhead and billing PDV USA for "Strategic Consulting Services" in the amount of $5,000,000.

34. On or about April 19, 2017, Interamerican Consulting received $5,000,000 by wire transfer from a PDV USA bank account.

35. On or about April 21, 2017, **DAVID RIVERA** caused Interamerican Consulting to transfer $625,000 to Communication Solutions.

36. On or about April 21, 2017, **DAVID RIVERA** caused Interamerican Consulting to transfer $625,000 to Company 1.

37. On or about April 21, 2017, **DAVID RIVERA** caused Interamerican Consulting to send a wire transfer of $625,000 to Company 3.

38.     On or about April 21, 2017, **DAVID RIVERA** sent an email to U.S. Congressman 1 and Individual 2 with a draft letter from "Delcy Rodriguez, Minister of Foreign Affairs" to [U.S. Oil Company 1]'s general counsel requesting a meeting at [U.S. Oil Company 1]'s headquarters in the United States with herself and Venezuela's "Energy Minister".

39.     On or about April 26, 2017, **DAVID RIVERA** sent an email to a PDVSA representative (with bcc copies to **ESTHER NUHFER** and Foreign Individual 1), attaching "Invoice #4" on Interamerican Consulting letterhead and billing PDV USA for "Strategic Consulting Services" in the amount of $5,000,000.

40.     On or about May 1, 2017, **DAVID RIVERA** sent an email to a PDVSA representative (with bcc copies to **ESTHER NUHFER** and Foreign Individual 1) with a "PDV USA Progress Report," which stated, in part, that Interamerican Consulting had "organized meetings for the Client with important policy makers and opinion leaders in the United States as part of the strategy to build long-term relationships among key public sector stakeholders in the United States."

41.     On or about May 29, 2017, **DAVID RIVERA** sent an email to Individual 1 (versions of which **RIVERA** also sent to **ESTHER NUHFER** and Individual 2) with a draft statement addressed to Foreign Individual 1 relating to the "concerns and frustrations expressed by the client," and explaining (a) that U.S. Oil Company 1 had rejected U.S. Congressman 1's request to meet directly with Venezuelan government officials to discuss a resolution of their pending legal dispute because U.S. Oil Company 1 preferred to have their attorneys address any settlement issues, (b) that the Venezuelan government officials should emphasize that they also wanted to meet with U.S. Oil Company 1 executives to discuss new business opportunities in

18

Venezuela for U.S. Oil Company 1, (c) that "the best backchannel avenue to resolve V[enezuela]'s situation with [U.S. Oil Company 1]" was for Venezuela "to make the meeting request via [U.S. Oil Company 1]'s email address" while [U.S. Congressman 1] "put pressure on [U.S. Oil Company 1] to accept the meeting," and (d) that, if Venezuela was unwilling to do so, suggesting that "we return the last payment and either terminate our efforts or return our focus to the original intent which was to work toward normalizing relations."

42.     On or about May 30, 2017, **DAVID RIVERA** received an email (in Spanish) from a CITGO representative stating (in translation) that the "contract originally signed with PDV USA must be assigned to PDVSA" and that **RIVERA** should issue the two pending invoices and the final invoice to PDVSA in Caracas, Venezuela.

43.     On or about May 30, 2017, **DAVID RIVERA** sent an email to a PDVSA representative, attaching the last three invoices on Interamerican Consulting letterhead and billing PDVSA in Caracas, Venezuela, for "Strategic Consulting Services" in the amount of $35,000,000.

44.     On or about May 31, 2017, **ESTHER NUHFER** sent a text message to **DAVID RIVERA** and Individual 1: "We should not have to return a penny."

45.     On or about May 31, 2017, **DAVID RIVERA** forwarded to **ESTHER NUHFER** an email he received from a CITGO attorney asking for **RIVERA's** consent to assign the consulting contract from PDV USA to PDVSA, stating: "Call me. I don't think there's any way we can do this."

46. On or about June 7, 2017, **ESTHER NUHFER** sent a text message (in Spanish) to **DAVID RIVERA** and Individual 1 stating (in translation): "Hopefully, they get more sanctions & we can go back to the original agenda."

47. On or about June 7, 2017, **ESTHER NUHFER** sent a text message (in Spanish) to **DAVID RIVERA** and Individual 1 stating (in translation): "Remember that [White House Advisor 1] arrives 6/27. . . ."

