**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
                                                                        :
PDV USA, INC.,                                                          :
                                                                        :
        Plaintiff,                :
                                                                        :
v.                                                                      :      Case No. 20-cv-3699
                                                                        :
INTERAMERICAN CONSULTING INC.,                                         :
                                                                        :
        Defendant.                 :
                                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

 

**PDV USA, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SANCTIONS</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

RELEVANT FACTUAL BACKGROUND..........................................................................4

    A.    The March 2017 Consulting Agreement and the Parties' Claims .............. 4

    B.    In November 2017, the Government Seizes Mr. Rivera's Phone and Interamerican Engages Counsel to "Address Concerns About Future Litigation"................................................................................................. 6

    C.    Discovery in this Case Prior to the Indictment ......................................... 6

    D.    The Indictment Reveals that Interamerican Failed to Preserve Highly Responsive Mobile Communications and Emails ......................... 8

    E.    The Court Stays the Case................................................................................. 9

    F.    The Unpreserved Documents that PDV USA Has Been Able to Retrieve Directly Contradict Interamerican's Counterclaims and Sworn Testimony ........................................................................................... 10

    G.    Many More Responsive Documents Are Still Missing ........................... 12

ARGUMENT ...........................................................................................................................13

    I.    The Court Should Sanction Interamerican For Its Failure To Preserve ESI..........13

        A.    Interamerican Had an Obligation to Preserve Relevant Evidence by December 2017 at the Latest...................................................................... 13

        B.    Interamerican Failed to Preserve Relevant Evidence ............................... 14

        C.    Much of the Spoliated Evidence Is Irretrievable and Therefore PDV USA Is Prejudiced................................................................................. 17

        D.    Interamerican Intended to Deprive PDV USA of the Evidence .............. 19

        E.    The Court Should Order Sanctions........................................................... 20

    II.    The Court Should Award PDV USA Fees And Costs...........................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*CAT3, LLC v. Black Lineage, Inc.,*
    164 F. Supp. 3d 488 (S.D.N.Y. 2016)......................................................................21

*Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.,*
    337 F.R.D. 47 (S.D.N.Y. 2020) ................................................................18, 19, 25, 26

*Coan v. Dunne,*
    602 B.R. 429 (D. Conn. 2019) ..................................................................................4

*DeCastro v. Kavadia,*
    309 F.R.D. 167 (S.D.N.Y. 2015) ..............................................................................24

*DMAC LLC v. City of Peekskill,*
    2012 WL 4459290 (S.D.N.Y. Sept. 26, 2012)........................................................18

*Doubleline Cap. LP v. Oderbrech Fin., Ltd.,*
    2021 WL 1191527 (S.D.N.Y. Mar. 30, 2021) .........................................................14

*Freeman v. Giuliani,*
    691 F. Supp. 3d 32 (D.D.C. Aug. 30, 2023) ...................................................*passim*

*Ottoson v. SMBC Leasing and Finance, Inc.,*
    268 F. Supp. 3d 570 (S.D.N.Y. 2017).............................................................*passim*

*Pable v. Chicago Transit Authority,*
    2023 WL 2333414 (N.D. Ill. Mar. 2, 2023)......................................................21, 23

*Siani v. State Univ. of New York at Farmingdale,*
    2010 WL 3170664 (E.D.N.Y. Aug. 10, 2010)........................................................14

*StoneX Group, Inc. v. Shipman,*
    2024 WL 1509346 (S.D.N.Y. Feb. 25, 2024).................................................*passim*

*Swofford v. Eslinger,*
    2009 WL 10671171 (M.D. Fla. Dec. 1, 2009).......................................................17

**Other Authorities**

Fed. R. Civ. P. 37 ..............................................................................................*passim*

## PRELIMINARY STATEMENT

PDV USA, Inc. ("PDV USA") seeks sanctions against defendant Interamerican Consulting, Inc. ("Interamerican") to remedy Interamerican's pervasive spoliation of evidence.

The extent of Interamerican's spoliation is staggering. There is now no dispute that Interamerican, acting through its sole owner and officer, former Congressman David Rivera, failed to preserve thousands of communications to and from Mr. Rivera about the consulting agreement at issue in this litigation. Many of these communications were exchanged on an encrypted WhatsApp message chat group including Mr. Rivera and his closest associates, the purpose of which was to discuss the consulting agreement with PDV USA. They include communications about the agreement itself, such as drafts of the original agreement and draft amendments (*e.g.*, Ex. 1); communications about the invoices Mr. Rivera submitted to PDV USA (*e.g.*, Ex. 2 at -7638, -7641-42; Ex. 3) communications about █████████████████████████████████ ████████████████████████████████████████████████████████████████ (Ex. 39); communications about the progress reports that Mr. Rivera claims demonstrate his compliance with the agreement; and communications with and about another U.S. Congressman that Mr. Rivera claims he convinced to attempt to arrange a meeting involving senior officials of the Venezuelan government and senior executives at ExxonMobil ("Exxon").

Not only are these unpreserved documents unquestionably responsive to PDV USA's document requests, they prove that Interamerican's pleadings, and much of Mr. Rivera's sworn testimony in this case, relied upon willful misrepresentations. Mr. Rivera falsely testified that the "whole purpose" of the Agreement was to "try and develop" a "strategic partnership between Exxon and CITGO," but the unpreserved documents show that the outreach Mr. Rivera brokered vis-à-vis Exxon was directed by senior members of the regime of Nicolas Maduro, the President of Venezuela, and did not involve CITGO at all. Rather, Mr. Rivera's outreach was aimed at

attempting to resolve an ongoing arbitration between the Venezuelan Republic and Exxon.  Indeed,

buried in the unpreserved documents are █████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

     There are only two possible explanations for why these responsive communications (along

with hundreds of others) were never produced to PDV USA—the first is that Interamerican

unintentionally lost the communications, the second is that it deliberately deleted them.  PDV USA

respectfully submits that the *only* plausible explanation is the latter.  For starters, Mr. Rivera *did*

retain a substantial number of responsive mobile messages from the *exact same time period* as

some of the unpreserved mobile messages—in some instances even including messages sent or

received on the same day—proving that Mr. Rivera retained *some* mobile data, yet failed to

preserve *other* such data.  Further, there is overwhelming evidence of Mr. Rivera's intent: Mr.

Rivera encrypted many of these messages, his associates told him to ████████████████

██████████████████████████████████████ and the unpreserved messages are highly

inculpatory.  Mr. Rivera has already demonstrated a pattern of spoliation—he already admitted (in

an interrogatory response) to deleting another set of responsive documents during the pendency of

this litigation—after specifically testifying that he did not do so.  Against all of this background,

Interamerican has offered no plausible explanation for how these documents went missing.  Mr.

