# Exhibit 4

Page 1

1                UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK

2                    CASE NO.:  20-cv-3699

3
     PDV USA, INC.,

4
                       Plaintiff,

5      vs.

6      INTERAMERICAN CONSULTING INC.,

7                      Defendant.
     _____/

8

9

10                 VOLUME 1, PAGES 1 - 252

11
                   VIDEOTAPED DEPOSITION OF

12
                 INTERAMERICAN CONSULTING INC.

13                    BY:  DAVID RIVERA

14

15

16                 Tuesday, July 26, 2022
                   10:38 a.m. - 6:23 p.m.

17

18

19                      Jones Day
                   600 Brickell Avenue

20                   Miami, Florida

21

22

23             Stenographically Reported By:
                 Gina Rodriguez, RPR, CRR

24

25

                                            Page 2

```
 1      APPEARANCES:
 2      On behalf of Plaintiff PDV USA, Inc.:
 3          WILLKIE FARR & GALLAGHER LLP
            787 Seventh Avenue
 4          New York, New York 10019
            (212)728-8000
 5          BY:  BRADY SULLIVAN, ESQUIRE
            bsullivan@willkie.com
 6          BY:  JEFFREY B. KORN, ESQUIRE
            jkorn@willkie.com
 7
 8          WILLKIE FARR & GALLAGHER LLP
            1875 K Street, N.W.
 9          Washington, DC 20006
            (202)303-1442
10          BY:  MICHAEL J. GOTTLIEB, ESQUIRE (via Webex)
            mgottlieb@willkie.com
11
12      On behalf of Defendant Interamerican Consulting
        Inc.:
13
            BYRD CAMPBELL
14          180 Park Avenue North
            Suite 2A
15          Winter Park, Florida 32789
            (407)392-2285
16          BY:  JASON JOHNSON, ESQUIRE
            jjohnson@byrdcampbell.com
17          BY:  ANDREW DOMINGOES, ESQUIRE (via Webex)
            adomingoes@byrdcampbell.com
18          BY:  DEBORA ANTISDEL, ESQUIRE (via Webex)
            dantisdel@byrdcampbell.com
19
        ALSO PRESENT:
20
21      Javier Ordonez, Videographer
        Alex Gonzalez (via Webex)
22
23
24
25
```

```
                                          Page 97
 1          Q.   And is that Mr. Gorrin's signature beneath
 2      yours?
 3          A.   Yes.
 4          Q.   Were you together when this engagement
 5      letter was signed?
 6          A.   Possibly.
 7          Q.   Did he also sign it on March 21st, 2017?
 8               MR. JOHNSON:  Object to the form.
 9          A.   Yes, I believe so.
10      BY MR. KORN:
11          Q.   Did -- how did this engagement letter come
12      into your possession?
13          A.   Mr. Gorrin got it to me.
14          Q.   When?
15          A.   Whenever it went to you.
16          Q.   So sometime within the last few months?
17          A.   Yes.
18          Q.   Okay.  How did Mr. Gorrin get the -- this
19      engagement letter to you?
20          A.   He worked hard.  I don't know exactly how
21      he found it, but he worked hard.
22          Q.   Okay.  How did he physically send it to
23      you?  Was it an email?
24          A.   He didn't.  It was delivered.
25          Q.   So a courier showed up with an envelope and
```

```
                                           Page 98
 1     this inc- -- it was in it?
 2          A.   I wouldn't say a courier.  I don't know who
 3     showed up.
 4          Q.   Where did you -- where were you when you
 5     received a copy of Exhibit 4?
 6          A.   My house.
 7          Q.   Okay.
 8               Who handed it to you?
 9          A.   No one.
10          Q.   It came in a hard copy?
11          A.   Yes.
12          Q.   Was there an envelope?
13          A.   Yes.
14          Q.   Was it -- did the envelope have a stamp
15     and, you know, mailing address, or was it just a
16     blank envelope?
17          A.   Blank.
18          Q.   Where were you -- when you signed Exhibit 4
19     in 2017, were you in Miami?  Do you recall -- let me
20     step back.
21               Do you recall signing Exhibit 4?
22          A.   I recall doing the agreement.  I have no
23     idea where I was on that day.
24          Q.   Okay.  So sometime in the last few months,
25     a -- somebody shows up at your door at home in Miami
```

```
                                         Page 99
 1     and hands you a blank envelope and the engage- -- and
 2     this engagement letter is in there?
 3              MR. JOHNSON:  Object to the form.
 4     BY MR. KORN:
 5          Q.   Is that what happened?
 6          A.   No.
 7          Q.   What happened?
 8          A.   If you recall, I said to you, "I wasn't
 9     there."  So nobody handed it to me.
10          Q.   Okay.  You arrived home, and it was -- it's
11     sitting outside your front door?
12          A.   Correct.
13          Q.   Okay.  So at some point in the last few
14     months you arrive home and there is a blank envelope
15     sitting outside your front door, and it is a copy of
16     the engagement letter, correct?
17          A.   I don't think it was outside.  I think it
18     was on the inside.
19          Q.   Okay.
20               How did Mr. Gorrin note that you were
21     looking for a copy of the engagement letter?
22          A.   I asked him for it.
23          Q.   Okay.  Did you call him on the phone?
24          A.   It's the only way to talk to him.
25          Q.   You -- do you communicate with him over
```

