Exhibit 5

1        UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF NEW YORK

2

            CASE NO.:  20-cv-3699

3

    PDV USA, INC.,

4

                Plaintiff,

5    vs.

6    INTERAMERICAN CONSULTING INC.,

7                Defendant.

    _____/

8

9

10

11

12        VIDEOTAPED DEPOSITION OF

13        INTERAMERICAN CONSULTING INC.

14            BY:  DAVID RIVERA

15

16

17        Wednesday, July 27, 2022

          9:15 a.m. - 6:14 p.m.

18

19

20            Jones Day

            600 Brickell Avenue

21            Miami, Florida

22

23

24        Stenographically Reported By:

          Gina Rodriguez, RPR, CRR

25

1    presentation?

2         A.    I didn't because I wasn't going to make the

3    presentation, but my understanding is that executives

4    or technocrats inside Citgo did.

5         Q.    Have you ever seen a draft of this

6    presentation?

7         A.    It may have been more than one

8    presentation.  I think there were several.

9         Q.    Have you ever seen a draft of any

10   presentation that was intended to be made to

11   Exxon Mobil as part of the meeting that you were

12   arranging?

13        A.    No.  No.

14        Q.    Have you ever seen any talking points that

15   were intended to be used in connection with the

16   meeting you were trying to arrange with Exxon Mobil?

17        A.    No.

18        Q.    Have you ever seen any agenda to be used in

19   connection with the meeting you were trying to

20   arrange with Exxon Mobil?

21        A.    I believe in messages that went back and

22   forth between Exxon Mobil, there was discussion of

23   the agenda.

24        Q.    Did you see those messages?

25        A.    Yes.

```
 1      APPEARANCES:
 2      On behalf of Plaintiff PDV USA, Inc.:
 3           WILLKIE FARR & GALLAGHER LLP
             787 Seventh Avenue
 4           New York, New York 10019
             (212)728-8000
 5           BY:  BRADY SULLIVAN, ESQUIRE
             bsullivan@willkie.com
 6           BY:  JEFFREY B. KORN, ESQUIRE
             jkorn@willkie.com
 7
 8           WILLKIE FARR & GALLAGHER LLP
             1875 K Street, N.W.
 9           Washington, DC 20006
             (202)303-1442
10           BY:  MICHAEL J. GOTTLIEB, ESQUIRE (via Webex)
             mgottlieb@willkie.com
11
12      On behalf of Defendant Interamerican Consulting
        Inc.:
13
             BYRD CAMPBELL
14           180 Park Avenue North
             Suite 2A
15           Winter Park, Florida 32789
             (407)392-2285
16           BY:  JASON JOHNSON, ESQUIRE
             jjohnson@byrdcampbell.com
17           BY:  ANDREW DOMINGOES, ESQUIRE (via Webex)
             adomingoes@byrdcampbell.com
18           BY:  DEBORA ANTISDEL, ESQUIRE (via Webex)
             dantisdel@byrdcampbell.com
19
        ALSO PRESENT:
20
21      Paul Smith, Videographer
        Alex Gonzalez (via Webex)
22
23
24
25
```

1      A.   None.  According to the Venezuelan

2    Constitution.

3      Q.   Citgo is a U.S. company, correct?

4      A.   Yes.

5      Q.   And it had --

6           MR. KORN:  You know, now is a good time to

7         take a break.

8           THE WITNESS:  Thank you.  I appreciate it.

9           THE VIDEOGRAPHER:  Going off the record at

10        10:22 a.m.

11     (Recess was held from 10:22 a.m. until 10:33 a.m.)

12           THE VIDEOGRAPHER:  Back on the record at

13        10:33 a.m.

14    BY MR. KORN:

15      Q.   Welcome back, Mr. Rivera.

16      A.   Thank you.

17      Q.   Do you recall yesterday we discussed the

18    payments that you made to Hugo Perera, Raul Gorrin

19    and Esther Nuhfer?

20      A.   Yes.

21      Q.   And you referred to those as referral fees?

22      A.   Yes.

23      Q.   And I believe you testified that you never

24    paid any consulting fees to any of them?

25      A.   Correct.

1    BY MR. KORN:

2        Q.    Okay.  Put that document to the side.

3    Let's do Tab 35.

4            (Thereupon, marked as Exhibit 20.)

