Exhibit 14



Print | Close Window

Subject: Draft
  From: David Rivera <rivera2002@comcast.net>
  Date: Mon, May 29, 2017 5:44 pm
    To: hugo@pgandassociates.net

---

Raul,

    I understand all of the concerns and frustrations expressed by the client. However, they should know that EX never raised the issue of attorneys as a meeting obstacle until AFTER a settlement offer was made by V's lawyers to EX's lawyers.

    The reason EX cited the "ongoing arbitration process" in their text to Sombrero is that any ex parte communication between EX and V outside the arbitration process can result in sanctions against both EX as a corporate entity and against EX's attorneys individually. The American Bar Association defines ex parte communications as "an oral or written communication not on the public record with respect to which reasonable prior notice to all parties in a dispute is not given." Title 49 Section 1102.2(a)(3) of the Code of Federal Regulations states, "*Ex Parte* communication concerning the merits means an oral or written communication by or on the behalf of a party which is made without the knowledge or consent of any other party that could or is intended to influence anyone who participates or could reasonably be expected to participate in the decision." Section (f) (1) and (3) states that the penalties for ex parte communications include "censure, suspend, or revoke the privilege of practicing before the agency of any person who knowingly and willfully engages in or solicits prohibited *ex parte* communication concerning the merits of a proceeding and may institute proceedings to suspend or dismiss any party who knowingly and willfully violates the foregoing rules." In a civil proceeding these sanctions can include monetary damages and fines as well as professional sanctions against EX attorneys individually, including fines up to disbarment. This is the same as a prosecutor visiting a criminal in jail and trying to convince the criminal to plead guilty without notifying his attorney. There are exceptions to ex parte communications in Section (b) including "Any communication to which <u>all the parties to the proceeding agree</u> may be made on an *ex parte* basis."

    When EX reacted with the position that for now they wanted to keep matters between the attorneys, I spoke to Sombrero directly. Sombrero said it was important for V to communicate to EX why it sought to meet DESPITE the settlement offer that was made through formal legal channels. Thus the drafting of the text mentioning "new opportunities", which I was initially told would not be a problem. Sombrero communicating this message to EX rather than V will NOT address the legal exposure for EX pursuing or participating in an ex parte communication with V. BOTH parties to the ex parte communication must agree to engage in the ex parte communication. <u>Only by V communicating this meeting request directly to EX will the issue of an ex parte communication be resolved.</u>

    Remember, we are in this situation because V chose to send a settlement offer to EX, through formal ATTORNEY-TO-ATTORNEY channels, rather than through our informal channels, at the exact same time we were trying to organize the back channel meeting; which in effect is actually a textbook definition of an ex parte communication. Sending a formal settlement offer while at the same time requesting an informal ex parte communication is inherently contradictory, confusing and extremely counterproductive for our and V's ultimate goals and purposes. Besides the fact that the settlement offer was made without our knowledge and without giving us the opportunity to evaluate the impact on our meeting request and to provide V our advice. Unfortunately, we now know the impact was to derail the meeting request.

PGA0001



Again, EX never raised the issue of attorney interference before the settlement letter was sent by V. They had always expressed a willingness to Sombrero to meet before, and I personally had no indication that EX's willingness to meet was diminished until the issue of the settlement letter arose.

In terms of moving forward, I suggest OR1 or OR2 make the meeting request via EX's email address. Simultaneous with this email, Sombrero will put pressure on EX to accept the meeting request for June 9, 10 or 11. This is the best backchannel avenue to resolve V's situation with EX and ultimately the meeting with Mr. T. This pressure by Sombrero may have to include details regarding meeting topics, including payments, leases and MOUs.

However, if OR1 persists in being unwilling to make the written meeting request, then I suggest we return the last payment and either terminate our efforts or return our focus to the original intent which was to work toward normalizing relations.

I have no problem whatsoever returning EX's last payment, but it will not change the fact that a settlement offer has been made, one that we are unaware as to its details, complexities or evaluation time by EX. It will also not change the fact that EX needs protection from legal exposure to participate in an ex parte communication. So even if we return the last payment, EX is still going to need a formal meeting request from V. Therefore, I suggest we make the effort outlined above and if no meeting occurs before the expiration of visas, we return V's last payment. At the very least, V should know that everyone involves wants the meeting to happen and will do all within our power and ability to get it done.

I await your thoughts.

Copyright © 2003-2020. All rights reserved.

PGA0001