# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CASE NO.:  20-cv-3699

PDV USA, INC.,

              Plaintiff,

vs.

INTERAMERICAN CONSULTING INC.,

              Defendant.
_____/


VOLUME 1, PAGES 1 - 252


VIDEOTAPED DEPOSITION OF

INTERAMERICAN CONSULTING INC.
BY:  DAVID RIVERA


Tuesday, July 26, 2022
10:38 a.m. - 6:23 p.m.


Jones Day
600 Brickell Avenue
Miami, Florida


Stenographically Reported By:
Gina Rodriguez, RPR, CRR

APPEARANCES:

On behalf of Plaintiff PDV USA, Inc.:

    WILLKIE FARR & GALLAGHER LLP
    787 Seventh Avenue
    New York, New York 10019
    (212)728-8000
    BY:  BRADY SULLIVAN, ESQUIRE
    bsullivan@willkie.com
    BY:  JEFFREY B. KORN, ESQUIRE
    jkorn@willkie.com

    WILLKIE FARR & GALLAGHER LLP
    1875 K Street, N.W.
    Washington, DC 20006
    (202)303-1442
    BY:  MICHAEL J. GOTTLIEB, ESQUIRE (via Webex)
    mgottlieb@willkie.com

On behalf of Defendant Interamerican Consulting Inc.:

    BYRD CAMPBELL
    180 Park Avenue North
    Suite 2A
    Winter Park, Florida 32789
    (407)392-2285
    BY:  JASON JOHNSON, ESQUIRE
    jjohnson@byrdcampbell.com
    BY:  ANDREW DOMINGOES, ESQUIRE (via Webex)
    adomingoes@byrdcampbell.com
    BY:  DEBORA ANTISDEL, ESQUIRE (via Webex)
    dantisdel@byrdcampbell.com

ALSO PRESENT:

Javier Ordonez, Videographer
Alex Gonzalez (via Webex)

A.   I believe she was at the April meeting.

Q.   Any other times?

A.   No.

Q.   Had you communicated with her in any other way other than at those two meetings?

A.   No.

Q.   Do you know whether Raul Gorrin has any relationship with Delcy Rodriguez?

A.   You mean, does he know her?  He certainly knows her.

Q.   Did they do business together, to your knowledge?

A.   I have no idea.

Q.   Now, did Delcy Rodriguez have any involvement in the work you did in connection with the PDV USA consulting agreement?

A.   No.

Q.   Are you familiar with Nelson Martinez?

A.   Yes.

Q.   At the time you entered into the PDV USA contract, he was the energy minister of Venezuela, correct?

A.   That's my recollection.

Q.   And he was the president of PDVSA, correct?

A.   I don't know about that.  I remember him

Q.   Did Interamerican prepare the written agreement for services with PDV USA?

A.   No.

Q.   Who did?

A.   Somebody inside Citgo.

Q.   Did Interamerican have any input on the terms of the agreement that it signed with PDV USA?

A.   No.

Q.   Did you provide any language to be included in the agreement between Interamerican and PDV USA?

A.   No.

Q.   Did you draft any portion of the contract between Interamerican and PDV USA?

A.   No.

Q.   Did you have a role in preparing the exhibits to the contract between Interamerican and PDV USA that set forth the scope of services that Interamerican would provide to PDV USA?

A.   No.

Q.   That was all drafted by Citgo and PDV USA?

A.   Somebody inside Citgo.

Q.   Somebody inside Citgo, but David Rivera had nothing to do with that drafting, correct?

A.   Correct.

Q.   Was Raul Gorrin involved in any way in the

A.   Correct.

Q.   Did Esther Nuhfer have any involvement in any work you did in connection with the consulting engagement?

Did Esther Nuhfer have any involvement in any work you did in connection with the consulting engagements?

A.   No.  I told you no.

Q.   Did you -- were you ever asked to prepare any budget for your client?

A.   The budget to me was the agreement.

Q.   That wasn't my question.  My question is: Did Citgo or PDV USA or anyone else ever ask you to prepare any sort of budget for the work that you would do?