**D.     White House Advisor 1**

48. On or about June 20, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "[Foreign Individual 1], good morning. They are calling me from the White House about the possible flight of [White House Advisor 1] in your airplane next week. Is that still a possibility?"

49. On or about June 22, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "The six-hour meeting with [the President of the United States]'s counselor . . . is more important than the meeting with [the Vice-President of the United States], because she made him president directing his campaign. And she works at his side every day."

50. On or about June 22, 2017, **DAVID RIVERA** sent a text message to the MIA Chat Group, containing a draft letter of introduction from President Maduro to several U.S. public officials:

> To Whom It May Concern: Please know that the bearer of this letter, [Foreign Individual 1], has been designated by me as my personal Special Envoy on resolving bilateral issues surrounding the U.S.-Venezuela relationship. [Foreign Individual 1] has my full confidence and is empowered and authorized to negotiate all relevant issues on my behalf. Sincerely, El Guaguero

51.     On or about June 22, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "This is what we need".

52.     On or about June 22, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "And for you to convince [the President of the United States], [the Vice-President of the United States], [White House Advisor 1], [the U.S. Secretary of State], etc. that the bus driver is truly interested in an electoral solution, [Foreign Individual 1] needs the letter designating him as the bus driver's personal envoy".

53.     On or about June 22, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group: "They have to empower you if they are serious.  But, in any case, let's continue with the goals of the contract in order to take it where they want."

**E.     Meetings with U.S. Senator 1**

54.     On or about July 9, 2017, **DAVID RIVERA** flew from Florida to Washington D.C. to meet with U.S. Senator 1.

55.     On or about July 9, 2017, **DAVID RIVERA** met with U.S. Senator 1 at a private residence in Washington, D.C. and told him that **RIVERA** was working with Foreign Individual 1, who had persuaded President Maduro to accept a deal whereby President Maduro would hold free elections in Venezuela.

56.     On or about July 10, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "[U.S. Senator 1] will be with [the President of the United States] at 9:00 AM tomorrow to tell him that he has the possibility in his hands to solve the crisis of V[enezuela]. We have to meet with him and [Venezuelan Politician 2] tomorrow in DC!!!!!!!!!!!!!!"

57.     On or about July 11, 2017, **DAVID RIVERA** sent a text message to U.S. Senator 1: "Remember, US should facilitate, not just support, a negotiated solution."

58.     On or about July 11, 2017, **DAVID RIVERA** sent a text message to U.S. Senator 1: "No vengeance, reconciliation".

59.     On or about July 11, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "[U.S. Senator 1] just called me.  The bus driver has to give guarantees for December's election."

60.     On or about July 12, 2017, **DAVID RIVERA, ESTHER NUHFER,** Individual 1, Foreign Individual 1, U.S. Senator 1, Venezuelan Politician 2 (by telephone), and others met at a hotel in Washington, D.C. to discuss Venezuelan affairs.

61.     On or about July 14, 2017, **ESTHER NUHFER** sent a text message to **DAVID RIVERA**: "Call [Individual 1] now".

62.     On or about July 14, 2017, **ESTHER NUHFER** sent a text message to **DAVID RIVERA**: "No more mtgs until we get a slice".

63.     On or about July 14, 2017, **DAVID RIVERA** sent a text message to **ESTHER NUHFER**: "Tell [Individual 1] to tell his new BFF the bus driver to pay us for the mtg w [U.S. Senator 1].  Since there will b no turkey wout him".

64.     On or about July 18, 2017, **DAVID RIVERA** received a text message (in Spanish) from Individual 1: "I talked to [Foreign Individual 1], the meeting is tonight".

65.     On or about July 18, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "[Foreign Individual 1] just called me.  He said that he has tried very hard to bring the parties together but there is nothing further to discuss w the

bus driver. [Foreign Individual 1] says it's time to unfold Maduro completely. He says no mercy. Repeat, NO MERCY!"

## F. **Venezuelan Sanctions**

66. On or about August 30, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "Summary of last night. First: the nephew: 5 melons of retainer and 5 melons when resolved. Second: the aunt and her children: 10 melons. Third: resolve the crisis: 25 melons."

67. On or about August 30, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "Good morning . . . I'm going to call the Sombrero today for the meeting in Dallas".