Rivera appears to claim that the government's seizure of his phone in November of 2017 was

somehow responsible for some undefined loss of documents, but fails to explain why the

government's purported actions would have permanently deleted *some* but not all of his

contemporaneous communications from his WhatsApp account.  And, even if one were to credit

Mr. Rivera's self-interested and incredible suggestion that the government's seizure of his phone in November 2017 was somehow responsible for his loss of these particular documents, many of the unpreserved documents were created, sent, or received *after* November 2017.  Interamerican appears to have made no meaningful efforts to investigate how or when the documents were lost, or to show what steps it took (at any time) to attempt to recover them.

It is also clear that whenever these documents were deleted, or lost, Interamerican was under a legal obligation to preserve them.  By Interamerican's own admission, the unpreserved documents existed on Mr. Rivera's phone in November 2017, when he claims the government seized his phone.  And Interamerican has also admitted that it was anticipating litigation in connection with the agreement by December 2017 at the latest—which triggered a preservation obligation with respect to any documents related to the agreement.  Interamerican has offered no credible explanation for when the documents were lost, and it is not entitled to an inference that the mysterious loss conveniently occurred without Mr. Rivera's involvement between November 2017 and December 2017.

To make matters worse, and further supporting the imposition of serious sanctions, Interamerican made a series of false representations to PDV USA and this Court (and other courts), all in an effort to cover up its spoliation and prevent PDV USA from recovering the deleted documents.  For example, even *after* Mr. Rivera received the government's production that we now know contained many of the "missing documents" that necessitated the stay in this case, Interamerican falsely represented to this Court the missing documents had "yet to be produced" and then, after PDV USA learned about the government production (but before PDV USA had received it), it falsely represented to PDV USA that the government production was not "relevant."

3

These and other factors discussed below demonstrate intentional spoliation, which warrants the most severe sanctions available pursuant to Rule 37(e)(2), as well as the Court's inherent authority.

Finally, although PDV USA need not demonstrate prejudice to obtain sanctions pursuant to Rule 37(e)(2) or the Court's inherent authority, PDV USA has been severely prejudiced by Interamerican's spoliation. This entire litigation has been polluted by Interamerican's blatant disregard for the federal rules. Years of litigation, and countless hours of work, have been lost in pursuit of entirely unnecessary litigation (in multiple jurisdictions) to allow PDV USA to obtain a fraction of the "missing documents" from the government and third parties, and there is no doubt that many more responsive communications are still missing. As just two examples: PDV USA has never recovered documents showing how, when, or by whom Interamerican's purported progress reports were drafted; nor does PDV USA have any versions of ███████████ ███████████ that is referenced in some of the messages Mr. Rivera deleted. *See* Sec. G, *infra.* It is therefore "plausible to conclude that the [documents] received from third parties are but the tip of a proverbial iceberg of other powerfully probative [documents] by [Mr. Rivera] during the periods that are critical in this litigation and that have not emerged from third parties in discovery." *Coan v. Dunne*, 602 B.R. 429, 440 (D. Conn. 2019). PDV USA faces substantial prejudice without access to those additional, and vital documents.

Under these circumstances, severe sanctions are warranted, including terminating sanctions, adverse inferences, and/or preclusion orders. PDV USA is also entitled to attorneys' fees and costs incurred in connection with this motion.

## RELEVANT FACTUAL BACKGROUND

### A.    The March 2017 Consulting Agreement and the Parties' Claims

This case concerns a March 21, 2017 consulting agreement between Interamerican and PDV USA, pursuant to which Interamerican would be paid $50 million over a three-month period

to provide "strategic consulting services" for the benefit of PDVSA (the "Agreement").  *See* ECF No. 104 at ¶ 1.[1]  Interamerican performed virtually no services under the Agreement, and certainly did not perform the level of services that might justify a fee of approximately $17 million *per month*.  ¶¶ 32–35.  Shortly after receiving the first three installment payments from PDV USA— totaling $15 million[2]—Interamerican transferred approximately 75% of that amount (without notifying PDV USA) to three third parties:  Hugo Perera, a convicted drug trafficker, Raul Gorrin, a Venezuelan billionaire and fugitive from justice who was indicted by the United States in 2018 in connection with a multibillion-dollar money laundering and bribery scheme, and Esther Nuhfer, a long-time associate of Mr. Rivera.  ¶ 52.  Interamerican documented its arrangements with Ms. Nuhfer and Mr. Perera in the form of signed "subcontracts" to the Agreement—in direct violation of the Agreement's prohibition on subcontracting without PDV USA's prior written consent. ¶¶ 30, 46–47, 53–57.  Beyond subcontracting without authorization, Interamerican breached numerous other provisions of the Agreement.  For example, Interamerican failed to provide seven bi-weekly progress reports.  ¶ 38.  None of its invoices had any supporting documentation or explanation of services.  ¶ 44.  Interamerican breached its warranty to not use any of the payments from PDV USA for illegal purposes.  ¶ 58.  PDV USA thus sued Interamerican for breach of contract or, in the alternative, unjust enrichment, on the grounds that the Agreement is a void instrument of illegality.  ¶¶ 7, 76–81.

Interamerican asserts counterclaims for the unpaid $30 million on the Agreement. According to Interamerican, it provided $50 million worth of consulting services, not for PDVSA or the Venezuelan government, but for PDVSA's U.S.-based, indirect subsidiary CITGO

---

[1] Unless otherwise noted, all citations to "¶" refer to the Second Amended Complaint, ECF No. 104.

[2] In October 2017, PDVSA paid another $5 million installment directly to Mr. Rivera through a Russian bank.  ¶ 65.

Petroleum Corporation ("Citgo").  ECF No. 111 (Counterclaims).  According to Mr. Rivera's sworn deposition testimony, the "whole purpose" of the Agreement was to "try and develop" a "strategic partnership between Exxon and Citgo."  Ex. 4 at 212:1–7.  Mr. Rivera has been adamant throughout this case that he has "never done any work" for PDVSA and he never considered PDVSA his "client."  Ex. 5 at 374:6, 398:12–17, 581:8–14.  As for the millions of dollars Interamerican paid to subcontractors Mr. Gorrin, Ms. Nuhfer, and Mr. Perera, Mr. Rivera denies that those individuals acted as subcontractors for Interamerican, Ex. 4 at 230:5–232:14; Ex. 6 at 2–3, instead claiming that those payments were merely "referral fees" because those individuals allegedly referred Mr. Rivera to PDV USA.  Ex. 5 at 302:17–22.