Page 109

1          A.   I believe she was at the April meeting.

2          Q.   Any other times?

3          A.   No.

4          Q.   Had you communicated with her in any other

5     way other than at those two meetings?

6          A.   No.

7          Q.   Do you know whether Raul Gorrin has any

8     relationship with Delcy Rodriguez?

9          A.   You mean, does he know her?  He certainly

10    knows her.

11         Q.   Did they do business together, to your

12    knowledge?

13         A.   I have no idea.

14         Q.   Now, did Delcy Rodriguez have any

15    involvement in the work you did in connection with

16    the PDV USA consulting agreement?

17         A.   No.

18         Q.   Are you familiar with Nelson Martinez?

19         A.   Yes.

20         Q.   At the time you entered into the PDV USA

21    contract, he was the energy minister of Venezuela,

22    correct?

23         A.   That's my recollection.

24         Q.   And he was the president of PDVSA, correct?

25         A.   I don't know about that.  I remember him

Page 143

1          Q.   Did Interamerican prepare the written

2     agreement for services with PDV USA?

3          A.   No.

4          Q.   Who did?

5          A.   Somebody inside Citgo.

6          Q.   Did Interamerican have any input on the

7     terms of the agreement that it signed with PDV USA?

8          A.   No.

9          Q.   Did you provide any language to be included

10    in the agreement between Interamerican and PDV USA?

11         A.   No.

12         Q.   Did you draft any portion of the contract

13    between Interamerican and PDV USA?

14         A.   No.

15         Q.   Did you have a role in preparing the

16    exhibits to the contract between Interamerican and

17    PDV USA that set forth the scope of services that

18    Interamerican would provide to PDV USA?

19         A.   No.

20         Q.   That was all drafted by Citgo and PDV USA?

21         A.   Somebody inside Citgo.

22         Q.   Somebody inside Citgo, but David Rivera had

23    nothing to do with that drafting, correct?

24         A.   Correct.

25         Q.   Was Raul Gorrin involved in any way in the

Page 202

```
 1    break so you can go to the bathroom.
 2         A.    Thank you.
 3              THE VIDEOGRAPHER:  The time is 5:14 p.m.,
 4         and we're going off the record.
 5      (Recess was held from 5:14 p.m. until 5:18 p.m.)
 6              THE VIDEOGRAPHER:  The time is 5:18, and
 7         we're back on the record.
 8    BY MR. KORN:
 9         Q.    Welcome back, Mr. Rivera.
10         A.    Thank you.
11         Q.    You should have in front of you Exhibit 15,
12    which is the consulting agreement between
13    Interamerican and PDV USA.  I would like you to turn
14    to Page 4.
15         A.    I'm there.
16         Q.    Page 4.  Great.  Do you see there's a
17    Section 14, "Authorized Representative and Notices"?
18         A.    Yes.
19         Q.    And for PDV USA, the authorized
20    representative is Pio Gonzalez at PDVSA.  Do you see
21    that?
22         A.    I see Mr. Pio Gonzalez and I see @PDVSA in
23    his email address.
24         Q.    In fact, his address is in Venezuela.  His
25    phone number is in Venezuela and his email address is
```

1          Q.   Why would there be a strategic partnership

2     between Exxon and Citgo?

3          A.   Because the whole purpose of Citgo

4     retaining me was to try and develop such efforts.

5          Q.   Aren't Exxon and Citgo competitors?

6          A.   Not necessarily.  Exxon is always trying to

7     expand business and so is Citgo.