5    BY MR. KORN:

6        Q.    Mr. Rivera, the court reporter has handed

7    you Exhibit 20.

8        A.    Yes.

9        Q.    Which is an email from you to Esther Nuhfer

10   and Hugo Perera dated November 29th, 2017, bearing

11   the Bates Number PGA104.  Do you see that?

12       A.    Yes.

13       Q.    Okay.  This email is a little over a week

14   after the email that we just looked at from you to

15   Mr. Lykkebak; do you see that?

16       A.    Yes.

17       Q.    Okay.  And do you see in your -- first off,

18   did you send the email I've marked as Exhibit 20 to

19   Ms. Nuhfer and Mr. Perera?

20       A.    Who gave you this?

21       Q.    It was produced by PG & Associates.

22       A.    I would assume so, but I would not say

23   definitely if it came from PG & Associates.

24       Q.    You're the author of this email according

25   to Exhibit 20.

1          A.    Yes.

2          Q.    Do you doubt that you sent this email on

3     November 29th, 2017?

4          A.    I would presume so, but I cannot say

5     definitely if it came from PG & Associates.

6          Q.    Do you recall sending this email?

7          A.    No.

8          Q.    Do you see that in this email you wrote:

9     "Here are the invoice dates and amounts that I need

10    from each subcontractor"?

11              MR. JOHNSON:  Object to the form.

12              MR. KORN:  What is wrong with my question?

13              MR. JOHNSON:  Your question presumes that

14         he wrote it.  He just testified he doesn't

15         remember writing it and the question, the

16         veracity of it, if it came from PG & Associates.

17         That's why I objected to the form, Mr. Korn.  I

18         don't like doing speaking objections, but if you

19         want to ask me to explain it, I'm happy to do so

20         for the record.

21              MR. KORN:  My question was:  Do you see

22         that in this email you wrote, "Here are the

23         invoice dates and amounts that I need from each

24         subcontractor"?

25              MR. JOHNSON:  And my objection is that your

1              question is presuming that he wrote it when he's

2              just testified that he's not sure he wrote it.

3                    MR. KORN:   Okay.

4    BY MR. KORN:

5         Q.   Are you questioning -- are you questioning

6    the authenticity of this document?

7         A.   Who did it come from?

8         Q.   I just answered that question.

9    PG & Associates produced this to us.  Do you, sir,

10   question that this email was actually sent by you at

11   this time?

12        A.   I question anything provided by

13   PG & Associates.

14        Q.   Why?

15        A.   Because PG & Associates is run by

16   Hugo Perera.

17        Q.   Okay.

18        A.   Who since December 2018 has been a

19   cooperating FBI informant in an investigation of this

20   matter.

21        Q.   Do you believe that Hugo Perera fabricated

22   the email that I have marked as Exhibit 20?

23        A.   I question anything produced by Hugo Perera

24   because since December 2018, he has been a FBI

25   government informant in a matter related to these

1    topics.

2         Q.   Right.  The FBI is investigating the

3    contract arrangements that you entered into with

4    Hugo Perera, correct?

5         A.   I have no idea what the FBI is

6    investigating.  I can only tell you what I've read.

7         Q.   Okay.  Did you delete your copy of the

8    email that I've marked as Exhibit 20?

9         A.   I don't recall this email, so I can't

10   recall deleting it.

11        Q.   Okay.  You testified yesterday that in

12   response -- after conversations that you had with

13   your accountant, you had further discussions with

14   Mr. Perera and Ms. Nuhfer and Mr. Gorrin about

15   documenting the referral fees that you paid.  Do you

16   recall that?

17        A.   Yes.

18        Q.   Okay.

19             And I believe you said that you went back

20   to the three of them and asked for W9s, invoices and

21   other things; is that correct?

22        A.   Correct.

23        Q.   Okay.  This email says:  "Here are the

24   invoice dates and amounts that I need from each

25   subcontractor."