A.   They prepared the budget.  It was 50 million.

Q.   Okay.  How many hours per week did you expect that you would work for PDV USA as part of this engagement?

A.   Whatever it took.

Q.   Did you have other clients at the time?

Were you servic- -- was Interamerican working for other clients at the time it was also working for PDV USA?

that I had discussed with the Citgo executives.

Q.    Okay.  What did the meeting have to do with your strategic plan for -- with the Citgo executives?

A.    As I mentioned earlier, establishing strategic partnerships with U.S. petroleum companies was an important part of the effort.

Q.    Okay.  Well, when I asked you who the attendees were expected to be, you did not identify anybody from Citgo.  Isn't it true that there were no expected attendees that were executives at Citgo for this meeting?

A.    No.

Q.    Who from Citgo were you expecting to attend?

A.    General counsel, probably Orsoni, and a technocrat.

THE COURT REPORTER:  A?

A.    A technocrat.

BY MR. KORN:

Q.    And what technocrat was that?

A.    That was up to Citgo.

Q.    Okay.  What was the purpose of the meeting that you were planning in Dallas with Exxon?

A.    To lay the groundwork for a strategic partnership.

Q. Why would there be a strategic partnership between Exxon and Citgo?

A. Because the whole purpose of Citgo retaining me was to try and develop such efforts.

Q. Aren't Exxon and Citgo competitors?

A. Not necessarily. Exxon is always trying to expand business and so is Citgo.

Q. Did you receive instructions from Pio Gonzalez as part of your work for PDV USA?

A. I remember emails from his email domain.

Q. So is the answer to my question "yes"?

A. I don't remember every email. I would need to see the emails.

Q. Right. But do you remember any emails where you received instructions from Pio Gonzalez?

A. I seem to recall an email regarding emailing him the invoices, if you consider that an instruction.

MR. KORN: 16, 17.

(Thereupon, marked as Exhibit 17.)

BY MR. KORN:

Q. Okay. I have just handed you Exhibit 17, which is an email exchange that bears the Bates range Interamerican_002198 and also has 2199. I've also included a certified translation and the attached

invoice which bears the Bates range Interamerican_002200.

Okay. Do you see there's an email that was sent by you to Pio Gonzalez? It's a copy to Guillermo Blanco on March 21st at 8:53 p.m.

A. Yeah, yes.

Q. Did you send this email?

A. I'm sure I did.

Q. Okay.

A. This comes from me?

Q. This was produced by you.

A. Yes.

Q. Okay.

A. Then I'm sure I did.

Q. Okay. Do you know why some of your emails from this time period were produced while others were not?

A. No.

Q. Did you deliberately at some point go through your files to delete some emails and leave others?

A. No.

Q. Okay. Well, let's look at the email at the bottom of the second page.

Do you see that there's an email from

A.    My tax returns have been scrutinized since the moment I got elected to Congress.

BY MR. KORN:

Q.    All right.  A few wrap-up questions and then we can break for the day.

Did Interamerican ever retain the law firm of Cozen O'Connor as its counsel?

A.    Yes.

Q.    What was the scope of that engagement?

A.    They wrote this thing, this retainer agreement that had the verbiage that you guys use, but basically to review this contract.

Q.    Meaning, the Cozen O'Connor firm was retained by Interamerican to review the Interamerican/PDV USA contract?

A.    Yes.  But it took them ten pages to say that.

THE COURT REPORTER:  Ten?

A.    Ten pages to say that.

BY MR. KORN:

Q.    Did Cozen O'Connor then proceed to do an investigation of the PDV USA contract with Interamerican?

A.    I wouldn't use that term.

Q.    Did they do a review of the contract?

A.   They did.

Q.   Over what period of time?

A.   Oof, sometime in 2018.

Q.   Okay.  Was it your idea to hire Cozen O'Connor to conduct that review?

A.   It was a joint decision.

Q.   A joint decision by who?

A.   Mr. Perera, Ms. Nuhfer and myself.

Q.   Was Mr. Gorrin involved in that decision?

A.   No.

Q.   Did Cozen O'Connor also serve as counsel to Mr. Perera and Ms. Nuhfer as part of that engagement or was the engagement only with Interamerican?