68. On or about September 7, 2017, **ESTHER NUHFER** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "Hi, I already have the invoice prepared. Do we send to the same place?"

69. On or about September 7, 2017, **DAVID RIVERA** sent an email to a PDVSA representative (with bcc copies to **ESTHER NUHFER** and Foreign Individual 1), attaching "Invoice #4" and "Invoice #5" on Interamerican Consulting letterhead and billing PDV USA for "Strategic Consulting Services" in the amount of $10,000,000.

70. On or about September 25, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "[Foreign Individual 1], I just spoke again with our friend in the White House. She tells me that she is willing to help any way she can. The faster The Light arrives, the faster the engines will start."

71.     On or about September 26, 2017, **DAVID RIVERA** sent a text message to the MIA Chat Group stating: "[Attorney 1] is your guy-will connect you soon-he is unreachable today – his [law] firm gets people off the [sanctions] list regularly; has one guy assigned to task".

72.     On or about September 26, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation): "The friend just sent me this text".

73.     On or about September 26, 2017, **DAVID RIVERA** sent an email to Foreign Individual 1 (with a bcc copy to **ESTHER NUHFER**), attaching an amendment to the consulting agreement between Interamerican Consulting and PDV USA increasing the total compensation under the contract to $60,000,000.

74.     On or about October 5, 2017, **DAVID RIVERA** sent a text message (in Spanish) to the MIA Chat Group stating (in translation):

> [Foreign Individual 1], I just talked to [Foreign Individual 2].  He asked me for two things. 1. That I sign the transfer of the contract from PDV USA to PDVSA Caracas. 2. That I send a report justifying the first three payments. About 1. Just as it was impossible to transfer it when asked for four months ago, it is even more impossible to transfer it now, as it would harm our efforts for [Family Member 1]. It would be impossible to resolve [Family Member 1]'s situation based on a contract with an entity that OFAC considers a source of income for people already sanctioned and that at this moment is sanctioned by OFAC (particularly, if [U.S. Senator 1] will be involved). And secondly, a contract with PDVSA Caracas requires registering with FARA (Foreign Agent[s] Registration Act), which my attorney has told me is currently illegal due to [the President of the United States]'s sanctions on PDVSA, and not to touch it with a 50-foot pole, but it would be a scandal of monumental proportions. I have no problem allocating contract payments at PDV USA's discretion, to give you flexibility in payment sources, but to have a contract with PDVSA Caracas would make our efforts impossible. As to the report, I have no problem doing it, but we have to decide what we're going to put in the report.  I await your advice . . . ."

75.     On or about October 16, 2017, **ESTHER NUHFER** sent a text message to **DAVID RIVERA**: "They better hurry & drop that light in Doral before [Family Member 1] is fkd".

76.     On or about October 18, 2017, **ESTHER NUHFER** sent a text message to **DAVID RIVERA**: "Where is the slice for [Family Member 1]?"

77.     On or about October 19, 2017, **DAVID RIVERA** sent an email to a PDVSA representative (with bcc copies to **ESTHER NUHFER** and Foreign Individual 1), attaching "Invoice #4" on Interamerican Consulting letterhead and billing PDV USA for "Strategic Consulting Services" in the amount of $5,000,000.

78.     On or about October 27, 2017, Interamerican Consulting received a transfer in the amount of $5,000,000 from a PDVSA account at Gazprom Bank in Russia.

79.     On or about November 7, 2017, **DAVID RIVERA** caused Interamerican Consulting to transfer $1,000,000 to Communication Solutions.

80.     On or about November 7, 2017, **DAVID RIVERA** caused Interamerican Consulting to transfer $1,100,000 to Company 1.

81.     On or about December 31, 2017, **DAVID RIVERA** sent an email to a PDVSA representative (with a bcc copy to **ESTHER NUHFER**) with two invoices from Interamerican Consulting to PDV USA totaling $30,000,000 and a "Final Progress Report[]" in which **RIVERA** asserted that Interamerican Consulting had "successfully positioned the Client . . . to achieve its . . . goals and objectives of inform[ing] policy makers and opinion leaders regarding . . . issues of concern between the Client and important actors in the United States . . . first with

public sector stakeholders of interest to the Client, then with private sector stakeholders . . . and finally . . . reengaging with public sector stakeholders of interest to the Client."