### B.    In November 2017, the Government Seizes Mr. Rivera's Phone and Interamerican Engages Counsel to "Address Concerns About Future Litigation"

Although never disclosed to PDV USA until years into this litigation, Interamerican now claims that "Mr. Rivera's phone was seized in or around November 2017 by the government" and that the phone was "never returned to Mr. Rivera."  Ex. 7 at 3–4.  Shortly thereafter, in "December 2017," Interamerican "retained the law firm of Cozen O'Connor" to "review" the Agreement and "address potential future litigation with the government[.]"  Ex. 8; Ex. 4 at 240:6–242:23.  Cozen O'Connor thereafter prepared a "multi-page memo with an analysis of the [Agreement]."  Ex. 4 at 242:4-15 (the "Cozen Memorandum").

### C.    Discovery in this Case Prior to the Indictment

Discovery in this matter initially ran from approximately September 2021—when the parties exchanged RFPs—to November 2022.  Mr. Rivera sat for his deposition in July 2022.  The government unsealed a criminal indictment against Mr. Rivera in December 2022.

Prior to the unsealing of the indictment, some of the most important documents that PDV USA received in discovery came from third parties, such as Ms. Nuhfer, Mr. Perera, Mr. Gorrin's

yacht manager, and Mr. Rivera's accountant.  Mr. Rivera should have had these documents—communications to and from him and documents signed by him—in his possession and should have produced them, but he did not, for reasons he has never explained.  These unpreserved documents include, for example, the executed subcontracts between Interamerican and Ms. Nuhfer/Mr. Perera (signed by Mr. Rivera).  Exs. 9, 10, 11.  They also include emails from Mr. Rivera to Ms. Nuhfer and Mr. Perera attaching and discussing the Agreement (*e.g.*, Ex. 12); emails from Mr. Rivera concerning efforts to remove a Maduro family member from the Treasury Department's Specially Designated National list (Ex. 13)—which appears to be the real reason why Mr. Rivera received $5 million directly from PDVSA in October 2017, not, as Mr. Rivera testified, because Citgo wanted to entice him to assign the Agreement to PDVSA (Ex. 4 at 246:18-247:6); emails from Mr. Rivera to Mr. Perera describing failed attempts to arrange meetings between Exxon and PDVSA (Ex. 14); emails from Mr. Rivera to Ms. Nuhfer and Mr. Perera congratulating "each sub-contractor" for a "truly exceptional" performance (Ex. 15); and emails from Mr. Rivera to his accountant describing "sub-contractor" payments (Ex. 16).  Interamerican never produced any of these documents to PDV USA.

The few responsive documents Interamerican did produce included a limited set of WhatsApp messages that appeared to be communications between Mr. Rivera and Mr. Gorrin, but that did not reveal who had sent or received the individual messages.  When PDV USA asked Interamerican to produce versions of those messages that showed the sender/receiver, Interamerican represented that it no longer had the original messages and invited PDV USA to ask Mr. Rivera at deposition what happened to them.  Ex. 17 at 2.  At Mr. Rivera's deposition in July 2022, Mr. Rivera answered "no" when asked "since this litigation has been filed, did you go through your WhatsApp messages and attempt to delete or delete messages or information

involving Raul Gorrin." Ex. 5 at 419:24–420:3. Later, however, Interamerican admitted in an interrogatory response that those same WhatsApp messages with Raul Gorrin "must have been deleted" during discovery in this action. Ex. 18 at 2–3.

### D. The Indictment Reveals that Interamerican Failed to Preserve Highly Responsive Mobile Communications and Emails

On November 18, 2022, fact discovery closed. On December 5, 2022, an indictment against Mr. Rivera and Ms. Nuhfer was unsealed in the Southern District of Florida. Ex. 19 (the "Indictment"). The Indictment goes to the heart of the issues in this case: it alleges that Mr. Rivera and Ms. Nuhfer used the Agreement to "creat[e] the false appearance that they were providing consulting services to PDV USA," when in reality they were working for the government of Venezuela and PDVSA without registering with the Attorney General. Indictment at p.5, ¶ 3. The Indictment quoted directly from over fifty emails and WhatsApp messages, many of them encrypted, to and from Mr. Rivera—ranging from February 23, 2017 to April 5, 2018—that Interamerican had never produced to PDV USA and that directly contradicted Mr. Rivera's testimony and counterclaims. ECF No. 121-2 at 3–5 (the "Indictment Documents").

Interamerican claimed that it did not "possess[]" the Indictment Documents. ECF No. 123 at 2. The only justification proffered by Interamerican was: "we believe they were on a phone which the FBI took control of back in [November] 2017, years before a lawsuit was filed. And my clients never got the possession of that phone back." Ex. 20 at 8:11–19. Interamerican never explained how the government's seizure had limited, in any way, Mr. Rivera's access to his email and social media (such as WhatsApp) accounts. When PDV USA sought relief from the Court, Interamerican accused PDV USA of "improperly recruit[ing] this Court in its campaign to assist the government's prosecution of David Rivera." ECF No. 123 at 1. It hypothesized that the Indictment Documents may not "even exist," i.e., that the government had somehow fabricated

them.  ECF No. 133 at 2.  It also claimed that it was under no obligation to preserve documents in November 2017 because "[t]he mere fact that Mr. Rivera's phone was seized in November 2017 in no way put him on notice that he was being investigated in connection with the [Agreement][.]" ECF No. 123 at 3, n.2.

### E.    The Court Stays the Case

In January 2023, the Court stayed the case "to provide time and opportunity for the production of certain text and other communications referred to as the 'Missing Documents.'" ECF No. 129.  Interamerican agreed that the purpose of the stay was "to provide time and opportunity for the production of the [Indictment] Documents to Mr. Rivera in the criminal matter, at which time the documents could be produced by Interamerican."  ECF No. 131.

During the stay, in August and September of 2023—unbeknownst to PDV USA at that time—Mr. Rivera received a substantial document production from the government that PDV USA now knows (but did not know then) included many of the Indictment Documents, as well as hundreds of additional responsive and inculpatory communications to and from Mr. Rivera (the "Government Production").  *See* Ex. 21 at 5.  Upon receiving the Government Production, neither Mr. Rivera nor Interamerican said anything to PDV USA or the Court.  Then, at least a month *after* Mr. Rivera received the Government Production, on October 3, 2023, **Interamerican falsely represented to PDV USA and this Court**, in connection with arguing that the stay should be lifted and the case should move forward, that the Indictment Documents had "yet to be produced." ECF No. 155 at 1–2.