8          Q.   Did you receive instructions from

9     Pio Gonzalez as part of your work for PDV USA?

10          A.   I remember emails from his email domain.

11          Q.   So is the answer to my question "yes"?

12          A.   I don't remember every email.  I would need

13     to see the emails.

14          Q.   Right.  But do you remember any emails

15     where you received instructions from Pio Gonzalez?

16          A.   I seem to recall an email regarding

17     emailing him the invoices, if you consider that an

18     instruction.

19               MR. KORN:  16, 17.

20               (Thereupon, marked as Exhibit 17.)

21     BY MR. KORN:

22          Q.   Okay.  I have just handed you Exhibit 17,

23     which is an email exchange that bears the Bates range

24     Interamerican_002198 and also has 2199.  I've also

25     included a certified translation and the attached

```
 1      invoice which bears the Bates range
 2      Interamerican_002200.
 3              Okay.  Do you see there's an email that
 4      was sent by you to Pio Gonzalez?  It's a copy to
 5      Guillermo Blanco on March 21st at 8:53 p.m.
 6          A.   Yeah, yes.
 7          Q.   Did you send this email?
 8          A.   I'm sure I did.
 9          Q.   Okay.
10          A.   This comes from me?
11          Q.   This was produced by you.
12          A.   Yes.
13          Q.   Okay.
14          A.   Then I'm sure I did.
15          Q.   Okay.  Do you know why some of your emails
16      from this time period were produced while others were
17      not?
18          A.   No.
19          Q.   Did you deliberately at some point go
20      through your files to delete some emails and leave
21      others?
22          A.   No.
23          Q.   Okay.  Well, let's look at the email at the
24      bottom of the second page.
25              Do you see that there's an email from
```

Page 230

```
 1      any way whatsoever to any services provided under
 2      the contract at issue in this case."
 3              Did I read that correctly?
 4      A.    Yes.
 5      Q.    Is it your sworn testimony that
 6  Krome Agronomics never entered into a subcontract
 7  with Interamerican in connection with its engagement
 8  by PDV USA?
 9      A.    Correct.
10      Q.    Is it your sworn testimony that
11  PG & Associates never entered into a subcontract with
12  Interamerican in connection with its engagement with
13  PDV USA?
14      A.    Correct.
15      Q.    Is it your sworn testimony that
16  Interglobal Yacht Management never entered into a
17  subcontract with Interamerican in connection with its
18  engagement by PDV USA?
19      A.    Correct.
20      Q.    Is it your sworn testimony that
21  Communication Solutions never entered into a
22  subcontract with Interamerican in connection with its
23  engagement by PDV USA?
24      A.    Correct.
25      Q.    Is it also your sworn testimony that
```

Page 231

1      Krome Agronomics never acted as a subcontractor for
2      Interamerican in connection with its engagement by
3      PDV USA?
4            A.    Correct.
5            Q.    Is it your sworn testimony that
6      PG & Associates never acted as a subcontractor for
7      Interamerican in connection with its engagement by
8      PDV USA?
9            A.    Correct.
10           Q.    Is it your sworn testimony that
11     Interglobal Yacht Management never acted as a
12     subcontractor for Interamerican in connection with
13     its engagement by PDV USA?
14           A.    Correct.
15           Q.    Is it your sworn testimony that
16     Communication Solutions never acted as a
17     subcontractor for Interamerican in connection with
18     its engagement by PDV USA?
19           A.    Correct.
20           Q.    Is it your sworn testimony that
21     Krome Agronomics was never paid consulting fees by
22     Interamerican in connection with its engagement by
23     PDV USA?
24           A.    Correct.
25           Q.    Is it your sworn testimony that

Page 232

1    PG & Associates was never paid consulting fees in

2    connection with its engag- -- Interamerican's

3    engagement by PDV USA?

4        A.    Correct.

5        Q.    Is it your sworn testimony that

6    Interglobal Yacht Management was never paid

7    consulting fees in connection with Interamerican's

8    engagement by PDV USA?

9        A.    Correct.

10       Q.    Is it your testimony that

11   Communication Solutions was never paid consulting

12   fees in connection with Interamerican's engagement by

13   PDV USA?

14       A.    Correct.

15       Q.    If you look at the second sentence of your

16   interrogatory response to Number 23, it reads:

17   "Interamerican is aware of documents created in

18   coordination with entities that receive referral fees

19   in connection with the solicitation of

20   Interamerican's services.  These documents were

21   created long after the contract had expired and at

22   the expressed request of the entities that refer --

23   that receive referral fees in connection with the

24   contract."