1          MR. JOHNSON:  Let him ask his question,

2     David.

3   BY MR. KORN:

4          Q.   Have you provided information to the FBI?

5          A.   They have the same information you have.

6          Q.   Meaning what?

7          A.   Meaning whatever we gave you, we gave them.

8          Q.   Have you ever been interviewed by the FBI?

9          A.   No.

10         Q.   Have you spoken to the FBI?

11         A.   No.

12         Q.   I believe you testified yesterday that

13    following your discussions with Mr. Lykkebak, your

14    accountant, you, together with Mr. Perera and

15    Ms. Nuhfer, put together contracts for services to

16    document the referral fees that you paid; is that

17    correct?

18         A.   We did not all put it together.  I drafted

19    it.

20         Q.   Okay.  That was going to be one of my

21    questions.

22              The contract for services that were signed

23    were drafted by you; is that correct?

24              MR. JOHNSON:  Object to the form.

25         A.   Say it one more time.

1          right.  So . . .

2                Thank you for the clarification.

3     BY MR. KORN:

4          Q.   So Exhibit 22 is a one-page contract for

5     services produced to us by Interglobal Yacht

6     Management bearing the Bates number IYM Supplemental

7     Response 000290.

8                Do you have the document in front of you?

9          A.   Yes.

10         Q.   Okay.  My first question, sir, is that --

11    do you see that there's a signature block at the

12    bottom?

13         A.   Yes.

14         Q.   And there's a signature block for

15    Interamerican Consulting Incorporated.  Do you see

16    that?

17         A.   Yes.

18         Q.   Is that your signature?

19         A.   Yes.

20         Q.   Did you sign this document?

21         A.   Yes.

22         Q.   Okay.

23         A.   But not on that date.

24         Q.   I'll get -- I'll get there.

25                But this contract for services is a

1   document that you signed, correct?

2          A.   Yes.

3          Q.   And am I correct that you were the person

4   who drafted the contract for services that I've

5   marked as Exhibit 22?

6          A.   Yes.

7          Q.   And you prepared this contract for services

8   and signed it in connection with the preparation of

9   your 2017 tax return; is that correct?

10         A.   Yes.

11         Q.   You signed this document in order for

12   Mr. Lykkebak to use it in connection with the

13   preparation of your tax return, correct?

14         A.   I don't know if he was going to use it.  I

15   think the way he described it was that he wanted to

16   have them in the file.

17         Q.   Okay.  Did you give this contract for

18   services to Mr. Lykkebak for his file?

19         A.   I believe I either gave it to him for his

20   file or he told me that I should keep it in a file.

21   I can't remember which one.

22         Q.   Okay.  Were you the person who wrote the

23   date in on under your signature?

24         A.   Yes.

25         Q.   And the date you wrote is March 20th, 2017,

1    this contract for services as Interglobal Yacht
2    Management, right?
3        A.    That is the name printed on this document.
4        Q.    Okay.  If the referral fee was owed to
5    Mr. Gorrin, why didn't you identify Mr. Gorrin as the
6    subcontractor in this contract for services?
7        A.    Because Mr. Gorrin asked that the payment
8    be made to Interglobal Yacht Management.
9        Q.    Was Mr. Gorrin part of the project that
10   Interamerican did with Citgo in 2017?
11       A.    Only as a referral.
12       Q.    Was Mr. Gorrin involved in helping to
13   arrange meetings with Exxon?
14       A.    No.
15       Q.    Did you communicate with Mr. Gorrin about
16   arranging meetings with Exxon?
17       A.    I may have, sure.
18       Q.    Did he communicate with you about
19   conversations he had with Delcy Rodriguez about the
20   Exxon meeting?
21       A.    No.  At least not that I recall.
22       Q.    If you can pull out Exhibit 15 from your
23   stack.  That's the consulting agreement.
24       A.    I got it.
25       Q.    I'd like you to turn to Page 6.  If you

1          A.    Right, full-time Citgo employees.

2          Q.    Or PDVSA employees or any Cit0 -- PDV USA

3     affiliates or anybody within the PDVSA, PDV universe,

4     that you might consider to be your client.

5                Are you with me?

6          A.    No one in PDVSA do I consider my client.

7          Q.    Okay, fine.  Just so we're clear, we're

8     talking about meetings between Interamerican and its

9     client and no one else, correct?

10         A.    Yes.

11         Q.    Okay.  The written record of any such

12    meetings would be communication -- written

13    communications or documents that were either produced

14    by Interamerican in this case or by my client in this

15    case, correct?