A.   It was jointly financed, so I don't know if that means -- what was the term you used?  If they --

Q.   I just want to understand whether Mr. Perera and Ms. Nuhfer were also clients of Cozen O'Connor as part of this exercise.

A.   I mean, the attorney at Cozen knew that Mr. Perera and Ms. Nuhfer were involved in hiring them, but Interamerican had the name on the retainer agreement.

Q.   Did Cozen O'Connor produce bills as part of this engagement?

A.   I have no doubt.

THE COURT REPORTER: I'm sorry?

A. I have no doubt.

BY MR. KORN:

Q. Right. Did they provide a memo to Interamerican as part of this engagement?

A. They did.

Q. Was it a lengthy memo?

A. What do you consider lengthy?

Q. Fair. It's fair question.

A. Particularly for attorneys.

Q. Okay. It was a multi-page memo with an analysis of the PDV USA/Interamerican contract?

A. Multi-page, you said?

Q. Yes.

A. Yes.

Q. Okay. What attorney at Cozen O'Connor was your main point of contact?

A. Oh, mine was Jeff Feldman.

Q. Jeff?

A. Feldman.

Q. Jeff Feldman. He's the attorney at Cozen O'Connor that was your main point of contact?

A. Yes.

Q. I've seen reference in the documents to a BCM Consulting that was paid $250,000 by

fully intended to pay off the contract.  They never mentioned Gazprom or PDVSA.

Q.    Were you surprised when you received a payment from PDVSA?

A.    No.

Q.    Were you aware by this point in time in October of 2017 that PDVSA was the source of funds for the $50 million that you had received previously?

A.    I was never told that.

Q.    When you say that Mr. Arcay and Mr. Orsoni communicated to you that you would be receiving the additional $5 million at this time, was that over email that they told you this?

A.    Yes and probably on the phone, too.

THE COURT REPORTER:  I'm sorry.

A.    And probably on the phone, too.

BY MR. KORN:

Q.    And did they tell you -- were these communications in October as well?  Was it proximate to the received the payment?

A.    We had been having conversations for months about contract payments.  So for months Mr. Arcay, Mr. Orsoni were trying to convince me to assign the contract to PDVSA and for months I had kept rejecting that request.  Until finally, I think it was

September or October, they tried again to get me to assign the contract to PDVSA and, again, I refused. And then they said, "Well, to show you our good faith, we're going to send a contract payment to show you we're intent on paying off the contract if you assign it."

Q. Did you return the money that you received from PDVSA?

A. No.

Q. Why not?

A. It was part of the payment for the original contract.

Q. Why were you so committed to -- withdrawn.

Why did you not want to agree to the assignment of the agreement with PDVSA?

A. Because I had no interest in doing business with PDVSA.

Q. And that's despite the fact that you had from the very first day that you signed the agreement in communicating with PDVSA and getting instructions from people with PDVSA email addresses?

MR. JOHNSON: Object to the form.

A. Number one, I don't know that to be the case. I don't know if those email domains are even legitimate. And I have seen Citgo email domains,

presentation?

A. I didn't because I wasn't going to make the presentation, but my understanding is that executives or technocrats inside Citgo did.

Q. Have you ever seen a draft of this presentation?

A. It may have been more than one presentation. I think there were several.

Q. Have you ever seen a draft of any presentation that was intended to be made to Exxon Mobil as part of the meeting that you were arranging?

A. No. No.

Q. Have you ever seen any talking points that were intended to be used in connection with the meeting you were trying to arrange with Exxon Mobil?

A. No.

Q. Have you ever seen any agenda to be used in connection with the meeting you were trying to arrange with Exxon Mobil?

A. I believe in messages that went back and forth between Exxon Mobil, there was discussion of the agenda.

Q. Did you see those messages?

A. Yes.