### G.    U.S. Congressman 1 Meets with President Maduro

82.    On or about March 23, 2018, **ESTHER NUHFER** sent an email to **DAVID RIVERA** containing a revised letter of invitation from the Foreign Minister of Venezuela to the Acting U.S. Secretary of State inviting U.S. Congressman 1 "to travel to Venezuela and meet with President Maduro and other government officials on matters of mutual concern to our two countries."

83.    On or about March 29, 2018, **DAVID RIVERA** sent an email to Foreign Individual 1 with a draft letter from President Maduro to [the President of the United States] regarding, in part, his "good-faith desire[] to take steps that will facilitate the reestablishment of normal relations between the United States and Venezuela . . . through free, fair and internationally recognized democratic elections."

84.    On or about April 2, 2018, **DAVID RIVERA**, Individual 1, Individual 2, and others, travelled on Foreign Individual 1's private jet from Opa-Locka, Florida, to Caracas, Venezuela.

85.    On or about April 2, 2018, **DAVID RIVERA**, U.S. Congressman 1, Foreign Individual 1, and others met with President Maduro and other members of his regime, in Caracas, Venezuela.

86.    On or about April 3, 2018, **DAVID RIVERA**, U.S. Congressman 1, Foreign Individual 1, and others met with Venezuelan Politician 2 and U.S. Embassy officials at the home of Foreign Individual 1 in Venezuela.

87.     On or about April 5, 2018, **DAVID RIVERA** sent an email to Foreign Individual 1 (with bcc copies to **ESTHER NUHFER** and Individual 1) containing a "final" version of a letter from President Maduro to the President of the United States stating, in part, President Maduro's hope that the United States would "demonstrat[e] its willingness to recognize the outcome of a democratic election [in Venezuela] with normalization of the diplomatic, political, and economic relationship between our two governments."

88.     On or about April 5, 2018, **DAVID RIVERA** sent an email to Foreign Individual 1 (with a bcc copy to **ESTHER NUHFER**) containing a letter from U.S. Congressman 1 to President Maduro, thanking President Maduro for the meeting and reiterating the United States' commitment to "free, fair and internationally supervised" elections in Venezuela.

**H.     Rivera's Distribution of Funds and Attempts to Collect Final Payment**

89.     On or about July 11, 2018, **DAVID RIVERA** caused Interamerican Consulting to transfer $104,333 to Communication Solutions.

90.     On or about July 11, 2018, **DAVID RIVERA** caused Interamerican Consulting to transfer $204,333 to Company 1.

91.     On or about December 18, 2018, **DAVID RIVERA** sent an email to a CITGO employee asking for an update as to the payment status of the final two invoices for $30,000,000.

92.     On or about December 28, 2018, **DAVID RIVERA** sent an email to **ESTHER NUHFER** forwarding CITGO's response, which stated, in part, that "[n]o CITGO entity has ever had any involvement with or obligations under the Agreement. We suggest you reach out to PDVSA to discuss your questions relating to the Consulting Agreement."

All in violation of Title 18, United States Code, Section 371.

27

## COUNT 2
### Failure to Register as a Foreign Agent
### (22 U.S.C. §§ 612(a) and 618(a)(1))

1.      Paragraphs 1 through 26 of the General Allegations Section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around February 2017, and continuing through in or around December 2018, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**DAVID RIVERA**
**and**
**ESTHER NUHFER,**

did willfully act and cause others to act in the United States as an agent of a foreign principal, to wit, the Government of Venezuela, without registering with the Attorney General as required by law, in violation of Title 22, United States Code, Sections 612(a) and 618(a)(1), and Title 18, United States Code, Section 2.

## COUNT 3
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

1.      Paragraphs 1 through 26 of the General Allegations Section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around February 2017, and continuing through in or around December 2018, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**DAVID RIVERA**
**and**
**ESTHER NUHFER,**

did knowingly and voluntarily combine, conspire, confederate, and agree with each other, to knowingly engage in a monetary transaction affecting interstate and foreign commerce, by,

28

through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.