In November 2023, PDV USA first learned about the existence (though not the substance) of the Government Production, after the government filed a memorandum in the criminal matter that referred to a document production.  *See* ECF No. 157.  PDV USA asked Interamerican to produce responsive documents from the Government Production immediately, but Interamerican

refused, and Mr. Rivera's counsel took the astonishingly misleading position that he "doubt[ed] that any discovery they have received [from the Government Production] is at all relevant to the issues in this case." ECF Nos. 158 at 2, 158-1 at 2. Mr. Rivera later doubled down on this misrepresentation, stating that it was "likely inaccurate" for PDV USA to contend that the Government Production included "many more responsive emails and messages tha[n] what has been produced to PDV USA." Ex. 22 at 7.

Following lengthy and costly motions practice in this Court and in the Southern District of Florida, the Florida court ordered Mr. Rivera to produce to PDV USA all responsive documents from the Government Production. Ex. 23. The Florida court observed that Mr. Rivera's arguments for why he was not obligated to produce documents from the Government Production to PDV USA were a "fallacy" and "extremely frustrating." Ex. 24 at 15:9–13. On May 8, 2024, Mr. Rivera finally sent the Government Production to PDV USA. The Government Production included some, but not all, of the Indictment Documents. PDV USA was forced to separately pursue the remainder of the Indictment Documents from the government—serving a *Touhy* request and subpoena on the government on May 29, 2024. Ex. 25. On June 20, 2024, the government produced the remainder of the Indictment Documents to PDV USA, including hundreds of encrypted messages among Mr. Rivera, Ms. Nuhfer, Mr. Gorrin, and Mr. Perera in the "MIA Group Chat," which they used to discuss the Agreement secretly.

### F.    The Unpreserved Documents that PDV USA Has Been Able to Retrieve Directly Contradict Interamerican's Counterclaims and Sworn Testimony

Now that PDV USA has had an opportunity to review the Government Production (as well as the additional production the government made to PDV USA on June 20), it is clear that Mr. Rivera failed to preserve at least hundreds (if not thousands) of responsive communications that

directly contradict Mr. Rivera's sworn testimony and counterclaims in this litigation. As just a few examples of Mr. Rivera's lies:

- Mr. Rivera testified that the "whole purpose" of the Agreement was to "try and develop" a "strategic partnership between Exxon and CITGO." Ex. 4 at 212:1–7. He also answered "no" to the question "did Delcy Rodriguez have any involvement in the work you did in connection with the" Agreement.  *Id*. at 109:14–17.    However, documents that Interamerican failed to preserve show that, on April 10, 2017, Mr. Gorrin messaged Mr. Rivera:

  Ex. 2 at -7635.  On April 10, Mr. Rivera drafted "talking points" for a United States Congressman that read:

  Ex. 26.[3]

- Mr. Rivera falsely testified that Raul Gorrin was not "involved in helping to arrange meetings with Exxon," and that Mr. Gorrin never "communicat[ed] with [Mr. Rivera] about conversations he had with Delcy Rodriguez about the Exxon meeting." Ex. 5 at 363:9–21.  Documents that Interamerican failed to preserve show that this was false testimony.  On April 4, 2017, Mr. Rivera messaged a United States Congressman:

  Ex. 27 at -7385.  On April 4, 2017 in the MIA Group Chat, Gorrin messaged:

  Ex. 2 at -7628.

- Mr. Rivera falsely testified that he did not "have any input on the terms of the [A]greement," did not "provide any language to be included in the [A]greement," and did not "draft any portion of the" Agreement.  Ex. 4 at 143:1–24.  Documents that Interamerican failed to preserve show that, on March 20, 2017, the day before the Agreement was signed, Mr. Rivera and Ms. Nuhfer drafted the "Scope of Services" section of the Agreement based on Foreign Agents Registration Act filings that Ms. Nuhfer had shared with Mr. Rivera.  Ex. 28.

- Mr. Rivera falsely testified that, when he funneled 75% of the money paid to him by PDV USA to Mr. Gorrin, Ms. Nuhfer, and Mr. Perera, the payments were merely "referral fees," Ex. 5 at 302:17-22, but in the unpreserved documents,                                Ex. 2 at -7620.

---

[3] At deposition, Mr. Rivera answered "no" to the question "have you ever seen any talking points that were intended to be used in connection with the meeting you were trying to arrange with Exxon Mobil." Ex. 5 at 271:14–17.

### G.    Many More Responsive Documents Are Still Missing

It is certain that PDV USA has not recovered the full universe of relevant and inculpatory documents that Interamerican failed to preserve. As discussed above, PDV USA has been able to recover unpreserved documents that Interamerican should have produced from (1) the Government Production and (2) an additional production of documents from the government in response to PDV USA's *Touhy* request. Both, however, are limited. The Government Production was, according to the government, limited to the forfeiture litigation concerning a $3.75 million payment received by Ms. Nuhfer from Mr. Gorrin. Ex. 21 at 5. And the *Touhy* production was limited to only those documents referenced in the public Indictment, including the MIA Group Chat thread. *See* Ex. 25. Accordingly, PDV USA has not recovered all (or even most) of Mr. Rivera's electronic communications that the government likely has.

In addition, the record shows that there are many other documents that remain missing. As just a few examples:

- PDV USA has not been able to recover drafts of the progress reports that Interamerican submitted to PDV USA, or any documents showing how, when, or by whom the progress reports were created.

- All of the signed and draft subcontracts that PDV USA obtained came from third-party productions. PDV USA has not received any versions of these subcontracts from Mr. Rivera's possession, yet Mr. Rivera testified that he wrote them and signed them (Ex. 5 at 337:4-338:10).

- Mr. Rivera testified that he and the subcontractors created the subcontracts at the request of Ms. Nuhfer and Mr. Perera (Ex. 4 at 233:13-235:7), yet PDV USA has not been able to recover any substantive discussions among the subcontractors concerning the origins of the subcontracts. PDV USA recovered one email from Hugo Perera in which Mr. Rivera discussed subcontractors, but Mr. Rivera testified that he believed that email was fabricated and he claimed that he had no recollection of sending it. *See* Ex. 15; Ex. 5 at 309:9-312:10.

- Some of Mr. Rivera's communications refer to an ███████████████ ███████ (*e.g.*, Ex. 2 at -7681-83)—as part of the work Mr. Rivera bizarrely claims he did for *Citgo*—but PDV USA has not located any versions of this ████.

- In support of his claim that Mr. Gorrin acted as his attorney in connection with the Agreement, Mr. Rivera produced an engagement letter between him and Mr. Gorrin signed in March 2017. When asked how Mr. Rivera came into possession of this engagement letter, Mr. Rivera testified that it appeared one day in 2022 at his home in an unmarked envelope delivered by an unidentified person. Ex. 4 at 97:22-99:18. Given that Mr. Rivera communicated with Mr. Gorrin electronically on a sometimes daily basis in 2017, it is highly implausible that there are no contemporaneous electronic communications concerning this engagement letter—and PDV USA has not uncovered any.