25             You see that?

                                        Page 233

1           A.    Yes.

2           Q.    What does that mean?

3           A.    It means I'm aware of the documents and the

4      documents were created in December.

5           Q.    So the documents you are referring to are

6      the contract for services that identify

7      Communication Solutions, Interglobal Yacht Management

8      and PG & Associates as subcontractors, correct?

9           A.    Correct.

10          Q.    Now, you signed two of those contractors

11     for services, correct?

12          A.    Correct.

13          Q.    And you signed them and dated them from

14     March 2017; do you recall that?

15          A.    Correct.

16          Q.    Why did you do that?

17          A.    Because at the time I wanted to prepare my

18     taxes or begin preparing taxes for 2017, and I told

19     my CPA that I wanted the most pristine, perfect,

20     immaculate taxes ever created by hand.  I wanted all

21     the T's crossed, and I wanted all the I's dotted.

22                He told me that what I need to do is

23     get -- is do 1099s, get W9s, get invoices from

24     anybody that Interamerican paid in 2017.  When I

25     went to ask Mr. Perera and tell him that I was going

Page 234

1    to 1099 him, that I wanted a W9 and invoices, he

2    came back to me and said that his CPA had insisted

3    on having a contract with Interamerican, for

4    whatever reason, to substantiate his payments.  So

5    that's where it came in.

6        Q.    And your testimony is that these

7    conversations occurred in December of 2017?

8        A.    At least.

9        Q.    It might have been later than that?

10        A.    I mean, I know that I met with my CPA in

11    December, I know he gave me all of my marching orders

12    in December.  I'm sure I would have relayed it there

13    or very soon after the new year, probably in

14    December.

15        Q.    So you and Mr. Perera and Ms. Nuhfer

16    decided to create contracts for services and then

17    backdate them to March of 2017 for purposes of your

18    and their tax returns with the U.S. federal

19    government?

20             MR. JOHNSON:  Object to the form.  Object

21        to --

22        A.    No.

23             MR. JOHNSON:  Hang on.  When I start an

24        objection, just stop.

25             Object to the form.

Page 235

1          Go ahead and answer.

2      A.    No.  My recollection is it was Mr. Perera

3   who insisted on it or he had told me his CPA insisted

4   on it.  I recall mentioning it to Ms. Nuhfer.  Her

5   father is a CPA and does her taxes.  I recall her

6   asking her father and then she came back and all of a

7   sudden, "Well, it's probably a good idea."

8   BY MR. KORN:

9      Q.    Okay.  Regardless of how you characterized

10   this, in the contracts for services that we're --

11   that you say were signed later, the payments

12   themselves that are referenced in those contracts,

13   were made during the time that the PDV USA contract

14   was operative, right?

15      A.    Absolutely.

16      Q.    So -- and we've -- can look at the records,

17   but there were 75 percent of the payments that you

18   received from PDV USA were disbursed to the three

19   other sets of parties, correct?

20      A.    Yes.

21      Q.    And that occurred during the second quarter

22   of 2017, correct?

23      A.    Yes.

24      Q.    If --

25      A.    Well, March 21st might be the first

Page 240

1          A.    My tax returns have been scrutinized since

2      the moment I got elected to Congress.

3      BY MR. KORN:

4          Q.    All right.  A few wrap-up questions and

5      then we can break for the day.

6              Did Interamerican ever retain the law firm

7      of Cozen O'Connor as its counsel?

8          A.    Yes.

9          Q.    What was the scope of that engagement?

10         A.    They wrote this thing, this retainer

11     agreement that had the verbiage that you guys use,

12     but basically to review this contract.

13         Q.    Meaning, the Cozen O'Connor firm was

14     retained by Interamerican to review the

15     Interamerican/PDV USA contract?

16         A.    Yes.  But it took them ten pages to say

17     that.