16         A.    Unless Barry and Corey have records of

17    internal Citgo employee meetings related to these

18    matters.

19         Q.    Okay.  Do you personally have any written

20    records in your files showing that you participated

21    in meetings with representatives of Interamerican's

22    client in this engagement?

23         A.    Do you define meetings as over the phone?

24         Q.    All -- meetings, calls --

25         A.    Anything.

1         A.    Yes.

2         Q.    Okay.  Am I correct that you did not send a

3    written bi-weekly report to PDV USA on May 16?

4         A.    Say that one more time.

5         Q.    Am I correct that you did not send a

6    written bi-weekly report to PDV USA on May 16th?

7         A.    I don't believe it was written, but oral.

8         Q.    Am I correct that you did not send a

9    written bi-weekly report to PDV USA on May 30th?

10        A.    Probably not written, but verbal.

11        Q.    Am I correct that you did not send a

12   written bi-weekly report to PDV USA on June 13th?

13        A.    Probably not written, but verbal.

14        Q.    Okay.  Do you recall actually delivering a

15   oral bi-weekly report to PDV USA on May 16th?

16        A.    Of course.

17        Q.    Do you recall actually --

18        A.    May I rephrase.  On May 16th and many other

19   days.

20        Q.    Okay.  Well, I'm only asking about

21   May 16th.

22        A.    Okay.

23        Q.    And I'm only asking about bi-weekly

24   reports.

25        A.    Okay.

1          Q.   Do you recall actually delivering an oral

2     bi-weekly report to the PDV USA on May 16th?

3          A.   Of course.

4          Q.   Do you recall actually delivering an oral

5     bi-weekly report to PDV USA on May 30th?

6          A.   Of course.

7          Q.   Do you recall actually delivering an oral

8     bi-weekly report to PDV USA on June 13?

9          A.   Of course.

10         Q.   Okay.  Do you recall what you told to

11    PDV USA in your oral bi-weekly report on May 16th?

12         A.   No.

13         Q.   Do you recall what you told to PDV USA in

14    your oral bi-weekly report on May 30th?

15         A.   No, whatever was happening at that moment

16    or that week is what I would report, so whatever was

17    happening that week.

18         Q.   Do you recall what you told to PDV USA in

19    your oral bi-weekly report on June 13th?

20         A.   Again, whatever is referenced in these

21    written reports was what was discussed on those dates

22    and other dates as well, throughout the periods.

23         Q.   Okay.  At the risk of going backwards, if

24    you turn back to Exhibit 27, which contains your

25    progress report dated May -- from May 1.

1      A.    Yeah.

2      Q.    I'll ask you the same questions.

3          Do you recall actually giving an oral

4  bi-weekly report to PDV USA on April 4th?

5      A.    I recall giving my biweekly reports as well

6  as daily reports but certainly the bi-weekly reports

7  whenever they were to be given, so if April 4th was a

8  day for a report, I gave it.

9      Q.    Do you recall what you told to PDV USA in

10  your bi-weekly report on April 4th?

11     A.    I'm absolutely positive that we discussed

12  the details associated with this written report.

13     Q.    Do you recall giving an actual oral report

14  to PDV USA on April 18th?

15     A.    I provided the bi-weekly and daily reports

16  throughout the period and discussed the details

17  behind these written reports.

18     Q.    Do you recall what you told to PDV USA as

19  part of your bi-weekly report on April 18th?

20     A.    Whatever the details are behind this

21  written report is what was discussed in the bi-weekly

22  reports.

23     Q.    Okay.  Do you recall what those details

24  are, as you sit here today?

25     A.    Of course.

1       Q.   Are you able to testify what you

2  specifically said to PDV USA as part of your

3  bi-weekly report on April 18th?

4       A.   I already have.  You asked me in specifics

5  about this paragraph, and I gave you specifics about

6  this paragraph.

7       Q.   And those are the specifics that you can

8  recall?

9       A.   Of course.

10      Q.   Okay.

11           Nothing -- do you recall anything else

12  that you said during your April 18th, bi-weekly

13  report, that you delivered orally to PDV USA?