It is further alleged that the specified unlawful activity was willfully acting and causing others to act in the United States as an agent of a foreign principal, to wit, the Government of Venezuela, without registering with the Attorney General as required by law, in violation of Title 22, United States Code, Sections 612(a) and 618(a)(1), and Title 18, United States Code, Section 2.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 4-8
### Engaging in Transactions in Criminally Derived Property
### (18 U.S.C. § 1957)

1.       Paragraphs 1 through 26 of the General Allegations Section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.       On or about the dates set forth in each Count below, in the Southern District of Florida and elsewhere, the defendants,

**DAVID RIVERA**
**and**
**ESTHER NUHFER,**

did knowingly engage in, and attempt to engage in, monetary transactions in and affecting interstate and foreign commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, and knowing that the property involved in the financial transaction represented

the proceeds of some form of unlawful activity, as more particularly described in each Count
below:

| Count | Defendant(s) | Approximate Date | Description of Transaction (Approximate Amounts) |
|---|---|---|---|
| 4 | **DAVID RIVERA** | 12/29/2017 | Transfer of $50,746.56 from Interamerican Consulting's JPMorgan Chase account (x1682) by check #1119 payable to SunTrust Bank for payment on a loan against 10925 N.W. 43rd Lane, Doral, Florida |
| 5 | **DAVID RIVERA** | 01/09/2018 | Deposit of check #1068 in the amount of $300,000.00 from Interamerican Consulting's JPMorgan Chase account (x1682) to Florida First account at First American Bank (x0801) re "marketing" |
| 6 | **ESTHER NUHFER** | 05/07/2018 | Wire transfer of $455,704.09 from Communication Solutions Wells Fargo account (x3419) to Law Firm 1's account at BB&T Bank (x6476) for the purchase of 21 Sadowski Causeway, Key Colony Beach, Florida |
| 7 | **DAVID RIVERA** | 07/19/2018 | Withdrawal of $297,148.64 from Florida First's account at First American Bank (x0801) to purchase official bank check from First American Bank payable to **DAVID RIVERA** |
| 8 | **DAVID RIVERA** | 07/19/2018 | Deposit of official bank check from First American Bank in the amount of $297,148.64 to the David M Rivera Campaign Account at SunTrust Bank (x9982) |

It is further alleged that the specified unlawful activity was willfully acting and causing
others to act in the United States as an agent of a foreign principal, to wit, the Government of

Venezuela, without registering with the Attorney General as required by law, in violation of Title 22, United States Code, Sections 612(a) and 618(a)(1), and Title 18, United States Code, Section 2.

In violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE ALLEGATIONS

1. The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants, **DAVID RIVERA** and **ESTHER NUHFER**, have an interest.

2. Upon conviction of a violation, or conspiracy to commit a violation, of Title 22, United States Code, Sections 612 and 618, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3. Upon conviction of a violation of Title 18, United States Code, Section 1956 and/or 1957, as alleged this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

4. The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, the following:

    a.    A sum of at least $23,750,000.00 in U.S. currency, which represents the total amount of funds involved in or derived from the alleged offenses and may be sought as a forfeiture money judgment;

    b.    Wells Fargo Securities brokerage account no. 6423-2614, held in the name of **ESTHER NUHFER**;

    c.    Real property located at 2665 S.W. 37th Avenue, Unit 504, Miami, Florida 33133;

    d.    Real property located at 1673 Pink Dogwood Way, Oviedo, Florida 32765;

    e.    Real property located at 21 Sadowski Causeway, Key Colony Beach, Florida 33051; and

    f.    Real property located at 10925 N.W. 43rd Lane, Doral, Florida 33178.

5.    If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to the forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p). Such substitute property includes, but is not limited to, the following:

    a.    Real property located at 3663 S. Atlantic Ave, Unit 20C, New Smyrna Beach, Florida 32169;

    b.    Real property located at 9425 S.W. 38th Street, Miami, Florida 33165;

    c.    Real property located at 82 Tingler Lane, Marathon, Florida 33050;

    d.    Real property located at 237 Cole Street N.E., Marietta, Georgia 30060;

    e.    Real property located at 3060 Fleet Street, Marietta, Georgia 30064;

    f.    Real property located at 549 Bethesda Court, Oviedo, Florida 32765;

    g.    Real property located at 13604 SW 83rd Court, Palmetto Bay, Florida 33158; and

    h.    Real property located at 2188 Ellis Mountain Drive, S.W., Marietta, Georgia 30064.