## ARGUMENT

Under Rule 37(e), the Court may sanction a party "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Rule 37(e)(1) authorizes, upon a finding of prejudice, sanctions to cure that prejudice, whereas Rule 37(e)(2) authorizes sanctions upon a finding that a party intended to deprive another party of information and requires no showing of prejudice. "In addition, the court may impose discovery sanctions pursuant to its inherent power to manage its own affairs." *Ottoson v. SMBC Leasing and Finance, Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017).

### I.    The Court Should Sanction Interamerican For Its Failure To Preserve ESI

#### A.    Interamerican Had an Obligation to Preserve Relevant Evidence by December 2017 at the Latest

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Doubleline Cap. LP v. Oderbrech Fin., Ltd.*, 2021 WL 1191527, at *6 (S.D.N.Y. Mar. 30, 2021). Anticipating litigation for "work product purposes" triggers a duty to preserve documents. *Siani v. State Univ. of New York at Farmingdale*, 2010 WL 3170664, at *5 (E.D.N.Y. Aug. 10, 2010).

Here, in connection with its assertion of work product protection over the (spoliated) Cozen Memorandum, Interamerican concedes that it anticipated litigation concerning the Agreement no later than "December 2017," when it retained outside counsel to "review" the Agreement and draft the Cozen Memorandum following the government's seizure of Mr. Rivera's phone in November 2017. *See* Factual Background Sec. B, *supra*.[4] Moreover, by Interamerican's own admission, it anticipated litigation with PDV USA once "PDV USA had refused to make further payments due and owing on the consulting contract with Interamerican." Ex. 7 at 3. Contrary to Interamerican's counterfactual claim that this happened in "late 2018," *id.*, in fact, PDV USA had refused to make further payments under the Agreement in May of 2017, when PDV USA told Mr. Rivera that it was assigning the Agreement to PDVSA, which would be responsible for any future payments (if any). Ex. 4 at 246:21-247:6. By December 2017—the same month Mr. Rivera retained outside counsel in anticipation of litigation and eight months after PDV USA had last made a payment on the Agreement, which ran from March 2017 to June 2017—Mr. Rivera sent another demand for payment to PDV USA, which PDV USA refused to pay. Ex. 29 at 1.

### B.    Interamerican Failed to Preserve Relevant Evidence

The record also shows that Interamerican deleted hundreds if not thousands of relevant documents, and that it did so while under an obligation to preserve them, which arose in December 2017 at the latest. Interamerican claims that many of these documents "were on a phone" that the FBI seized in November 2017. *See* Factual Background Sec. D, *supra*. And according to Interamerican, when it imaged Mr. Rivera's phone in April 2022, those same communications

---

[4] To be clear, "the question" is not whether the electronic evidence "would be relevant to *this* litigation," but rather, "whether defendants knew or should have known that the evidence they destroyed may be relevant to future litigation." *Doubleline*, 2021 WL 1191527, at *6 (finding that the spoliating party had a duty to preserve evidence relevant to defendant's bribery scheme when the criminal authorities were investigating the bribery scheme more than a year and a half prior to plaintiff filing its private securities fraud lawsuit).

were no longer in his possession.  *See* ECF No. 123 at 2.  Accepting Interamerican's representations as true, that means the documents went missing at some point between November 2017 and April 2022.  This raises two questions:  how did they go missing, and when?

On the first question, the only plausible explanation is that Mr. Rivera deleted them. Interamerican blames the government's seizure of Mr. Rivera's phone in November 2017, but that is nonsensical.  As an initial matter, many of the unpreserved documents were emails and standalone files (such as subcontracts), not mobile messages, and many were sent/received *after* November 2017.[5]  Clearly, the government's seizure of Mr. Rivera's phone in November 2017 cannot have been responsible for Mr. Rivera's "loss" of those documents.  It also cannot explain the loss of hundreds of WhatsApp messages dated before November 2017.  Mr. Rivera indisputably retained access to his WhatsApp account—including pre-November 2017 messages—long after the government seized his phone, because **he continued to send and receive WhatsApp messages after that time**, and moreover, in 2022 he produced to PDV USA *some* WhatsApp messages from pre-November 2017, but failed to preserve others.  For example, Mr. Rivera produced WhatsApp messages with Esther Nuhfer dated June 22, 2017 (Ex. 30), but failed to preserve other messages with Ms. Nuhfer from that same day (Ex. 31).  Accordingly, someone made the decision to affirmatively delete certain of Mr. Rivera's pre-November 2017 WhatsApp messages but not others, and there is no plausible explanation for why that would have been done by anyone other than Mr. Rivera.

Interamerican's newfound justification fares no better.  It now claims that Mr. Rivera's "rivera2002@comcast.net" email address experienced a "server crash" in August 2020.  Ex. 7 at

---

[5] *See, e.g.*, Ex. 26; Exs. 10, 11 (subcontracts that Mr. Rivera claims were signed in December 2017 but backdated to March 2017); Ex. 4 at 233:10-15; Ex. 19 at p.26, ¶¶ 82–83, p.27, ¶¶ 87–88.

4. But an email "crash" cannot possibly explain why WhatsApp messages, other mobile messages, or non-email documents (such as the subcontracts) went missing. Beyond that, Interamerican never said anything to PDV USA about a server crash for nearly four years after it supposedly occurred.[6] Interamerican provides no evidence whatsoever of this "crash," such as a report from a forensic analyst. It does not even explain what a "server crash" means. And while Mr. Rivera claims that he "had included all emails related to the contract at issue" in a "folder" that was "not destroyed" in the server crash, that claim is false because PDV USA uncovered many emails from the same email account that clearly "relate" to the Agreement but that were *not* preserved. *E.g.*, Exs. 28, 32. It also makes no sense that the "server crash" would impact some emails on the account but not others merely because they were placed in a folder. Finally, this supposed "crash" does not explain why responsive emails from other email accounts, such as Mr. Rivera's "electrivera@comcast.net" email address, were also not preserved. *E.g.* Exs. 34, 35, 36.

As for the question of *when* the messages and emails were deleted, in the absence of any credible explanation by Interamerican, and accepting Interamerican's representation that many of the documents existed on Mr. Rivera's phone in November 2017, the Court can conclude that Mr. Rivera deleted them at some point between December 2017 when Interamerican admits that it anticipated litigation, and April 2022, when Interamerican claims it did not have them, especially considering that many of the unpreserved documents themselves post-date December 2017.[7] And even accepting Interamerican's unsupported assertion that its duty to preserve arose in "late 2018,"

---

[6] When Interamerican became aware of the "crash" and any other deletion of potentially responsive documents, it was obligated to investigate and notify PDV USA in accordance with PDV USA's Instruction #6 in its RFPs. Ex. 33 at 2; *Ottoson v. SMBC Leasing and Fin., Inc.*, 268 F. Supp. 3d 570, 574 (S.D.N.Y. 2017) ("Plaintiff failed to provide any explanation or information about such documents or the circumstances of their loss, as required by Defendants' instructions to their Request for Production.").