18             THE COURT REPORTER:  Ten?

19         A.    Ten pages to say that.

20     BY MR. KORN:

21         Q.    Did Cozen O'Connor then proceed to do an

22     investigation of the PDV USA contract with

23     Interamerican?

24         A.    I wouldn't use that term.

25         Q.    Did they do a review of the contract?

```
                                        Page 241
 1          A.   They did.
 2          Q.   Over what period of time?
 3          A.   Oof, sometime in 2018.
 4          Q.   Okay.  Was it your idea to hire
 5     Cozen O'Connor to conduct that review?
 6          A.   It was a joint decision.
 7          Q.   A joint decision by who?
 8          A.   Mr. Perera, Ms. Nuhfer and myself.
 9          Q.   Was Mr. Gorrin involved in that decision?
10          A.   No.
11          Q.   Did Cozen O'Connor also serve as counsel to
12     Mr. Perera and Ms. Nuhfer as part of that engagement
13     or was the engagement only with Interamerican?
14          A.   It was jointly financed, so I don't know if
15     that means -- what was the term you used?  If they --
16          Q.   I just want to understand whether
17     Mr. Perera and Ms. Nuhfer were also clients of
18     Cozen O'Connor as part of this exercise.
19          A.   I mean, the attorney at Cozen knew that
20     Mr. Perera and Ms. Nuhfer were involved in hiring
21     them, but Interamerican had the name on the retainer
22     agreement.
23          Q.   Did Cozen O'Connor produce bills as part of
24     this engagement?
25          A.   I have no doubt.
```

```
                                                    Page 242

   1              THE COURT REPORTER:  I'm sorry?

   2         A.   I have no doubt.

   3    BY MR. KORN:

   4         Q.   Right.  Did they provide a memo to

   5    Interamerican as part of this engagement?

   6         A.   They did.

   7         Q.   Was it a lengthy memo?

   8         A.   What do you consider lengthy?

   9         Q.   Fair.  It's fair question.

  10         A.   Particularly for attorneys.

  11         Q.   Okay.  It was a multi-page memo with an

  12    analysis of the PDV USA/Interamerican contract?

  13         A.   Multi-page, you said?

  14         Q.   Yes.

  15         A.   Yes.

  16         Q.   Okay.  What attorney at Cozen O'Connor was

  17    your main point of contact?

  18         A.   Oh, mine was Jeff Feldman.

  19         Q.   Jeff?

  20         A.   Feldman.

  21         Q.   Jeff Feldman.  He's the attorney at

  22    Cozen O'Connor that was your main point of contact?

  23         A.   Yes.

  24         Q.   I've seen reference in the documents to a

  25    BCM Consulting that was paid $250,000 by
```

Page 246

1    fully intended to pay off the contract.  They never
2    mentioned Gazprom or PDVSA.
3         Q.    Were you surprised when you received a
4    payment from PDVSA?
5         A.    No.
6         Q.    Were you aware by this point in time in
7    October of 2017 that PDVSA was the source of funds
8    for the $50 million that you had received previously?
9         A.    I was never told that.
10        Q.    When you say that Mr. Arcay and Mr. Orsoni
11   communicated to you that you would be receiving the
12   additional $5 million at this time, was that over
13   email that they told you this?
14        A.    Yes and probably on the phone, too.
15             THE COURT REPORTER:  I'm sorry.
16        A.    And probably on the phone, too.
17   BY MR. KORN:
18        Q.    And did they tell you -- were these
19   communications in October as well?  Was it proximate
20   to the received the payment?
21        A.    We had been having conversations for months
22   about contract payments.  So for months Mr. Arcay,
23   Mr. Orsoni were trying to convince me to assign the
24   contract to PDVSA and for months I had kept rejecting
25   that request.  Until finally, I think it was

1    September or October, they tried again to get me to

2    assign the contract to PDVSA and, again, I refused.

3    And then they said, "Well, to show you our good

4    faith, we're going to send a contract payment to show

5    you we're intent on paying off the contract if you

6    assign it."

7         Q.   Did you return the money that you received

8    from PDVSA?

9         A.   No.

10        Q.   Why not?

11        A.   It was part of the payment for the original

12   contract.

13        Q.   Why were you so committed to -- withdrawn.

14             Why did you not want to agree to the

15   assignment of the agreement with PDVSA?

16        A.   Because I had no interest in doing business

17   with PDVSA.

18        Q.   And that's despite the fact that you had

19   from the very first day that you signed the agreement

20   in communicating with PDVSA and getting instructions

21   from people with PDVSA email addresses?

22             MR. JOHNSON:  Object to the form.

23        A.   Number one, I don't know that to be the

24   case.  I don't know if those email domains are even

25   legitimate.  And I have seen Citgo email domains,