14      A.   Can I read it again?

15      Q.   Please.

16      A.   So on the first sentence, that obviously

17  refers to the corporate constituent outreach element

18  of the strategic plan, so I'm absolutely sure that

19  was discussed in the bi-weekly report.

20           The second sentence, similar, involves the

21  details regarding corporate constituent outreach,

22  de facto independence, association organization as

23  well.  The third sentence refers to the corporate

24  constituent services, certainly the de facto

25  independence.  I would say those are the -- those

1    interactions in 2017 with the Committee On Foreign
2    Investment in the United States relating to PDVSA's
3    pledge of 49.9 percent of the stock -- of
4    Citgo Holding Inc. to the Russian entity Rosneft?
5         A.    I've never heard of that before in my life.
6         Q.    Did you work -- withdrawn.
7               Did you do any work to improve PDVSA or
8    PDV USA's standing with the treasury department
9    after the announcement of new sanctions in August of
10   2017?
11        A.    Give it to me one more time.
12        Q.    Did you do any work to improve PDVSA or
13   PDV USA's standing with the treasury department after
14   the announcement of new sanctions in August of 2017?
15        A.    Well, number one, I've never done any work
16   to improve PDVSA's standing anywhere so the first
17   part of your question is no.
18               Give me the second part.
19        Q.    Did you do any work to improve PDV USA's
20   standing with the treasury department after the
21   announcements of new sanctions in August of 2017?
22        A.    So I remember that even though the contract
23   had expired in June of 2017, I was still in touch
24   with Arcay and Orsoni and maybe a couple of the other
25   guys all the way till November, and so I remember

1          to the form of that, and I don't want to make a
2          speaking objection, but I think part of the
3          disconnect is the way they were retrieved the
4          first time.  That information wasn't, either
5          wasn't retrieved by the vendor or couldn't be
6          for some reason.  I don't know the specifics of
7          that, but it wasn't withheld from you, it's just
8          when we went back and produced it the second
9          time with a different vendor, the information
10         wasn't there, so for whatever that's worth.  I
11         just want to clarify that, that I think the
12         wording of what you said, and I can't remember
13         exactly what it was.
14         A.   I had nothing to do with this.  I just gave
15    the phone.
16    BY MR. KORN:
17         Q.   Do you have any explanation for why this
18    information is missing?
19         A.   I know nothing about IT.
20         Q.   Did you go through your WhatsApp messages
21    at some point in time and attempt to delete messages
22    or information involving Raul Gorrin?
23         A.   No.
24         Q.   Since this litigation has been filed, did
25    you go through your WhatsApp messages and attempt to

1   delete or delete messages or information involving

2   Raul Gorrin?

3        A.   I just said no.

4        Q.   Okay.  Let's go to Interamerican_3062 in

5   Exhibit 31.

6             Do you see that there is a message in the

7   middle of the page, and if you --

8        A.   Can I -- there we go.

9        Q.   So --

10       A.   A little bit more.

11       Q.   Okay.  So just so the record is clear, we

12  have set up a monitor in this deposition in front of

13  Mr. Rivera that allows us to display Exhibit 31

14  electrically in order to zoom in on the text so it is

15  legible.

16       A.   Thank you.

17       Q.   The version that was produced to us has

18  print that is very difficult to read given its size.

19            Mr. Rivera, if you need us to zoom in

20  further on any message --

21       A.   I think we're good.

22       Q.   -- let me know.

23       A.   I think we're good in 286.

24            Can you go to 300?

25            MR. JOHNSON:  I think he means the Zoom

1    document.

2         Q.   Did you put that information in this

3    document?

4         A.   I did not.

5         Q.   And you did not name PDV USA as the

6    counter-party to this agreement, right?

7         A.   I did not.

8         Q.   If they had said this agreement was between

9    PDVSA and Interamerican, would you have entered into

10   this agreement?

11        A.   Absolutely not.

12        Q.   Why not?

13        A.   Because I would never want anything

14   whatsoever to do with PDVSA in any type of agreement.

15        Q.   When did PDV USA send the written

16   termination -- the written notice of their

17   termination of this agreement to you?

18        A.   They never did.

19             MR. JOHNSON:  That's it.

20             THE VIDEOGRAPHER:  Going off record at

21        6:14 p.m.

22             (Proceedings concluded at 6:14 p.m.)

23

24

25