[INTENTIONALY LEFT BLANK]

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

HAROLD E. SCHIMKAT
ASSISTANT UNITED STATES ATTORNEY

EVAN N. TURGEON
TRIAL ATTORNEY
COUNTERINTELLIGENCE &
EXPORT CONTROL SECTION
NATIONAL SECURITY DIVISION
U.S. DEPARTMENT OF JUSTICE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

**v.**

DAVID RIVERA and ESTHER NUHFER,

_____/
**Defendants.**

CASE NO.: _____

### CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of New Counts _____

**Court Division** (select one)
- ☒ Miami
- ☐ Key West
- ☐ FTP
- ☐ FTL
- ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) **No**
   List language and/or dialect: _____

4. This case will take **11-20** days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I ☐ 0 to 5 days
   - II ☐ 6 to 10 days
   - III ☒ 11 to 20 days
   - IV ☐ 21 to 60 days
   - V ☐ 61 days and over

   (Check only one)
   - ☐ Petty
   - ☐ Minor
   - ☐ Misdemeanor
   - ☒ Felony

6. Has this case been previously filed in this District Court? (Yes or No) **No**
   If yes, Judge _____ Case No. _____

7. Has a complaint been filed in this matter? (Yes or No) **No**
   If yes, Magistrate Case No. _____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) **No**
   If yes, Judge _____ Case No. _____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) **No**

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) **No**

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) **No**

By: _____

Harold E. Schimkat
Assistant United States Attorney
Court ID No. A5500567

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:**  DAVID RIVERA

**Case No:**

Count #: 1

<u>Conspiracy to Commit Offense Against the United States</u>

<u>Title 18 United States Code, Section 371</u>
* **Max. Term of Imprisonment:**   Five (5) years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**   N/A
* **Max. Supervised Release:** Three (3) years
* **Max. Fine:**   greater of $250,000 or twice the pecuniary gain derived from the offense

Counts #: 2

<u>Failure to Register as a Foreign Agent</u>

<u>Title 22 United States Code, Sections 612(a) and 618(a)(1)</u>
* **Max. Term of Imprisonment:**   Five (5) years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**   N/A
* **Max. Supervised Release:**   Three (3) years
* **Max. Fine:**   greater of $250,000 or twice the pecuniary gain derived from the offense

Count #: 3

<u>Conspiracy to Commit Money Laundering</u>

<u>Title 18 United States Code, Section 1956(h)</u>
* **Max. Term of Imprisonment:**   Ten (10) years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**   N/A
* **Max. Supervised Release:**   Three (3) years
* **Max. Fine:**   $250,000

Counts #: 4-5, 7-8

<u>Engaging in Transactions in Criminally Derived Property</u>

<u>Title 18 United States Code, Section 1957</u>
* **Max. Term of Imprisonment:**   Ten (10) years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**   N/A
* **Max. Supervised Release:** Three (3) years
* **Max. Fine:**   $250,000 or not more than twice the amount of the criminally derived property
  involved in each count

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:**  ESTHER NUHFER

**Case No:** 

Count #: 1

<u>Conspiracy to Commit Offense Against the United States</u>

<u>Title 18 United States Code, Section 371</u>
* **Max. Term of Imprisonment:**  Five (5) years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**  N/A
* **Max. Supervised Release:** Three (3) years
* **Max. Fine:**  greater of $250,000 or twice the pecuniary gain derived from the offense

Counts #: 2

<u>Failure to Register as a Foreign Agent</u>

<u>Title 22 United States Code, Sections 612(a) and 618(a)(1)</u>
* **Max. Term of Imprisonment:**  Five (5) years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**  N/A
* **Max. Supervised Release:**  Three (3) years
* **Max. Fine:**  greater of $250,000 or twice the pecuniary gain derived from the offense

Count #: 3

<u>Conspiracy to Commit Money Laundering</u>

<u>Title 18 United States Code, Section 1956(h)</u>
* **Max. Term of Imprisonment:**  Ten (10) years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**  N/A
* **Max. Supervised Release:**  Three (3) years
* **Max. Fine:**  $250,000

Count #: 6

<u>Engaging in Transactions in Criminally Derived Property</u>

<u>Title 18 United States Code, Section 1957</u>
* **Max. Term of Imprisonment:**  Ten (10) years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**  N/A
* **Max. Supervised Release:**  Three (3) years
* **Max. Fine:**  $250,000 or not more than twice the amount of the criminally derived property
involved in each count

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**