[7] *See, e.g.*, Ex. 37; Exs. 10, 11 (subcontracts that Mr. Rivera claims were signed in December 2017 but backdated to March 2017). *See also* Ex. 19 at p.26, ¶¶ 82–83, p.27, ¶¶ 87–88.

it is still most plausible that Interamerican deleted the documents after "late 2018" rather than before.[8]

### C.    Much of the Spoliated Evidence Is Irretrievable and Therefore PDV USA Is Prejudiced

"Under Rule 37(e), the party seeking sanctions must demonstrate that the alleged spoliated evidence was 'lost.'" *StoneX Group, Inc. v. Shipman*, 2024 WL 1509346, at *10 (S.D.N.Y. Feb. 25, 2024). Relatedly, Rule 37(e)(1) requires a finding of prejudice—although PDV USA need not demonstrate prejudice to obtain Rule 37(e)(2) sanctions. *Id.* at *8. Rule 37(e)(1) "does not place a burden of proving or disproving prejudice on one party or the other. . . ." Fed. R. Civ. P. 37(e) (advisory committee's note to 2015 amendment). The "prejudiced party must not be held to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence, because doing so would allow parties who have destroyed evidence to profit from that destruction." *Ottoson*, 268 F. Supp. 3d at 580. Rather, "[i]t is sufficient that [the moving party] has provided evidence that plausibly suggests that the spoliated ESI could support [its] case." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 66 (S.D.N.Y. 2020).

As set forth in Section G, *supra*, there is more than enough evidence that many responsive documents are still missing and clearly a plausible suggestion that such evidence "could support" PDV USA's case. Indeed, even in the absence of such evidence, courts infer the existence and importance of additional spoliated documents based on spoliated documents that the prejudiced party managed to obtain from separate sources. For example, in *Charlestown Capital Advisors*, the spoliating party (the defendant) failed to preserve "hundreds" of important communications to

---

[8] *See, e.g.*, *Swofford v. Eslinger*, 2009 WL 10671171, at *2 (M.D. Fla. Dec. 1, 2009) (imposing adverse inference that defendants deleted documents from April 2006 to April 2007 "even if the duty to preserve emails did not arise until" February 2007 because, where the spoliating party offered the court "no means to determine when emails were deleted," the court could reasonably infer that relevant emails were deleted after February 6, 2007).

and from the defendant's president that the plaintiff was able to recover from its own emails.  337

F.R.D. at 58, 63–66.  The court reasoned that the spoliation of those recovered communications

"raises questions about . . . the existence of other potentially probative emails not currently known

to plaintiff" and held that "there can be no assurance that the recovered emails constitute all of the

meaningful emails that could and should have been obtained in the first instance from the"

president.  *Id.* at 64–65.  Here, like in *Charlestown*, the Court can reasonably infer the existence

of other potentially probative emails that Interamerican failed to preserve but that have not been

produced, based on the highly inculpatory communications that Interamerican failed to preserve

but that have been retrieved from other sources.  *Id.* at 64.[9]

For its part, Interamerican has done *nothing* to attempt to retrieve the communications

missing from Mr. Rivera's devices, or investigate when and how they went missing.  PDV USA's

spoliation interrogatories asked Interamerican to "describe with corroborating details and specific

dates what efforts (if any) you have taken to retrieve any such Unproduced Documents,[10] including

any efforts to retrieve any such Unproduced Documents from WhatsApp, email servers that host

Mr. Rivera's emails, the government (whom you contend seized Mr. Rivera's phone), and third-

party senders/recipients of such Unproduced Documents who may have their own copies, such as

Esther Nuhfer, Hugo Perera, or Raul Gorrín."  Ex. 38 at 6.  Interamerican's response describes no

such efforts whatsoever, Ex. 7—a significant factor weighing in favor of sanctions.  *Cf.*

---

[9] *See also DMAC LLC v. City of Peekskill*, 2012 WL 4459290, at *4–5 (S.D.N.Y. Sept. 26, 2012) (finding that "additional relevant e-mails—favorable to plaintiffs—existed but were not produced" based on the contents of other emails that the moving party obtained from third parties); *Freeman v. Giuliani*, 691 F. Supp. 3d 32, 60–61 (D.D.C. 2023) (finding prejudice because, even though the court could not "accurately assess the full scope of the evidence that has been lost," the moving party showed "through discovery obtained from third parties, that had Giuliani properly satisfied his preservation and production obligations, he should be in possession of documentary evidence that goes to the heart of claims in this lawsuit").

[10] The Interrogatory used the defined term "Unproduced Documents," which included the Indictment Documents.  Ex. 38 at 2.

*Charlestown Capital*, 337 F.R.D. at 63 (imposing Rule 37(e) sanctions where the spoliating party's "restoration efforts were . . . both untimely and inadequate").

### D.    Interamerican Intended to Deprive PDV USA of the Evidence

The record also demonstrates that Interamerican deleted evidence "with the intent to deprive" PDV USA of the information in litigation. Fed. R. Civ. P. 37(e)(2). "Courts in this Circuit have held that where a party has significantly failed in its obligation to preserve and collect documents, it is appropriate to infer intent to deprive. Other courts in this Circuit have inferred an intent to deprive through circumstantial evidence where the data loss could not be credibly explained other than by bad faith." *StoneX*, 2024 WL 1509346, at *11. Intent can also be inferred where the spoliating party has "offered no credible explanation for the loss of this ESI" and the spoliating party's explanations "d[o] not comport with . . . his own prior conduct." *Id.* at *13. "[F]alse statements" about the lost evidence and the spoliation "further support a finding of bad faith." *Id.* (spoliating party falsely testified at deposition that he could not "recall any situation where [he] deliberately tried to destroy evidence"). The following facts—set forth in more detail above—are more than sufficient to establish a "logical inference" that Interamerican destroyed electronic evidence with the requisite intent. *Ottoson*, 268 F. Supp. 3d at 582.

- Mr. Rivera selectively deleted some messages but retained others from the exact same time period, and the communications that Mr. Rivera chose to delete are highly inculpatory and contradict Mr. Rivera's counterclaims and sworn testimony.

- Interamerican offers no credible explanation for the loss of evidence, and its explanations are rife with inconsistencies and misrepresentations.

- Mr. Rivera encrypted many of the communications he subsequently deleted. And Interamerican's subcontractors openly discussed ▮▮▮▮ their communications because ▮▮▮▮ Ex. 2 at -7672.

- Interamerican failed to disclose the November 2017 phone seizure to PDV USA until it was forced to come up with an excuse for the missing documents in December 2022. In fact, at deposition, before the indictment was unsealed, Mr. Rivera provided false testimony that all documents he gave to the FBI were also produced to PDV USA. Ex. 5

at 334:4–7.  And then Interamerican failed to disclose the August 2020 "server crash" until May 2024 when the Court ordered it to respond to PDV USA's spoliation interrogatories. This was after Mr. Rivera testified (in 2022) that he did not "know why some of [his] emails from this time period [2017] were produced while others were not."  Ex. 4 at 213:15–18.

- Mr. Rivera provided false testimony that he did not "go through [his] WhatsApp messages and attempt to delete or delete messages or information involving Raul Gorrin."  Ex. 5 at 419:20–420:3.

- Interamerican told the Court that "[t]he mere fact that Mr. Rivera's phone was seized in November 2017 in no way put him on notice that he was being investigated in connection with the [Agreement]," ECF No. 123 at 3, n.2, yet later admitted that he engaged outside counsel in December 2017 to "review" the Agreement and "address potential further litigation with the government[.]"  Ex. 8; Ex. 4 at 240:6–242:23.

- After Mr. Rivera received the Government Production containing many of the Indictment Documents, Interamerican falsely represented to the Court that the Indictment Documents had "yet to be produced."  Then, after admitting that the government had made a production, Mr. Rivera (through his counsel) falsely represented that the production was not "relevant."  *See* Factual Background Sec. E, *supra*.

- In response to PDV USA's spoliation interrogatories, Mr. Rivera falsely stated that he "had included all emails related to the contract at issue in this litigation in a folder named 'Citgo,' none of which were destroyed in the server crash."  *See* Argument Sec. B, *supra*.

- Interamerican made no efforts to recover the lost evidence, as shown by its response to PDV USA's spoliation interrogatory.  *See* Argument Sec. C, *supra*.[11]

Finally, because "spoliation designed to deprive an adversary of the use of evidence in litigation qualifies as bad faith conduct," the Court may sanction Interamerican pursuant to the Court's inherent authority, whether or not PDV USA meets the requirements of Rule 37(e).  *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 501 (S.D.N.Y. 2016) (finding that "inherent authority" sanctions were available "even if Rule 37(e) is inapplicable here").

### E.    The Court Should Order Sanctions

Determining an "appropriate sanction lies within the sound discretion of the trial court." *StoneX*, 2024 WL 1509346, at *14.  Having demonstrated spoliation under both Rule 37(e)(1) and

---

[11] *See Giuliani*, 691 F. Supp. 3d at 61 ("party's failure to make any serious effort to recover the data was sufficient to demonstrate a conscious disregard of [their] preservation obligations").

(e)(2)—as well as "bad faith conduct" sufficient to invoke the Court's inherent authority—PDV USA is entitled to the following sanctions.

1.    <u>The Court should order default judgment against Interamerican on liability and dismiss Interamerican's counterclaims.</u>

Terminating sanctions are reserved for "extreme circumstances," *StoneX*, 2024 WL 1509346 at *14, but Interamerican's discovery misconduct is precisely the circumstance contemplated by the federal rules. For example, in *Pable v. Chicago Transit Authority*, the court recommended that the District Judge dismiss the plaintiff's complaint with prejudice because the plaintiff repeatedly and intentionally deleted potentially relevant messages that he exchanged on a messaging application with individuals related to the lawsuit. 2023 WL 2333414, at *33-34 (N.D. Ill. Mar. 2, 2023). The plaintiff provided "completely incredible" excuses for why the messages were deleted, including that he no longer had the messages on his device because the individual with whom he exchanged the messages deleted them from the application. *Id.* at *15-16. Moreover, his attorney made false representations to the moving party and the court about the nature of the forensic collection of his client's phone. *Id.* at *2, *34. As another example, in *Freeman v. Giuliani*, the court awarded terminating sanctions where the defendant "forced the expenditure of judicial resources to assess and ensure compliance with the most basic of discovery obligations," including "six months and two court hearings." 691 F. Supp. at 64. In that case, like in *Pable*, Mr. Giuliani devised implausible excuses for his failure to preserve documents, such as blaming the government vendor for "wiping" his phone of the data after it was seized, without examining whether the data existed independently on the cloud. *Id.* at 56. *See also StoneX*, 2024 WL 1509346, at *14 (imposing terminating sanctions where the spoliating party "intentionally spoliate[d] multiple categories of ESI," "repeatedly lied in connection with his spoliation of that

21

ESI, including under oath," and "fabricated implausible and contradictory explanations for his conduct").

Interamerican's misconduct warrants similar, if not more severe, sanctions. As detailed above, Mr. Rivera intentionally and selectively deleted a large volume of responsive communications from his WhatsApp account, multiple email accounts, and likely other sources that reveal Interamerican's counterclaims, and much of his sworn testimony, to constitute fraud on the Court. Interamerican tendered false statements at a deposition, in sworn interrogatory responses, in written correspondence to PDV USA, and in signed submissions to this Court, all in a brazen attempt to conceal its misconduct, and when it was revealed, to do whatever it could to ensure that PDV USA would never recover the spoliated evidence. It came up with excuses for why the documents went missing that make no sense and are contradicted by the record. All the while, it made no efforts at all to investigate why (or when) the documents went missing, let alone attempt to retrieve the documents, such as by engaging a forensic vendor to run tests for deletion, or attempting to obtain the documents from hosted servers, third parties, or the government. Interamerican's misconduct has wasted significant judicial resources, needlessly prolonged this litigation, and made a mockery of the discovery rules.

Importantly, as set forth in this motion, the spoliated evidence, including the evidence PDV USA has not been able to recover, implicates virtually every key issue in this litigation: the formation of the Agreement, the purpose of the Agreement, Interamerican's supposed performance under the Agreement, the intended recipient of services under the Agreement, Interamerican's subcontracting, Interamerican's purported progress reports, its invoices, assignment of the Agreement, and the additional $5 million payment that Interamerican received from PDVSA directly in October 2017. This is not a case where the spoliated evidence concerns a particular

subject matter, such that discrete adverse inferences are sufficient to cure the prejudice. Thus, the Court should order default judgment against Interamerican on PDV USA's claims and, at a minimum, dismiss Interamerican's counterclaims, not just because they are based on false representations exposed by the unpreserved documents, but because PDV USA has been severely prejudiced in defending itself against those counterclaims without access to Interamerican's electronic records. *See, e.g.*, *Pable*, 2023 WL 2333414, at \*33-34; *Freeman v. Giuliani*, 691 F. Supp. 3d at 58-60.

        2.    <u>The Court should enter adverse inferences and preclusion orders against Interamerican.</u>

Short of entering default judgment on liability, the Court should enter adverse inferences and preclusion orders against Interamerican. Adverse instructions are appropriate where "(1) the spoliating party had control over the evidence and an obligation to preserve it at the time of destruction or loss; (2) the spoliating party acted with a culpable state of mind upon destroying or losing the evidence; and (3) the missing evidence is relevant to the moving party's claim." *Ottoson*, 268 F. Supp. 3d at 580. As set forth above, PDV USA has demonstrated each of these factors. Accordingly, if the Court is not inclined to enter default judgment or dismissal of Interamerican's counterclaims, it should enter the following adverse inferences and preclusion orders against Interamerican, applicable at summary judgment and trial:

- First, PDV USA is entitled to an inference that Interamerican intentionally deleted documents helpful to PDV USA, as follows: *Defendant Interamerican spoliated evidence concerning the Agreement contained on Mr. Rivera's mobile phone (including WhatsApp messages), email accounts, and other electronic devices. The evidence contained documents and communications that would have tended to prove PDV USA's claims and defenses, and to disprove Interamerican's claims and defenses. See DeCastro v. Kavadia*, 309 F.R.D. 167, 184 (S.D.N.Y. 2015) (ordering similar instruction).

- Second, Interamerican's counterclaims rest on its assertion that it provided a variety of services to *Citgo* and *PDV USA* under the Agreement. *See, e.g.*, Ex. 40 at 3; Ex. 41 at 2–3. Yet, based on what Mr. Rivera has produced and what PDV USA has retrieved from the government, there is no evidence that Mr. Rivera provided any services to Citgo or

PDV USA; the only indication of any "work" is that he attempted (and failed) to arrange a meeting between *PDVSA* (not Citgo) and Exxon. In fact, Mr. Rivera's theory seems to be that he documented his services over a series of conference calls. Ex. 5 at 382:2–385:10. But without full access to Mr. Rivera's contemporaneous documents, PDV USA is unable to disprove these assertions and show the Court and the jury that, in fact, no such calls took place (via the absence of scheduled calls in calendars or other ESI memorializing the calls). To remedy this prejudice, Interamerican should be precluded from asserting that it provided any consulting services under the Agreement apart from the single service documented in the produced documents (*i.e.*, the attempted brokering of a meeting between Exxon and members of the Maduro regime).

- Third, it is clear that evidence concerning the formation, purpose, and performance of the subcontracts is still missing. *See* Sec. G, *supra*. Therefore, the Court should enter the following adverse inference: *During the term of the Agreement (March 21, 2017–June 21, 2017) and thereafter, Interamerican breached the Agreement by entering into subcontracts with respect to the Services under the Agreement without the prior written consent of the PDV USA Authorized Representative.* Likewise, the Court should preclude Interamerican from asserting that it did not enter into subcontracts with respect to the Services under the Agreement or that it did not subcontract its services under the Agreement.

- Fourth, evidence is still missing concerning the progress reports that Interamerican was contractually obligated to provide to PDV USA. *See* Sec. G, *supra*. The Court should enter the following adverse inference: *Interamerican failed to provide a bi-weekly report detailing the activities that it had carried out during each two-week period of the Agreement and failed to provide a final report integrating all work product, including recommendations for monitoring and following up on the strategies implemented.* Interamerican should also be precluded from asserting, as it has (i) that Mr. Rivera wrote the progress reports submitted in writing to PDV USA, (ii) that the progress reports submitted in writing to PDV USA accurately reflected services that Interamerican performed under the Agreement, or (iii) that Mr. Rivera provided oral progress reports (for which there is no documentary evidence).

- Fifth, evidence is still missing concerning the additional $5 million that Mr. Rivera received directly from PDVSA via a Russian bank under the Agreement, such as correspondence describing the purpose of the payment, the individuals involved in approving it, or the rationale for its timing. *See* Ex. 13; Ex. 19 at 9-10, 25. The Court should preclude Interamerican from asserting, as it has, that PDV USA, Citgo, or either of those companies' employees had anything to do with this $5 million payment.

In addition, the Court should preclude Interamerican from relying on any electronic evidence that it failed to preserve—whether or not PDV USA has been able to recover it from other sources. Mr. Rivera deleted thousands of communications—many of which are devastating to his claims and defenses—while anticipating litigation. Once he came back into possession of

many of the documents he destroyed, he (through Interamerican and its counsel) made false representations to PDV USA and the Court about having the documents, and then doubled-down on his campaign of deceit by falsely representing to PDV USA that nothing in the Government Production was relevant to this case.  Now that Mr. Rivera's spoliation scheme has been at least partly unraveled, and PDV USA has access to some of the documents Mr. Rivera destroyed, it would be fundamentally unfair to permit Interamerican to now weaponize those documents for its own benefit.   Accordingly, the Court should order that Interamerican is prohibited from introducing into evidence, whether at summary judgment, at trial, or otherwise, any document that Interamerican failed to produce to PDV USA prior to this case being stayed.[12]

      3.      <u>In the Alternative, the Court should order Interamerican to produce Mr. Rivera's devices and account information to PDV USA for inspection.</u>

In the alternative—or in conjunction with any of the sanctions described above—the Court should compel Interamerican to make all of Mr. Rivera's electronic devices, as well as his social media and electronic communication accounts, available for collection and inspection by PDV USA's vendor, at Interamerican's expense.  The Court should permit PDV USA's retained forensics expert to determine whether, when, and under what circumstances any evidence was lost or deleted, and then permit PDV USA to renew a motion for sanctions.

## II.    The Court Should Award PDV USA Fees And Costs

In addition, the Court should impose monetary sanctions pursuant to Rule 37(e)(1), as well as its inherent authority.  *See Charlestown*, 337 F.R.D. at 67–68.

---

[12] At a minimum, the Court should preclude Interamerican from contesting the authenticity of any electronic communications to or from Mr. Rivera that PDV USA has obtained from the government or any other third party in this action. *See, e.g.*, *Charlestown*, 337 F.R.D. at 52.

Dated: July 17, 2024
New York, New York

**WILLKIE FARR & GALLAGHER LLP**


By: */s/ Jeffrey B. Korn*

Jeffrey B. Korn
Brady M. Sullivan
787 Seventh Avenue
New York, New York  10019-6099
(212) 728-8000
JKorn@willkie.com
BSullivan@willkie.com

Michael J. Gottlieb (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006-1238
(202) 303-1000
MGottlieb@willkie.com

*Attorneys for Plaintiff PDV USA, Inc.*