UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

PDV USA, INC.,                                          :

                                                       :          20-CV-3699 (JGK) (RWL)
                          Plaintiff,                   :

                                                       :
            - against -                                :          **DECISION AND ORDER:**
                                                       :          **MOTION FOR SANCTIONS (DKT. 262)**
INTERAMERICAN CONSULTING INC.,                          :

                                                       :
                          Defendant.                   :

                                                       :
-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

This is an action for breach of contract. Before the Court is the motion of Plaintiff

PDV USA, Inc. ("PDV USA") pursuant to Federal Rule of Civil Procedure 37(e) ("Rule

37(e)") and the Court's inherent powers for sanctions against Defendant Interamerican

Consulting Inc. ("Interamerican") based on spoliation of electronically stored information

("ESI"). The matter is fully briefed, and the Court heard oral argument on January 15,

2026.[1] For the reasons set forth below, the motion is GRANTED IN PART and DENIED

IN PART.

## Factual And Procedural Background

### A.    PDV USA's Allegations

PDV USA, formerly based in New York, is a wholly-owned subsidiary of PDV

Holding, Inc. ("PDV Holding"), which is a wholly-owned subsidiary of Petróleos de

---

[1] Citations herein to the transcript of oral argument at Dkt. 293 are designated by "Tr."

Venezuela, S.A. ("PDVSA").   (SAC ¶ 11.[2])   PDVSA is the state-owned oil and gas corporation of Venezuela.   (*Id*. ¶ 2.)   Interamerican is a one-person consulting firm incorporated in Florida by former United States Congressman David Rivera ("Rivera"). (*Id*. ¶ 12.)

On March 21, 2017, PDV USA and Interamerican entered into a consulting agreement (the "Agreement") pursuant to which Interamerican would be paid $50 million in six installments over a three-month period to provide "strategic consulting services" for a "CLIENT," whom the parties understood was PDVSA.   (*Id*. ¶¶ 1, 16, 22-23 and Ex. 1.) PDVSA instructed PDV USA to enter into the Agreement.   (*Id*. ¶¶ 2, 16.)   At the time of the Agreement, PDVSA was controlled by the regime of Nicolás Maduro.   (*Id.* ¶ 2.)

Under the Agreement, Interamerican was to develop and implement a plan to improve PDVSA's reputation and standing among, and build relationships with, United States policymakers, opinion leaders, public officials, and targeted stakeholders.   (*Id.* ¶¶ 3, 24.)   The Agreement required Interamerican to provide detailed accounts of the work it would do to further PDVSA's interests in the United States. (*Id*. ¶ 25.) Specifically, Interamerican was required to provide: (1) updates regarding its strategic consulting services; (2) supporting documentation for all invoices, as well as "adequate and complete details of the Services rendered"; (3) bi-weekly reports detailing its activities under the Agreement; and (4) a final report integrating all work product and making recommendations for monitoring the strategies implemented.   (*Id*.)

---

[2] "SAC" refers to the Second Amended Complaint filed on September 6, 2022, at Dkt. 104.

Interamerican did not, and never intended to, provide any meaningful services as required by the Agreement.  (*Id.* ¶¶ 3, 7, 32-35.)  For instance, instead of furnishing regular reports, Rivera submitted only two reports in total: one "bi-weekly" report and a final report. The reports together totaled no more than five pages, much of which was duplicative, and failed to describe any meaningful work done or provide any evidence that work was actually performed.  (*Id*. ¶¶ 38-44.)  The reports make numerous references to developing and implementing the "strategic plan," but do not describe what that plan entailed or how it was implemented.  (*Id*. ¶ 40.) The reports also refer generically to meetings and discussions with "important policy makers and opinion leaders in the United States," "key public officials," "target stakeholders," "public sector stakeholders," and "private sector stakeholders," but fail to describe the purpose of those meetings, who attended, what was discussed, or what makes any of these leaders, officials or stakeholders important to the "strategic plan."  (*Id*. ¶ 41.)  The final report refers to recommendations but does not explain what they are.  (*Id*. ¶ 42.)

The Agreement further required Interamerican to provide "supporting documentation" and "adequate and complete details of the Services rendered" with each invoice submitted to PDV USA.  (*Id*. ¶ 44.)  But Interamerican provided no supporting documentation or detail whatsoever with the invoices submitted for payment. (*Id*.)  And, although Interamerican was required to complete the services "to PDV USA's sole satisfaction," PDV USA was not satisfied and never expressed satisfaction with any of Interamerican's services.  (*Id*. ¶ 45.)  Rather than performing the services due to PDV USA, WhatsApp messages and emails show that during the term of the Agreement, Rivera attempted to arrange a meeting for senior officials of the Maduro regime with

executives of PDVSA and Exxon.  (*Id*. ¶ 36.)  Even that meeting, however, never occurred.  (*Id.* ¶ 37.)

After entering into the Agreement, PDV USA paid Interamerican the first three installments of $5 million each for a total of $15 million.  (*Id.* ¶¶ 4, 60-63.)  PDV USA made the payments on March 24, April 10, and April 19, 2017.  (*Id.*  ¶¶ 61-62.)  PDV USA paid those amounts – as it was instructed to do by PDVSA – before receipt of any interim reports from Interamerican, the first of which was not received until May 1, 2017.  (*Id.* ¶¶ 60, 63.)  Following receipt of the initial report, PDV USA made no further payments and refused to pay the final three installments totaling $35 million.  (*Id.* ¶ 64.)  On May 31, 2017, PDV USA and PDVSA jointly sought Interamerican's consent to assign the Agreement from PDV USA to PDVSA.  (*Id.* ¶ 70.)  Interamerican, however, did not consent.  (*Id.*; *see also id.* ¶¶ 71-75.)

The Agreement prohibited Interamerican from subcontracting any portion of its services without prior written consent of PDV USA.  (*Id.* ¶ 30 and Ex. 1 § 18.)  Nonetheless, soon after receiving the payments totaling $15 million from PDV USA, Interamerican paid 75 percent of that amount in equal payments of $3.75 million each to or for the benefit of three "sub-contractors":  Hugo Perera, a convicted drug trafficker; Raul Gorrín, a Venezuelan billionaire and fugitive from justice who was indicted by the United States in 2018 in connection with a multi-billion dollar money laundering and bribery scheme; and Esther Nuhfer, a long-time associate of Rivera.  (SAC ¶¶ 47-55.)  According to Rivera, under the subcontracts – which were backdated by several months to the day before the Agreement was executed – the subcontractors were to provide consulting services to PDV USA and/or assist Interamerican in doing so.  (*Id.* ¶¶ 6, 54.)

4

PDV USA never was informed about any subcontractors and did not consent to any subcontracting.  (*Id.* ¶¶ 46-47, 57.)

In January 2019, the United States Government recognized Juan Guaidó, the President of Venezuela's National Assembly, as the Interim President of Venezuela, and at the same time derecognized the Maduro regime and designated PDVSA as a "Specially Designated National" with whom no U.S. person may do business absent a license from the U.S. Department of Treasury.  (*Id.* ¶ 8.)  The Guaidó Government, in turn, appointed an Ad Hoc Board of Directors of PDVSA to oversee the U.S. operations of PDVSA's U.S.-based subsidiaries, including PDV USA.  (*Id.*)  In August of 2019, the Delaware Court of Chancery ruled that, under U.S. law, the Guaidó appointments to the PDVSA Ad Hoc Board were presumptively valid.  (*Id.*)

Rivera now claims that the true purpose of the Agreement was to help Citgo Petroleum Corporation – PDVSA's primary operating entity in the United States – "disengage" from its ultimate parent PDVSA as part of what Rivera claims was a rogue operation by Citgo executives in defiance of the Maduro regime.  (*Id.* ¶¶ 77-78.)  That claim "defies credulity" for multiple reasons, not the least of which is it suggests that PDVSA, which at the time was controlled by the Maduro regime, directed its U.S. subsidiary, PDV USA, to hire Interamerican so that Interamerican could advise PDVSA's U.S. operating entity on how to disengage from PDVSA and the Maduro regime.  (*Id.* ¶ 78.)  Rivera never provided any services to Citgo.  (*Id.* ¶ 79.)  Instead, the true purpose of the Agreement was to cover up illicit transactions involving Rivera and his associates. (*Id.*)  Interamerican thus violated representations and warranties in the Agreement that "no portion of any payment to [Interamerican] by PDV USA pursuant to this Agreement

shall be used as a bribe, kickback, rebate, illegal political contribution, or in violation of" any applicable law or regulation.  (*Id.* ¶¶ 31 (quoting § 7 of the Agreement), 58.)

PDV USA filed the instant action on May 13, 2020.  (Dkt. 1.)  It asserts claims for breach of contract based on Interamerican's 1) failing to provide the strategic consulting services set forth in the Agreement, (2) failing to provide seven bi-weekly reports or a final report per the terms of the Agreement, (3) failing to supply adequate supporting details on invoices, (4) subcontracting its services without prior written consent from PDV USA, and (5) violating its warranties and covenants not to use the money received for illegal purposes.  (SAC ¶¶ 59, 83-89.)  In addition, PDV USA asserts claims for indemnity,[3] unjust enrichment, and declaratory judgment.  (*Id*. ¶¶ 90-105.)  PDV USA seeks return of the $15 million (plus interest) it paid Interamerican; release of PDV USA from any further payment under the Agreement; payment of compensatory damages; and, its expenses, court costs, and attorneys' fees associated with enforcing its contractual rights.  (*Id*. ¶¶ 9-10 and Prayer for Relief.)

**B.      Interamerican's Counterclaim**

Interamerican moved to dismiss PDV USA's first amended complaint for lack of subject matter jurisdiction and failure to state a claim.  (Dkts. 29, 30.)  The Court denied those motions on June 22, 2021.  (Dkt. 36.)  On August 19, 2021, Interamerican filed its Answer along with a Counterclaim for breach of contract, unjust enrichment, and

---

[3] The Agreement's indemnity provision requires Interamerican to indemnify PDV USA for any breaches of the Agreement including all such expenses, court costs, and attorneys' fees expended to enforce PDV USA's rights under the Agreement.  (SAC ¶ 82 and Ex. 1 § 10.)

declaratory judgment.  (Dkt. 50 at pp. 12-18 ("CC").)  The Counterclaim, which remains essentially the same in Interamerican's response to the Second Amended Complaint (Dkt. 111 at pp. 19-25), alleges that the purpose of the Agreement was to develop a strategic plan to help Citgo develop a distinct identity and disengage from PDVSA.  (CC ¶¶ 1, 9, 13.)  Interamerican asserts that it performed all the consulting services required by the Agreement but that PDV USA failed to make remaining payments to Interamerican only after Interamerican refused to consent to assignment of the Agreement (*Id*. ¶¶ 2-3, 14-15.)  Interamerican seeks payment of the remaining amount due, plus interest, under the Agreement.[4]  (*Id.* ¶¶ 29, 31, and Prayer for Relief.)

**C.     Seizure Of Rivera's Phone By The FBI**

On October 20, 2017, the FBI seized Rivera's phone.[5]  (Dkt. 240-1; Sullivan Decl. Ex. 12 ¶ 26.[6])  Knowing that he was under surveillance by the FBI, Rivera sought "legal analysis and advice with respect to the [Agreement]." (*Id.* Ex. 11 ¶ 5.) In December 2017, Rivera "retained the law firm of Cozen O'Connor to review and provide advice as to any possible legal exposure resulting from [the Agreement]."  (*Id.* ¶ 3.)  In February 2018, Cozen O'Connor provided Rivera with a "multi-page memo with an analysis of the

---

[4] Interamerican alleges that the remaining payments not paid by PDV USA total $30 million, even though PDV USA alleges it paid only $15 million, leaving $35 million unpaid. (CC ¶ 15.)  PDV USA alleges that records show **PDVSA** paid Interamerican another $5 million in October 2017.  (SAC ¶ 65.)

[5] The parties sometimes refer to November 2017 as the month in which the FBI seized Rivera's phone.  The detention receipt, however, shows that the seizure took place on October 20, 2017.  (Dkt. 240-1.)

[6] "Sullivan Decl." refers to the Declaration of Brady M. Sullivan, dated June 30, 2025, at Dkt. 264.

[Agreement]" (the "Cozen Memo"). (*Id.* Ex. 6 at 242:4-15.) None of this was known to PDV USA at the time. Interamerican did not institute a document hold until late 2018. (*Id.* Ex. 12 at 3 ¶ 25.)

Less than a month after seizing Rivera's phone and having created a forensic "clone" (*see* Dkt. 248), the FBI returned the phone to Rivera's criminal attorney, Roy Kahn, in November 2017 (Dkt. 240-1.) Kahn, however, does not recall receiving back the phone, does not currently have it, and would have discarded it if Rivera did not want the phone. (Dkt. 245-2 ¶¶ 6-8.) Rivera avers that he told Kahn "to feel free to discard" the phone. (Dkt. 245-3 ¶ 4.) Rivera avers that he did not want the phone returned to him because, at the time, he had already purchased another phone and was concerned that the government would have inserted a listening or tracking device on the seized phone. (*Id.* ¶ 3.)

## D.    Initial Discovery

Discovery commenced in September 2021. (*See* Dkt. 51 § 4.) During that time, PDV USA sought and received discovery not only from Interamerican, but also third parties, including Nuhfer, Perera, associates of Gorrín, and Rivera's accountant. (*See* Sullivan Decl. Exs. 13-19 (production documents bearing varied Bates numbers from different sources).) Although Interamerican produced some documents (*see id*. Ex. 6 at 213:7-12), the third parties produced significant documents, including emails with Rivera and documents signed by him, that Interamerican did not produce. (*See, e.g.*, *id.* Exs. 13-19.)

In January 2022, Interamerican collected text messages, WhatsApp messages, and emails from Rivera's phone (*id.* Ex. 12 at 3 ¶ 25) – apparently a different phone than

had been seized and returned to Rivera's attorney.  Interamerican collected emails from two accounts, rivera2002@comcast.net and electrivera@comcast.net.  (*Id*.) "Interamerican also attempted to retrieve messages relating to this lawsuit to the extent any existed which were not on Mr. Rivera's electronic devices by following procedures available online but was unsuccessful."  (*Id*.)  On April 5, 2022, Interamerican made a "clone forensic image" of Rivera's phone (*id*.) and produced it in response to PDV USA's concerns about the format of the previously produced messages.  The clone production, however, did not include a series of WhatsApp messages between Rivera and Gorrín that had been among the messages previously produced from the phone.  (*Id*. Ex 47 at 2-3 ¶ 24; Opp. at 11.[7])

When first deposed in July 2022, Rivera testified that he did not know why some of his emails were produced while others were not.  (Sullivan Decl*.* Ex. 6 at 213:15-18.) Interamerican later speculated that the missing emails were the result of a "server crash." (*Id*. Ex. 12 at 4 ¶ 26.)  In the July 2022 deposition, Rivera also testified that he did not delete WhatsApp messages involving Gorrín.  (*Id.* Ex. 20 at 419:20-420:3.)  In a later interrogatory, Interamerican conceded that Rivera had deleted the Gorrín messages because, among other reasons, he believed they had already been produced.  (*Id*. Ex. 47 at 3 ¶ 24.)

### E.    The Indictment Against Rivera And The Missing Indictment Documents

On December 8, 2022, an indictment against Rivera and Nuhfer was unsealed in the Southern District of Florida (the "Indictment").  (*Id*. Ex. 21.)  *See USA v. Rivera*, No.

---

[7] "Opp." refers to Defendant's Memorandum of Law in Opposition to Plaintiff's Renewed Motion for Sanctions, at Dkt. 277.

1:22-cr-20552-MD (S.D. Fla.), Dkt. 11.  The Indictment charged Rivera and Nuhfer with willfully conspiring to act as agents of the Venezuelan government and concealing those efforts by using the Agreement to "creat[[e] the false appearance that they were providing consulting services to PDV USA."  (*Id.* at 5 ¶ 3*.*)  The Indictment quoted or cited over 50 emails and WhatsApp messages, many of them encrypted, to and from Rivera (the "Indictment Documents").  (*See id.* at 11-27.)  On December 15, 2022, PDV USA filed a motion to compel, explaining that most of the Indictment Documents had not been produced to PDV USA.  (Dkt. 121.)  As PDV USA explained, those "Missing Documents" included text messages and emails to or from Rivera "that related to the Agreement and demonstrate that Interamerican was attempting to perform services for the Maduro regime, not for Citgo."  (*Id.* at 2.)

Interamerican claimed that it did not have the Missing Documents, and informed the Court that "we believe they were on a phone which the FBI took control of back in 2017, years before a lawsuit was filed.  And my clients never got the possession of that phone back."  (Dkt. 138-1 at 8:11–19.)  At the same time, Interamerican accused PDV USA of "improperly recruit[ing] this Court in its campaign to assist the government's prosecution of David Rivera."  (Dkt. 123 at 1.)  It suggested that the Missing Documents may not "even exist."  (Dkt. 133 at 2.)  Interamerican also claimed that it was under no obligation to preserve documents in 2017, because the "mere fact that Mr. Rivera's phone was seized in November 2017 in no way put him on notice that he was being investigated in connection with the contract at issue in this litigation …."  (Dkt. 123 at 3 n.2.)

**F.      The 2023 Government Production To Rivera**

In January 2023, the Court stayed the case "to provide time and opportunity for the production of … the 'Missing Documents.'" (Dkt.  129 at 1.)  Interamerican acknowledged that the purpose of the stay was "'to provide time and opportunity for the production of' the Missing Documents to Mr. Rivera in the criminal matter, at which time the documents could be produced by Interamerican to PDV USA in this action." (Dkt. 131 at 1.)  During the stay, in August and September 2023, Rivera's attorney in the criminal action received a substantial document production from the government that included many of the Missing Documents, as well as hundreds of additional responsive communications to and from Mr. Rivera (the "2023 Government Production").  (*See* Dkt. 157 at 2; Sullivan Ex. 23.[8])  On October 3, 2023, Interamerican filed a letter opposing an extension of the stay. (Dkt. 155.)  Notwithstanding the government having produced the Missing Documents to Rivera, Interamerican represented that the Missing Documents had "yet to be produced" and were not in Interamerican's possession, custody, or control.  (Dkt. 155 at 1-2.)

**G.      Interamerican's Refusal To Produce The 2023 Government Production**

---

[8] The first cited source is a letter that PDV USA filed to compel Interamerican to produce the 2023 Government Production.  The letter in turn quotes from a government memorandum filed on October 13, 2023 in the criminal case against Rivera, in which the government referred to "an extensive record consisting of contemporaneous emails, text messages, and financial records voluntarily produced by the Government to Defendants … generally … described in the Indictment at Paragraph 9 of the 'Manner and Means of Conspiracy' section and Overt Acts 20 through 47."  *USA v. Rivera*, No. 1:22-cr-20552-MD (S.D. Fla.), Dkt. 116.  The cited paragraphs of the Indictment largely overlap with the paragraphs quoting or citing the Missing Documents.  The second cited source is a government petition in the criminal case for authorization to produce documents in response to a subpoena representing that the government made its production to Rivera in August and September 2023.

PDV USA first learned about the existence (though not the substance) of the 2023 Government Production from an October 2023 memorandum the government filed on the docket in the criminal matter. (*See* Dkt. 157 at 2.) PDV USA demanded that Interamerican produce responsive documents from the 2023 Government Production, but Interamerican asserted that it had no "access to anything the Government has produced in the Criminal Proceeding"; and, in any event, documents produced in the criminal case were immune from discovery in the instant action because they had been produced by the government under a protective order in the criminal case. (Dkt. 158 at 2; *see also* Sullivan Exs. 25-27.)

Interamerican also suggested that documents in the government's production in the criminal case would be either duplicative or irrelevant. Interamerican thus asserted that Rivera's counsel "expressed doubt that any discovery they have received [from the 2023 Government Production] is at all relevant to the issues in this case." (Dkt. 158-1 at 2.) In opposing an extension of the stay in this action in March 2024, Interamerican claimed it was "speculative" for PDV USA to argue that there were still "'additional' documents that Interamerican supposedly must produce from the" criminal case. (Dkt. 164 at 2.) Similarly, in April 2024, Rivera stated in briefing that it was "likely inaccurate" and "entirely speculative" for PDV USA to contend that the 2023 Government Production included "'many more responsive emails and messages' tha[n] what has been produced to PDV USA." (Sullivan Decl. Ex. 24 at 7.)

## H.    PDV USA's Continued Pursuit Of The Missing Documents

On March 25, 2024, this Court issued an order requiring Interamerican to produce to PDV USA "all non-privileged documents that (i) are responsive to PDV [USA]'s

document requests, (ii) have not already been produced, (iii) are in Interamerican's possession, custody, and control – including documents produced by the Government to Mr. Rivera in the criminal proceeding against Mr. Rivera, and (iv) consist of email, texts, or other electronic communications to which Mr. Rivera was an author or recipient in his capacity as an employee, officer, director, representative, or agent of Interamerican." (Dkt. 166.)

In its efforts to obtain the Missing Documents and any additional relevant documents from the criminal case, PDV USA had served a subpoena on Rivera resulting in motion practice in the Southern District of Florida.  Rivera objected to the subpoena, advancing arguments similar to those of Interamerican, including that his own emails and texts were not in his possession, custody, or control but instead resided solely with his criminal attorney, and asserting that the protective order in the criminal case prevented disclosure.  (*See* Sullivan Decl. Ex. 28 at 5, 8.)  On May 6, 2024, the Florida court issued a decision in PDV USA's favor.  (*Id*.)  The Florida court rejected Rivera's arguments entirely, characterized the communications sought as "patently relevant" to the instant case, and ordered Rivera to produce to PDV USA all responsive documents from the government productions.  (*Id*. at 4, 5-10.)

On May 8, 2024, Rivera produced to PDV USA what was, at the time, the entirety of the government productions in the criminal matter.  (Dkt. 247 at 2.)  Yet, that production included only some of the Missing Documents.  PDV USA thus pursued the remainder of those documents from the government, serving a subpoena on May 29, 2024.  (Sullivan Ex. 29.)  On June 20, 2024, the government produced the remainder of the Missing Documents to PDV USA, as well as thousands of unpreserved encrypted messages

13

among Rivera, Nuhfer, Gorrín, and Perera concerning the Agreement.[9]  That production, however, was itself still incomplete.

## I.      The Government's 2024 Production

On July 17, 2024, PDV USA moved for spoliation sanctions.  (Dkts. 208-09.) Interamerican's primary defense was that PDV USA had already recovered the Missing Documents from other sources and therefore suffered no prejudice. Interamerican claimed that it was "extremely unlikely that any more documents (much less documents which are probative of PDV USA's claims) actually exist." (Dkt. 220 at 2.)  Yet, on October 11, 2024, the government stated during a public hearing in the criminal case that, the following week, it would make additional voluminous productions to Rivera, which included a forensic clone of Mr. Rivera's cell phone, as well as "the entirety" of the "various e-mail accounts of both Mr. Rivera and various third parties" (the "2024 Government Production").   (*See* Dkts. 247-2 at 6:7-23, 4:16-5:4; 248 at 1 (Interamerican letter acknowledging possession of 2017 clone of Rivera's phone from government's production).)

Once again, Interamerican said nothing to PDV USA about these productions and, for several months, failed to produce them to PDV USA, despite the Court's March 25, 2024 discovery order.  (*See* Dkts. 166, 247.)  When PDV USA again moved to compel (Dkts. 241, 247), Interamerican resisted, again arguing that Interamerican did not possess documents produced by the government in the criminal case and that protective orders

---

[9] PDV USA does not provide support for the assertion of what documents the government produced and when they did so.  Interamerican's opposition, however, does not dispute the statement, which appears at page 9 of PDV USA's moving brief.

prevented their production in this case.  (Dkt. 248.)  Only after the Court held a hearing on January 23, 2025, did Interamerican agree to produce all responsive email communications from the government's production to Rivera and also a duplicate of the clone of Rivera's phone.  (Dkt. 251.)  According to PDV USA, it was not in possession of the complete 2024 Government Production until March 13, 2025, and "some of the most significant unpreserved documents" come from that production.  (Mem. at 9 (citing as examples, Sullivan Decl. Exs. 5 (email exchange between Rivera and Nuhfer facetiously characterizing draft consulting status report as a "bargain" at $10,000 per word), and 30 (WhatsApp text exchange between Rivera and Perera about PDVSA)).[10])

## J.    Additional Missing Documents

Although PDV USA has been able to recover documents from the 2023 and 2024 Government Productions, it believes other documents remain missing.  For example, the government productions that PDV USA has been able to recover do not appear to contain any documents from Rivera's personal computer, which Interamerican testified contained responsive documents.  (Sullivan Ex. 31 ¶ 17.)  Interamerican has not produced to PDV USA standalone files that PDV USA characterizes as "critical" and "that one would expect to find on a personal computer rather than a cellphone."  (Mem. at 10 (citing as examples communications referring to such documents as an "'MOU' seemingly between PDVSA and Exxon," and versions of the Agreement exchanged between Rivera and Gorrín).)  Interamerican also asserts that dozens of photos, PDF files, and voice recordings that Rivera and others exchanged in chats remain missing.  (*Id.*)

---

[10] "Mem." refers to PDV USA's Memorandum of Law in Support of its Renewed Motion for Sanctions, at Dkt. 263.

**Legal Standards**

**A.     Spoliation**

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) (internal quotation marks omitted).  In general, "a party spoliates evidence if (1) 'the party having control over the evidence had an obligation to preserve it at the time it was destroyed'; (2) 'the records were destroyed with a culpable state of mind'; and (3) 'the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'"  *Rossbach v. Montefiore Medical Center*, 81 F.4th 124, 139 (2d Cir. 2023) (quoting *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012)).  PDV USA seeks spoliation sanctions under both Rule 37(e) and the Court's inherent authority.  (PDV Mem. 10-11.)

**B.     Rule 37(e)**

Rule 37(e) applies specifically to spoliation of ESI.  The rule has two subsections. The first provides that "[i]f [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court" may, on a finding of prejudice, "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1).  The second subsection addresses intentional spoliation:  if "the party acted with the intent to deprive another party of the information's use in the litigation[,]" the court may: "(A) presume that the lost information was unfavorable to the

16

party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment."  Fed. R. Civ. P. 37(e)(2); *see generally Hoffer v. Tellone*, 128 F.4th 433, 437-38 (2d Cir. 2025) (explaining changes made to Rule 37(e) in 2015 amendments).

Rule 37(e) thus requires the following three-part analysis:

> The first is to decide if the rule applies at all – that is, if a party failed to take 'reasonable steps' to preserve [ESI] 'that should have been preserved in the anticipation or conduct of litigation.' Fed. R. Civ. P. 37(e). If so, then the second step is to decide if there has been 'prejudice to another party from loss of the information,' in which case the Court 'may order measures no greater than necessary to cure the prejudice.' Fed. R. Civ. P. 37(e)(1). Lastly, the third step to consider – regardless of prejudice to any other party – is whether the destroying party 'acted with the intent to deprive another party of the information's use in the litigation,' in which event a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.

*Doubleline Capital LP v. Odebrecht Finance, Ltd.*, No. 17-CV-4576, 2021 WL 1191527, at *4-5 (S.D.N.Y. Mar. 30, 2021) (quoting *Coan v. Dunne*, 602 B.R. 429, 437 (D. Conn. Apr. 16, 2019)).

### 1.  Step One:  Obligation To Preserve

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).  "[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."  *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118

17

(S.D.N.Y. 2008) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, 341 F.R.D. 474, 495 (S.D.N.Y. 2022) ("Once the duty to preserve attaches, a party and its counsel must take reasonable steps to preserve relevant evidence") (internal quotation marks omitted) (hereinafter *Keurig*).   "Relevance," for purposes of Rule 37(e), "is 'an extremely broad concept.'"   *Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436-37 (S.D.N.Y. 2010) (quoting *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)).

For spoliation "sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence actually existed and was destroyed." *Farella v. City of New York*, Nos. 05-CV-5711 & 05-CV-8264, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007); *see La Belle v. Barclays Capital Inc.*, 340 F.R.D. 74, 82 (S.D.N.Y. 2022) (explaining that "a party seeking spoliation sanctions must necessarily show that the evidence at issue actually existed").   "[S]peculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation." *Dilworth v. Goldberg*, 3 F. Supp.3d 198, 202 (S.D.N.Y. 2014) (quoting *Tri-County Motors, Inc. v. American Suzuki Motor Corp.*, 494 F. Supp.2d 161, 177 (E.D.N.Y. 2007)).   Thus, "sanctions are not warranted unless there is proof that some information of significance has actually been lost." *Orbit One Communications*, 271 F.R.D. at 431.

### 2. Step 2:  Prejudice

Sanctions under Rule 37(e)(1) "may only be imposed [on] a finding of prejudice to the moving party[.]" *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-CV-9363, 2018 WL 1512055, at *7 (S.D.N.Y. Mar. 12, 2018).  "Neither party has 'a burden of proving or

disproving prejudice,' and Rule 37(e) 'leaves judges with discretion to determine how best to assess prejudice in particular cases.'" *Keurig*, 341 F.R.D. at 495 (quoting Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend.). "Some courts have found prejudice based on the moving party's showing that the spoliated evidence 'would be helpful to them in connection with establishing several elements of their [ ] claims.'" *Id.* (quoting *Doubleline Capital*, 2021 WL 1191527, at *7). "[T]he moving party need not establish the loss of a 'smoking gun'"; rather, "'it is sufficient if the existing evidence plausibly 'suggests' that the spoliated ESI could support the moving party's case.'" *Id*. (quoting *Karsch v. Blink Health Ltd.*, No. 17-CV-3880, 2019 WL 2708125, at *21 (S.D.N.Y. June 20, 2019)).

"Proof of relevance[,]" however, "does not necessarily equal proof of prejudice." *Karsch*, 2019 WL 2708125, at *20 (internal quotation marks omitted). The moving party must show that the lost information "was not only probative, but that it would affirmatively support the movant's claim." *Keurig*, 341 F.R.D. at 497 (quoting *Ungar v. City of New York*, 329 F.R.D. 8, 15 (E.D.N.Y. 2018)); *see also Man Zhang v. City of New York*, No. 17-CV-5415, 2019 WL 3936767, at *6 (S.D.N.Y. Aug. 20, 2019) (requiring moving party to "'adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed ... evidence would have been' favorable to its case") (quoting *Khatabi v. Bonura*, No. 10-CV-1168, 2017 WL 10621191, at *7 (S.D.N.Y. Apr. 21, 2017)). At the same time, the "prejudiced party must not be held to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence, because doing so would allow parties who have destroyed evidence to profit from that destruction." *Ottoson v. SMBC Leasing and Finance, Inc.*, 268 F. Supp.3d 570, 580 (S.D.N.Y. 2017) (internal

19

quotation marks omitted); *Sekisui American Corp. v. Hart*, 945 F. Supp.2d 494, 504 (S.D.N.Y. 2013) (same).

### 3. Step Three: Intent To Deprive

Rule 37(e)(2) requires that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). The intent standard for imposing the "particularly harsh" sanctions under Rule 37(e)(2), *Lokai Holdings*, 2018 WL 1512055, at *8, "is both stringent and specific." *Doubleline Capital*, 2021 WL 1191527, at *8. "The intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Leidig v. Buzzfeed, Inc.*, No. 16-CV-542, 2017 WL 6512353, at *11 (S.D.N.Y. Dec. 19, 2017). "A party's acting negligently or knowingly will not suffice." *Hoffer*, 128 F.4th at 438. If an intent to deprive is found, "no separate showing of prejudice is required, because 'the finding of intent [to deprive] ... support[s] ... an inference that the opposing party was prejudiced by the loss of information.'" *Doubleline Capital*, 2021 WL 1191527, at *5 (quoting *Lokai Holdings*, 2018 WL 1512055, at *8).

"Courts in this Circuit have held that where a party has significantly failed in its obligation to preserve and collect documents, it is appropriate to infer intent to deprive." *StoneX Group, Inc. v. Shipman*, No. 23-CV-0613, 2024 WL 1509346, at *11 (S.D.N.Y. Feb. 25, 2024) (citing *Fashion Exchange LLC v. Hybrid Promotions, LLC*, No. 14-CV-1254, 2021 WL 1172265, at *6 (S.D.N.Y. Mar. 29, 2021)). "Other courts in this Circuit have inferred an 'intent to deprive' through circumstantial evidence where the data loss could not be 'credibly explained' other than by bad faith." *StoneX Group*, 2024 WL 1509346, at *11 (quoting *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, No. 13-CV-

2581, 2021 WL 4190628, at *18 (S.D.N.Y. Aug. 18, 2021)).  Factors courts have considered in determining whether a party acted with the intent to deprive thus include: "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator."  *Keurig*, 341 F.R.D. at 496 (quoting *Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 67 (S.D.N.Y. 2020)).

"[A] party seeking sanctions under Rule 37(e)(2) must establish the requisite elements – including that the party act with 'intent to deprive' – by a preponderance of the evidence."[11]  *Hoffer*, 128 F.4th at 439-40.

## C.    Inherent Power Of The Court

In addition to the sanctions available under Rule 37(e) for spoliation of ESI, "a district court may impose sanctions for spoliation, exercising its inherent power to control litigation."  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  "The inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49, 111 S. Ct. 2123 (1991).  "Thus, sanctions would be available under the court's inherent authority even if Rule 37(e)

---

[11] Interamerican incorrectly invokes the "clear and convincing evidence" standard for proving intent to spoliate that many courts applied before *Hoffer*.  (*See* Opp. at 12, 15.)

did not apply."  *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp.3d 488, 498 (S.D.N.Y. Jan. 12, 2016).

"[T]he Second Circuit has required a finding of 'bad faith' before sanctions can be imposed under the inherent-power doctrine, which must be shown by (1) 'clear evidence that the challenged actions are entirely without color,' and (2) 'are taken for reasons of harassment or delay or for other improper purposes.'"  *Zhang v. Tong*, 17-CV-840, 2025 WL 992359, at *2 (S.D.N.Y. Apr. 1, 2025) (quoting *United States v. International Brotherhood of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) (internal quotation marks and alterations omitted)); *see also Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir. 1986).  "Because of their very potency, inherent powers must be exercised with restraint and discretion," and the sanction must be "appropriate."  *Chambers*, 501 U.S. at 44-45.

**D.     This Court's Authority To Impose Sanctions**

The case has been referred to me for general pretrial management pursuant to 28 U.S.C § 636(b) and Fed. R. Civ. P. 72(a).  (Dkt. 62.)  As such, I have broad authority to impose discovery sanctions.  *See Doubleline Capital*, 2021 WL 1191527, at *4; *Man Zhang*, 2019 WL 3936767, at *4.  Orders imposing discovery sanctions "are ordinarily considered non-dispositive, and therefore fall within the grant of Rule 72(a), unless the sanction employed disposes of a claim."  *Joint Stock Company Channel One Russia Worldwide v. Infomir LLC*, No. 16-CV-1318, 2017 WL 3671036, at *16 (S.D.N.Y. July 18, 2017) (internal quotation marks omitted).  "A magistrate judge's authority to order (rather than recommend) a discovery sanction does not depend on the relief requested, but rather depends on the 'sanction the magistrate judge actually imposes.'"  *Charlestown*

*Capital*, 337 F.R.D. at 59 (quoting *Joint Stock Co.*, 2017 WL 3671036, at \*16 (internal citation omitted)).  Because, as discussed below, I am not imposing a dispositive sanction, I have the authority to resolve the motion "in the first instance."  *Lokai Holdings*, 2018 WL 1512055, at \*7; *see also Herbert v. Lynch*, 22-CV-6303, 2024 WL 20942, at \*4 (S.D.N.Y. Jan. 2, 2024) ("For the reasons discussed below, the Court finds that case-dispositive sanctions are unwarranted.  As a result, the Court has authority to impose Rule 37(e) sanctions").

## E.    No Need For An Evidentiary Hearing

Interamerican urges the Court, if it does not deny PDV USA's motion, to hold an evidentiary hearing on whether and to what extent Interamerican spoliated evidence. (Opp. at 4 n.1.)  It argues that PDV USA has not proven that Interamerican (by Rivera) deleted documents or made misrepresentations "just by saying it has."  (*Id*.)   The Court does not agree with that characterization.  As explained below, PDV USA has presented evidence of spoliation, not just its say so.  Interamerican also asserts that "[r]ather than proving that this Court should enter what is essentially summary judgment on Interamerican's counterclaim, the motion raises fact issues."  (*Id*.)   Again, the Court disagrees.  The sanctions being granted are not claim dispositive and not at all akin to a grant of summary judgment.  And, what Interamerican suggests are "matters that need to be determined after an evidentiary hearing" (Opp. at 15), are essentially divergent characterizations of the record, not genuine disputes of material fact.  (*See id*. at 15-20 (asserting, *e.g.*, "many of the unpreserved documents actually support Interamerican's claims and defenses"; "[t]his is another example of Plaintiff's misrepresentations and fixation with inappropriate inferences and extrapolations"; "[t]his assertion is another one

23

of Plaintiff's improper attempts to misconstrue and misrepresent the record"; "Plaintiff blatantly mischaracterizes Mr. Rivera's interrogatory answer";  "[a]gain, Plaintiff has misconstrued the events of this litigation to conform to its unfounded narrative").)

Tellingly, Interamerican did not submit any affidavits or exhibits in opposition to PDV USA's sanctions motion.  Interamerican has had full opportunity to submit contrary evidence but opted to rely on its briefing and exhibits submitted by PDV USA instead.  No hearing is warranted.  *See Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees & Restaurant Employees International Union*, 212 F.R.D. 178, 183 n.4 (S.D.N.Y. 2003) (observing, in regard to Plaintiff's motion for spoliation sanctions, "defendants and their counsel nowhere explain what disputed factual issues exist that require a hearing. … To the extent that defendants intend to imply that they have not had an opportunity to be heard on [Plaintiff]'s motion, in fact they have submitted several voluminous papers as well as additional letters amply voicing their position. … They had more than sufficient opportunity to correct their deficiencies during the course of discovery and to respond to the motion. The time to face the consequences is now at hand.").

## Discussion

The analysis below proceeds as follows.  The Court first addresses when Interamerican's duty to preserve evidence arose, determining that time to be December 2017 when Interamerican sought legal advice for anticipated future litigation related to the Agreement.  The Court then addresses whether Interamerican failed to preserve ESI that existed and which it had a duty to preserve.  The Court finds that it did.  Turning to prejudice, the Court finds that although PDV USA has recovered much of the spoliated evidence, there likely is additional relevant ESI that remains missing and which would be

24

helpful to PDV USA.   PDV USA also has been prejudiced economically by having to incur legal fees to obtain the Missing Documents from the government and to engage in motion practice against Interamerican's efforts to block PDV USA from obtaining the Missing Documents.   The Court also finds that Interamerican spoliated ESI intentionally and acted in bad faith to deprive PDV USA of evidence.   Finally, the Court fashions an appropriate, tailored sanction, which includes an adverse inference instruction and an award of fees to be paid by Interamerican to PDV USA.

## A.      Interamerican's Duty To Preserve Arose By December 2017

Interamerican reasonably anticipated litigation concerning the Agreement by December 2017.   First, PDV USA did not pay the remaining $35 million due under the Agreement,[12] the last payment of which was to be made by June 15, 2017.   (SAC ¶¶ 28, 64, 68-69; Agreement Ex. B.)   Although Interamerican contends that PDV USA, even as late as October 2017, held out the prospect of full payment if and when "the assignment [of the Agreement to PDVSA] was consummated" (Opp. at 10), Interamerican refused its consent.   (SAC ¶¶ 70-74.)   Moreover, Interamerican sent repeated demands for payment, continuing into 2018 and 2019 that were never satisfied.   (SAC ¶ 66.)   And, although Interamerican asserts that PDV USA did not "actually refuse to make payment until late 2018," it cites nothing in the record to support that.   (*See* Opp. at 10.)   Those facts alone, however, are too vague to identify when Interamerican should have first reasonably anticipated litigation.   For instance, it is unclear, based on the current record before the

---

[12] The parties appear to dispute whether a $5 million payment received by Interamerican in October 2017 came from PDV USA or PDVSA.   (*Compare* SAC ¶ 65 *with* CC ¶ 15.) There is no dispute, however, that no further payments were made beyond that juncture.

Court, exactly when PDV USA informed Interamerican that PDV USA would not make any further payments, when Interamerican refused to consent to assign the Agreement,[13] or what PDV USA said in response to Interamerican's demand letters or, for that matter, what those demand letters said.

The Court need not, however, divine whether Interamerican reasonably should have anticipated litigation. That is because Rivera (whose knowledge necessarily is that of Interamerican) has admitted that he actually did anticipate litigation as of December 2017. By then, not only was Interamerican in a dispute about the Agreement with PDV USA, but also the government had seized Rivera's phone as part of an investigation into his activities. Against that backdrop, Rivera "retained the law firm of Cozen O'Connor to review and provide advice as to ***any possible legal exposure resulting from [the Agreement]***." (Sullivan Decl. Ex. 11 ¶ 3 (emphasis added).)

In opposition, Interamerican argues that "retention of Cozen O'Connor had nothing to do with litigation with PDV USA and concerned possible future litigation with the Government." (Opp. at 10.) That argument is disingenuous. Rivera has attested that, by December 2017, Interamerican anticipated either criminal ***or*** civil litigation about the Agreement. Specifically, Rivera swore not only that he retained Cozen O'Connor to provide advice about "any possible legal exposure resulting from" the Agreement (Sullivan Decl. Ex. 11 ¶ 3), but also that the law firm provided its advice "***in***

---

[13] PDV USA states that Interamerican "refused to sign the assignment no later than October 2017." (Reply at 3.) The support cited, however, is the SAC, and even that does not refer to any particular month or year. (*See* SAC ¶¶ 70-75.)

"Reply" refers to PDV USA's Reply Memorandum in Further Support of its Renewed Motion for Sanctions, at Dkt. 281.

***contemplation of*** a potential federal indictment or ***civil litigation***." *PDV USA, Inc. v. Communication Solutions, Inc. et al.*, No. 22-CV-21372-MD, Dkt. 130 at 6 (S.D. Fla. Nov. 18, 2024) (emphases added) (Rivera brief asserting that the Cozen O'Connor memorandum "comprises the opinions and mental impressions of the lawyers who prepared it in contemplation of a potential federal indictment or civil litigation"). And even if Rivera had anticipated civil litigation about the Agreement with only the Government, he still would have been under the obligation to preserve essentially the same evidence at issue here inasmuch as both cases are centered on the Agreement, its origins, its purpose, and its implementation, or lack thereof.[14]

Interamerican argues that it cannot be charged with a duty to preserve "until the date this lawsuit was filed." (Opp. at 10.) Not so. "The duty to preserve can arise even before formal initiation of an action, once a party reasonably anticipates litigation."[15] *Kosmidis v. Port Authority of New York and New Jersey*, No. 18-CV-8413, 2020 WL

---

[14] At oral argument, Interamerican conceded that a party's anticipation of some future litigation – not a specific litigation – is sufficient to trigger the duty of preservation. (Tr. 10:4-7.) To be clear, however, the Court is not suggesting that Interamerican had a duty to preserve evidence just because Rivera was indicted. *See Tchatat v. O'Hara*, 249 F. Supp.3d 701, 709 (S.D.N.Y. Apr. 14, 2017) (rejecting plaintiff's attempt "to graft onto the spoliation analysis in his civil litigation whatever obligation to preserve evidence existed in the criminal case against him"). Rather, the Court's determination of when Rivera actually, or reasonably should have, anticipated litigation is based on PDV USA's dispute starting with non-payment in June 2017, together with Rivera's admissions about the purpose for which he sought legal advice from Cozen O'Connor in December 2017. *See In re NTL, Inc. Securities Litigation*, 244 F.R.D. 179, 193 (S.D.N.Y. 2007) (recognizing duty to preserve attached when party acknowledged "the obvious possibility that [it] may encounter a heightened risk of litigious activity in the ongoing restructuring process").

[15] Interamerican's assertion is also at odds with its interrogatory answer that "[i]n late 2018 Interamerican became aware that litigation with PDV USA was reasonably foreseeable" based on PDV USA's refusal to make further payments under the Agreement. (Sullivan Ex. 12 at 5 ¶ 25.)

5754605 (S.D.N.Y. Aug. 27, 2020) (internal quotation marks omitted), *R. & R. adopted*, 2020 WL 7022479 (S.D.N.Y. Nov. 30, 2020).  Although the duty to preserve evidence arises "most commonly when suit has already been filed," *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), the obligation to preserve evidence arises "when a party should have known that the evidence may be relevant to **future** litigation."  *Fujitsu*, 247 F.3d at 436 (emphasis added); *Zubulake*, 220 F.R.D. at 216 (quoting *Fujitsu*).

## B.    Interamerican Spoliated Relevant Evidence

Notwithstanding its obligation starting in December 2017 to preserve relevant evidence, Interamerican failed to do so.[16]  Interamerican did not implement a litigation hold until "late 2018," many months after the duty to preserve attached.  (Sulivan Decl. Ex. 12 at 3 ¶ 25.)  And regardless of whether Interamerican issued a hold notice, PDV USA has demonstrated that Interamerican did not preserve an array (PDV USA says thousands) of relevant, and in some instances inculpatory, communications involving Rivera.  Interamerican did not produce to PDV USA numerous mobile messages (primarily WhatsApp messages) and emails that at one point originated with or were received by Rivera electronically and, if retained by him, should have been included in Interamerican's production of documents.  But they were not.  Instead, PDV USA only learned of them through the documents produced by the government and other third parties.  (*See, e.g.*, Sullivan Decl. Exs. 1-5, 7, 9, 30, 33-34, 36-38, 41-43.)

---

[16] As Interamerican conceded at oral argument, Interamerican's conduct was "not a model of how preservation should be handled."  (Tr. 14:22-23.)

PDV USA highlights some examples that are particularly salient, both because of their subject matter and because they are arguably inconsistent with Rivera's deposition testimony and therefore potentially undermine his credibility.  For instance, an April 4, 2017 message from Gorrín to Rivera states: "They just wrote me from Venezuela[.] When you're ready they will see Exxon[.]  Everything th[r]ough me."  (*Id.* Ex. 2 at -7628.) Before PDV USA recovered this and other messages, Rivera testified that although Rivera may have communicated with Gorrín about arranging meetings with Exxon, Gorrín was not involved in helping to arrange such meetings.  (*Id*. Ex. 20 at 363:9-21.)  As another example, the documents include WhatsApp messages between Rivera and Nuhfer related to the Agreement, invoices related to the Agreement, and assignment of the Agreement.  (*Id.* Ex. 36-38.)  Before PDV USA recovered those messages, Rivera answered "no" to the question "[d]id Esther Nuhfer have any involvement in any work you did in connection with the consulting engagements" (*id.* Ex. 6 at 152:5-8), and he testified that he did not recall "ever communicating on WhatsApp" with Nuhfer about the Agreement (*id.* Ex. 20 at 350:14-17).  And, an April 10, 2017 email with "talking points" drafted by Rivera for a U.S. Congressman reads: "I am working with individuals who have initiated efforts and have been designated by the Government of Venezuela at the highest level to serve as liaisons in facilitating the transfer of Exxon Mobil's assets back to Exxon Mobil." (*Id*. Ex. 7.)  Before PDV USA recovered these other messages, Rivera answered "no" to the question "[H]ave you ever seen any talking points that were intended to be used in connection with the meeting you were trying to arrange with Exxon Mobil?"  (*Id.* Ex. 6 at 271:14-17.)  Interamerican disputes PDV USA's interpretation of the messages and emails presented as examples of unpreserved documents.  That is largely beside the

point.  For assessing spoliation, what matters is that the documents are relevant, likely helpful to PDV USA, and were not preserved.

As Interamerican notes, relevant questions are "how did [the messages] go missing, and when?"  (Mem. at 13.)  There is little direct evidence to answer either question.  There is, however, circumstantial evidence.   Rivera retained access to his WhatsApp *account* – including pre-October 2017 messages – long after seizure of his phone.  Interamerican has not contended otherwise, nor could it:  Rivera continued to send and receive WhatsApp messages after the seizure, and in 2022, he produced to PDV USA *some* responsive WhatsApp messages from *pre-October 2017* but not others.  Rivera has offered no explanation for how he retained the ability to access and produce some pre-October 2017 messages but not others.   Nor has he suggested that anyone other than him had access to his mobile message accounts.

Instead, Interamerican argues that PDV USA "fails to accept as fact that the phone in which Mr. Rivera's text messages were stored, was seized by the Government in 2017; and he never regained possession after it was returned to his attorney."  (Opp. at 24.)  Of course, Rivera is responsible for having authorized his attorney to discard the phone altogether and not regaining possession of it.[17]   (Dkt. 245-3 ¶¶ 3-4.)   Regardless, Interamerican's argument ignores Rivera's ongoing access to his WhatsApp account and his having been able to produce some pre-October 2017 messages but not others.

---

[17] Rivera's authorization to discard his phone would itself be actionable spoliation if he provided that authorization after the duty to preserve evidence attached.  There is no evidence before the Court, however, whether Rivera did so before or after December 2017.

To the extent Interamerican is suggesting that the FBI may have been responsible for deletion of the messages, such a scenario is not at all plausible. Again, it ignores Rivera's continuing access to his message accounts, regardless of what did or did not remain on his phone when the FBI returned it to his attorney. Second, as PDV USA aptly observes, "Interamerican's blame-the-government theory makes sense only if one believes that the government imaged Mr. Rivera's phone, for purposes of building a criminal case against him, and then not only (a) deleted mobile messages from Mr. Rivera's iCloud and WhatsApp accounts, but also (b) deleted *only some* responsive messages – including foundational documents proving Interamerican's culpability in the government's case – but *not* other responsive messages before then returning the phone to Mr. Rivera shortly after it was seized." (Mem. at 14 (emphases in original).) Absent accidental deletion by the FBI, of which there is no evidence whatsoever, the notion that the government would have deleted the missing messages is not plausible.

That theory debunked, Interamerican has not suggested that anyone else – other than Rivera – had access to his WhatsApp or other messaging accounts or was responsible for failing to preserve the unpreserved messages. The only plausible scenario is that Rivera either deleted the messages or is otherwise responsible for failing to preserve the missing messages. Whether he did so intentionally to deprive PDV USA of evidence is discussed below.

Turning to the question of when the mobile messages went missing, bounds can be set even if the exact date cannot. The now missing messages existed at the time Rivera's phone was seized on October 20, 2017. That is known because the messages were obtained by the FBI from Rivera's phone or its cloned version. In April 2022,

31

Interamerican cloned Rivera's *replacement* phone for this litigation, and the unpreserved messages were, according to Interamerican, no longer there or anywhere else within Rivera's possession.  (*See* Opp. at 11.)  Accordingly, the messages must have gone missing between October 20, 2017, and April 2022.

That date range, however, includes a period of time preceding the time when Interamerican's duty to preserve attached.  Interamerican's duty to preserve attached in December 2017.  Rivera's phone was seized on October 20, 2017.  If, assuming for the moment, Rivera deleted or failed to maintain mobile messages in that interim time period, rather than after December 2017, then Interamerican cannot be found to have engaged in sanctionable spoliation of those messages.   The record does not provide direct proof of exactly when the messages disappeared from Rivera's mobile message accounts.  There is, however, circumstantial evidence to further the analysis.

PDV USA cites to some mobile messages, emails, and documents post-dating December 2017 to show that the messages must have gone missing after the duty to preserve attached.  The evidence Interamerican cites as Missing Documents that post-date December 2017 consists of one page of texts from March and April 2018, four paragraphs of the Indictment each citing one email from March or April 2018, and two subcontracts signed in, not after, December 2017 (and backdated to March 2017).  (Mem. at 14-15 and n.4 (citing Sullivan Decl. Exs. 14, 16, 21, 42).)  That is not a particularly robust showing.  It certainly does not allow the Court to conclude that *all* messages disappeared after December 2017 or that they all disappeared at the same time – although Interamerican has provided no evidence to the contrary.   Nonetheless, the

March and April 2018 communications show that at least some mobile messages went missing after December 2017.[18]

Additionally, Rivera did selectively delete some relevant WhatsApp messages – communications with Gorrín – after the initial production of documents from his replacement phone in January 2022 and before Interamerican produced a clone of that phone. (Sullivan Decl. Ex. 47 at 2-3 ¶ 24; Opp. at 11.) Even though Rivera may have believed the messages on his phone already had been produced to PDV USA in January 2022,[19] the undisputed fact remains that he affirmatively deleted some mobile messages between January 2022 and April 2022 that were relevant and helpful to PDV USA. His having done so makes it more plausible that he deleted other relevant and helpful

---

[18] PDV USA asserts that there is no basis to infer that Interamerican "conveniently deleted the messages" during the time between seizure of Rivera's phone in late October 2017 and when the duty to preserve attached in December 2017. (Mem. at 15.) The Court agrees. In any event, at oral argument, Interamerican represented that it does not contend that any messages were spoliated during that short time frame. (Tr. 6:05-23.) *Cf. Swofford v. Eslinger*, No. 6:08-cv-00066-Orl-35DAB, 2009 WL 10671171, at *2 (M.D. Fla. Dec. 1, 2009) (imposing sanctions for deleting documents from April 2006 (when defendant committed the wrongful act) to April 2007 (when defendant received a preservation notice) "[e]ven if the duty to preserve emails did not arise until" February 2007, because defendant's spoliation of evidence left the court with "no means to determine when emails were deleted").

[19] During the interim period, Rivera replaced his phone but does not believe that the Gorrín messages went missing during the data transfer. Instead, Interamerican offers three potential explanations for why Rivera deleted those messages in that interim period: (1) the messages had already been collected, and Rivera was unaware that the production format posed a problem; (2) Rivera was unaware of any obligation to further retain the messages after they had been collected the first time; and/or (3) the messages included communications that Rivera believed were protected by attorney-client privilege, and Rivera was concerned about leaving such messages on his device. (Sullivan Decl. Ex. 47 at 2-3 ¶ 24.)

messages well after December 2017 and beyond the March and April 2018 messages identified by PDV USA.

Turning to missing emails, there are two relevant accounts. With respect to rivera2002@comcast.net, Interamerican claims that the account fell victim to a "server crash" in August 2020. (Sullivan Decl. Ex. 12 at 4 ¶ 26.) However, Interamerican asserts, a folder survived that happened to have "all emails related to the [Agreement]." (*Id.*) In other words, no responsive emails were lost from the rivera2002 account despite the August 2020 event. Interamerican's explanation falls flat. First, Interamerican nowhere explains what it means by a "server crash" and, in any event, offers no competent evidence of such crash. The only evidence it cites consists of an Xfinity bill from late 2020 with a handwritten notation that says "dumpster recovery" and lists various phone numbers. (Dkts. 220 at 17-28, 220-13.) Interamerican provides no affidavit or other testimony explaining what that notation means, let alone how it evidences a server crash. Second, Interamerican's assertion that Rivera maintained a folder of *all* emails related to the Agreement that survived the server crash is belied by the emails relating to the Agreement to and from the same email account that PDV USA obtained from third parties but not Interamerican.

Interamerican does not suggest that the other email account Rivera used to communicate about the Agreement – electrivera@comcast.net – was subject to a "server crash." Yet various emails to and from that account were produced from third parties, not Interamerican. Those emails include ones addressing salient facts, such as Interamerican's use of Nuhfer and Perera as subcontractors and its alleged attempt to broker meetings with Exxon on behalf of the Maduro regime. (*See* Sullivan Decl. Exs.

34

45-46, 49.)    Even though Interamerican used search terms to collect ESI, it has not explained why those terms would not have hit on the various electrivera@comcast.net emails that were produced by third parties but not Interamerican.

In short, the Court finds that Interamerican failed to preserve relevant ESI consisting of mobile messages and emails during the time it had an obligation to preserve them.

## C.    PDV USA Has Been Prejudiced

Interamerican's principal defense to the sanctions motion is that PDV USA is not prejudiced because it obtained the Missing Documents and additional documents from the government, including a clone of Rivera's phone as it existed at the time it was seized, and discovery from other third parties.  (Opp. at 4, 11-14, 20-24.)  PDV USA readily concedes that it recovered many of the Missing Documents.  But it contends that there likely are other spoliated documents that were not recovered and which would have been helpful to its case.  The Court agrees.

"Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source …."  *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 25 (S.D.N.Y. 2010); *see* Fed. R. Civ. P. 37(e) (permitting sanctions for spoliation of ESI only if "it cannot be restored or replaced through additional discovery"); *Morgan Art Foundation Ltd. v. McKenzie*, Nos. 18-CV-4438 & 18-CV-8231, 2020 WL 5836438, at *19 (S.D.N.Y. Sept. 30, 2020) (holding that deleted emails obtainable from other parties and non-parties were not "permanently lost"); *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 359 (S.D.N.Y. 2012) (explaining that spoliation

35

sanctions are not warranted if "the information was preserved in other locations"); Fed. R. Civ. P. 37(e) adv. comm. n. to 2015 amend. ("Because [ESI] often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere").

PDV USA has recovered documents from the 2023 and 2024 Government Productions (Mem. at 10); it has obtained documents from third parties such as Nuhfer and Perera that were not produced by Rivera (Mem. at 6); and it has the clone of Rivera's phone that was seized by the government (*see* Mem. at 9). Moreover, Rivera has agreed to "sit for a second and third deposition regarding new disclosed documents." (Opp. at 25.) In short, PDV USA has obtained from third parties a trove of communications that it sought, and will have had the opportunity to examine Interamerican about them.

But as PDV USA demonstrates, there likely are other spoliated documents helpful to its case that have not been recovered. PDV USA asserts that Interamerican does not "appear" to have produced documents from Rivera's personal computer – which Interamerican admits contained relevant documents (Sullivan Decl. Ex. 31 at 10 ¶ 17):

> the government productions that PDV USA has been able to recover do not appear to contain any documents from Mr. Rivera's personal computer, which Interamerican testified contained responsive documents. Given that Interamerican failed to preserve responsive documents from **every other source** of ESI, it is highly likely that Interamerican also failed to preserve documents from Mr. Rivera's personal computer. Indeed, Interamerican still has not produced to PDV USA critical standalone files in this case – the types of files one would expect to find on a personal computer rather than a cellphone[.]

(Mem. at 10 (emphasis in original) (internal citation omitted).) That argument is persuasive.

36

PDV USA references three examples mentioned in mobile messages:  an "MOU" (presumably "Memorandum Of Understanding") between PDVSA and Exxon; a version of the Agreement that Rivera emailed to Gorrín; and a version of Exhibit B to the Agreement emailed to Gorrín for the purposes of "facilitating payment."  (*Id.*)  Those documents necessarily implicate salient issues in dispute (e.g., consulting work allegedly performed by Interamerican, on whose behalf that work (if any) was performed, and Interamerican's use of subcontractors).  Interamerican has not disputed that those documents were not produced.

PDV USA additionally asserts that "there are dozens of photos, PDF files, and voice recordings that Mr. Rivera and others exchanged in [a WhatsApp chat group] that are still missing."  (Mem. at 10.)  As support, PDV USA cites two exhibits, each setting forth chains of translated texts.  (*Id.* (citing as examples, Sullivan Decl. Exs. 33-34).)  Interamerican obviously has those texts as it provided the exhibits.  But PDV USA apparently does not have – and Interamerican has not contended otherwise – the various attachments identified in the texts, including photos, PDF files, and voice recordings.  A review of the exhibits confirms that various text messages exchanged between Rivera, Gorrín, Perera, and Nuhfer included attachments in JPEG format (i.e., photos), MP4 files (recordings), and PDF files.  The texts primarily concern facilitation of a meeting between PDVSA and Exxon and likely are helpful to PDV USA to demonstrate the true nature of Interamerican's dealings under cover of the Agreement.  The messages, however, are open to interpretation and tell only a truncated, piecemeal story.  Absence of the attachments deprives PDV USA of evidence that likely would provide additional context and proof showing the true nature of what Rivera and his subcontractors were doing.

Also supporting the likely benefit to PDV USA of additional missing communications and documents is the fact that communications and documents helpful to PDV USA and adverse to Interamerican were among the Missing Documents recovered from third parties. *See Phoenix Four, Inc. v. Strategic Resources Corp.*, No. 05-CV-4837, 2006 WL 1409413, at \*6 (S.D.N.Y. May 23, 2006) (plaintiff demonstrated documents deleted from server would be relevant to plaintiff's case by showing that similar evidence received from the server was supportive of plaintiff's central claims); *Chan v. Triple 8 Palace, Inc.*, No. 03-CV-6048, 2005 WL 1925579, at \*8-9 (S.D.N.Y. Aug. 11, 2005) (some evidence of records tending to prove plaintiffs' allegations was enough to show relevance of other similar records that were destroyed, prompting the court to impose an adverse inference sanction against defendants). In other words, it is reasonable to infer, in the circumstances of this case, that missing ESI not recovered would be helpful to PDV USA because ESI that was recovered included documents helpful to PDV USA.[20]

---

[20] Interamerican can hardly lay claim to the benefit of the doubt about the existence of additional missing documents that likely would be helpful to PDV USA in advancing its case; Interamerican has consistently been proven wrong when it claimed or suggested that no additional, responsive documents existed, only to have additional, responsive documents emerge in later productions of recovered documents. (*See* Dkt. 123 at 3 (December 2022 letter to the Court asserting that "Interamerican did not uncover some fifty-three messages, whose existence is only alleged in an Indictment, is hardly a valid reason to broadly reopen discovery"); Dkt. 164 at 2 (March 2024 letter to the Court dismissing as "pure speculation" PDV USA's assertion that the 2023 Government Production was highly likely to contain responsive documents); Dkt. 220 at 2 (August 2024 Interamerican court filing claiming that it was "extremely unlikely" that more unproduced documents existed after PDV USA obtained the 2023 Government Production).)

Mindful that the "prejudiced party must not be held to too strict a standard of proof regarding the likely contents of the destroyed … evidence," *Ottoson*, 268 F. Supp.3d at 580, the Court finds that PDV USA has sufficiently demonstrated that there likely are other spoliated documents that have not been recovered and would be helpful to PDV USA. PDV USA therefore has established prejudice. Even Interamerican conceded at oral argument that PDV USA has recovered but a "substantial body" of the Missing Documents. (Tr. 37:4-14.) A "substantial body" necessarily implies the existence of additional material.[21]

Additionally, PDV USA has been prejudiced economically. Because of Interamerican's spoliation, PDV USA has had to expend significant effort and time, and thus legal fees, to discover and obtain the Missing Documents and other material that Interamerican at one time had but did not preserve. Those expenditures constitute economic prejudice. *See, e.g.*, *Karsch*, 2019 WL 2708125, at *25 (recognizing that defendants "suffered economic prejudice in the form of the attorneys' fees and other expenses they have incurred in discovering and proving the disappearance of the [electronic] [d]evices – tasks made all the more difficult by the Firm's pattern of misrepresentations, obfuscations, half-truths, and shifting stories") (internal quotation marks omitted); *CBF Industria*, 2021 WL 4190628, at *20 ("Monetary sanctions are

---

[21]    *See Substantial*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/substantial (last visited Jan. 21, 2026) (providing multiple definitions of "substantial," including "being largely but not wholly that which is specified"). "Substantial" of course can have varied meanings in varied contexts. Counsel did not suggest he was using the term "substantial" in a specially defined manner or context. And the Court recognizes that "substantial" is not a quantifiable term. Nonetheless, counsel's characterization is notable.

appropriate in this case to compensate Plaintiffs for the time and resources spent because of Defendants' unjustifiable failure to preserve documents or even issue a litigation hold.  This remedy ameliorates the economic prejudice imposed on Plaintiffs, and also serves as a deterrent to future spoliation") (internal quotation marks and brackets omitted).

**D.    Interamerican Acted Intentionally And In Bad Faith**

The next question to be examined is whether Interamerican spoliated evidence intentionally, for purposes of Rule 37(e)(2), or in bad faith, for purposes of the Court's inherent power to sanction.

As noted above, the intent required by Rule 37(e)(2) is "not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence," *Leidig*, 2017 WL 6512353, at *11, "***in this litigation***."  *Doubleline Capital*, 2021 WL 1191527, at *8 (emphasis in original); *see also Hoffer*, 128 F.4th at 438-40; *Keurig*, 341 F.R.D. at 496; *Johnson v. L'Oreal USA,* No. 18-CV-9786, 2020 WL 5530022, at *4 (S.D.N.Y. Sept. 15, 2020) (denying request for adverse inference in absence of "evidentiary basis for Plaintiff's allegations that [the defendant] acted with an intent to deprive Plaintiff of relevant ESI in this litigation").

PDV USA describes a number of actions taken by Interamerican that PDV USA contends demonstrate both Interamerican's bad faith and intent to deprive PDV USA of evidence in the instant case.  (Mem. at 18-19.)  Interamerican's attempts at rebuttal in most instances are not persuasive.  The actions on which PDV USA focuses generally can be grouped into five categories: selective deletion, secrecy, shifting explanations, contradictory testimony, and obfuscation and obstruction.

1.    **Selective Deletion.**  PDV USA asserts that Rivera selectively deleted some messages while retaining other messages from the same time period (sometimes the same day), and that the deleted communications are highly inculpatory and contradict Rivera's counterclaims and testimony.   The Court already has determined some messages and emails at one time in the possession, custody, and control of Interamerican and helpful to PDV USA, although eventually obtained from third parties, were not preserved during a time that they should have been.   No plausible explanation has been provided for how those messages – both from WhatsApp and from Rivera's email – disappeared from Rivera's possession, custody, or control – other than by an affirmative act of deletion.[22]

Interamerican posits that it would not make sense for Rivera to have deleted messages selectively and to have deleted messages that affirmatively help his case, while leaving supposedly harmful messages undeleted.  (Opp. at 15.)  Interamerican, however, cites no document, or any source for that matter, to support the assertion that any Missing Documents help Rivera's case.   Still, Interamerican's selective deletion argument has some appeal.  *See Keurig*, 341 F.R.D. at 520 ("If, as Plaintiffs argue, Keurig had engaged in 'intentional destruction' to 'gain[ ] an advantage in the litigation,' then 'one would assume' the record would show loss, destruction, or inaccessibility of all hard drives, rather than the isolated gaps the Court has found") (quoting *Europe v. Equinox*

---

[22]  Nor is there any evidence that Interamerican made any meaningful effort to recover messages that had not been preserved.  (*See* Sullivan Decl. Ex. 12 at 3 ¶ 25 (Interamerican's vague interrogatory response stating that it unsuccessfully "attempted to retrieve messages relating to this lawsuit to the extent any existed which were not on Mr. Rivera's electronic devices by following procedures available online").)

*Holdings, Inc.*, 592 F. Supp.3d 167, 179-80 (S.D.N.Y. Mar. 21, 2022)).  But as explained above, Rivera did selectively delete some relevant WhatsApp messages after the initial production of documents from his phone in January 2022 and before Interamerican produced a clone of his phone.  (Sullivan Decl. Ex. 47 at 2-3 ¶ 24; Opp. at 11.)  Although Rivera may well have believed those deleted messages already had been produced (which they had in some form), his affirmative act of deletion of some relevant messages but not others indicates that he had reason to selectively delete messages.

**2.   Secrecy.**   According to PDV USA, Rivera encrypted many of his communications, including ones that were subsequently deleted.  (Mem. at 18.)  PDV USA also cites to a message from Perera instructing Rivera to "erase" certain texts because "it could entail problems if someone see it who shouldn't."  (Sullivan Decl. Ex. 2 at -7672.)   Although not expressly denying that Rivera encrypted messages, Interamerican responds that PDV USA has offered no evidence to demonstrate that Rivera had the means or intent to encrypt.  (Opp. at 15.)  Regardless, encrypting messages is not uncommon and is not spoliation.  As for Perera's instruction to "erase," Interamerican weakly responds that it is unclear which messages Perera thought should be erased, and faults PDV USA for not pointing out that Rivera responded to Perera "I live alone."  (*Id.* at 16.)  More pointedly, Rivera apparently did not delete the texts in response to Perera's exhortation – the texts remained in the message chain at least as of the time the government obtained them.  The Court agrees with Interamerican that neither the alleged encryption nor the direction to "erase" prove intentional spoliation.

**3.   Shifting Explanations.**  In July 2022, Interamerican (by Rivera) testified that Rivera did not know why some of his emails were produced while others were not.

42

(Sullivan Decl. Ex. 6 at 213:15-18.)   In a later interrogatory response, Interamerican suggested that emails appearing in the government's production but not Interamerican's could have been deleted in a "server crash."  (Sullivan Decl. Ex. 12 at 4 ¶ 26.)  Now, Interamerican offers yet another explanation for missing emails:  that the search terms the parties agreed would be applied may not have identified some emails.  (Opp. at 16.) As noted above, there is no competent evidence of a server crash to support Interamerican's first theory, and, even if there were, it would not explain why some emails were missing from Rivera's email account and not others.  Interamerican's search term theory fares no better.  As PDV USA points out, the search terms that Interamerican applied, such as "PDV USA," should have hit on emails that Rivera did not produce but which were among the Missing Documents.  (Reply at 5-6.)  The fact that Interamerican first claimed lack of knowledge of why emails went missing, then put forward a non-credible theory, followed by yet another non-credible theory, suggests bad faith and the absence of a plausible non-bad-faith explanation for missing emails.

     **4.     Contradictory Testimony.**  PDV USA calls out instances in which it contends Rivera testified falsely.  It highlights in particular Rivera's July 2022 deposition, in which Rivera denied attempting to delete WhatsApp messages involving Gorrín at any time since the litigation began in 2020.  (Sullivan Decl. Ex. 20 at 419:20-420:3.)  In a later interrogatory response – attested to by Rivera – Interamerican admitted that WhatsApp messages between Rivera and Gorrín "must have been deleted" by Rivera.  (Sullivan Decl. Ex 47 at 2-3.)  Interamerican counters that the messages were not deleted until Interamerican already had produced them in some form even though they were deleted before Interamerican cloned Rivera's phone.  (Opp. at 17.)  That is true, but a hold notice

nevertheless remained in place at the time of deletion; Rivera's deposition testimony was untrue; and the incident demonstrates Rivera's willingness to selectively delete relevant messages.

**5.    Obfuscation And Obstruction.**  Interamerican recounts several incidents in which Interamerican downplayed the significance of the Missing Documents, otherwise misled PDV USA and the Court, or frustrated PDV USA's efforts to obtain Missing Documents.  (Mem. at 18-19.)

-    When PDV USA learned about documents in the Indictment that had not been produced by Interamerican, Interamerican suggested that the Missing Documents may not "even exist" (Dkt. 133 at 2), questioned their relevance (Dkts. 158 at 2, 158-1 at 2), and opposed a continued stay to afford sufficient time to obtain them (*e.g.*, Dkt. 155). Even later, Interamerican opposed extensions of the stay and brushed off the likelihood that the government's productions would contain many more responsive emails and messages as "speculative" and "likely inaccurate."  (*See, e.g.*, Dkt. 164 at 2; Sullivan Decl. Ex. 24 at 7.)

-    When PDV USA learned about the FBI's seizure of Rivera's phone, Interamerican told the Court that the phone had never been returned to Rivera without disclosing that it had been returned to his lawyer and that Rivera had told the lawyer he could discard the phone.  (*See* Dkts. 138-1 at 8:11-19, 245-3 ¶ 4.)

-    Interamerican informed the Court that the "mere fact that Mr. Rivera's phone was seized in November 2017 in no way put him on ***notice*** that he was being investigated in connection with [the Agreement]."  (Dkt. 123 at 3 n.2 (emphasis added).)  Yet Rivera later swore that "[b]ecause we all believed that we were under FBI investigation based on

44

the seizure of my electronic devices in October, 2017, and **confirmed** FBI surveillance in November 2017, Perera, Nuhfer and I all wanted competent legal … advice with respect to the [Agreement]."  (Sullivan Decl. Ex. 11 ¶ 5 (emphasis added).)

- In response to PDV USA's interrogatories seeking information about spoliation, Interamerican stated that Rivera had kept all emails related to the Agreement in an electronic folder that was not destroyed in the alleged server crash (*id.* Ex. 12 at 4), yet that proved to be untrue as evidenced by the fact that various responsive emails related to the Agreement were not produced by Interamerican but instead recovered from third parties.

- Even when the government made its 2023 production of Missing Documents to Rivera's criminal attorney, Interamerican represented that the Missing Documents had "yet to be produced" and were not in Interamerican's possession, custody, or control.   (Dkt. 155 at 1-2.)  Similarly, when the government made its 2024 production of Missing Documents to Rivera's attorney, Interamerican did not alert PDV USA.  And, even though Interamerican had agreed that the purpose of the stay (which it opposed) was to provide time and opportunity for production of the Missing Documents to Rivera in the criminal matter (Dkt. 131 at 1), Interamerican did everything it could to not produce the documents once they were in the hands of Rivera's criminal lawyer, advancing arguments that the Florida Court readily rejected.[23]  (*See, e.g.*, Dkt. 248; Sullivan Decl. Ex. 28.)

---

[23] PDV USA provides a further example, but the Court finds the proof lacking.  PDV USA asserts that, in explaining why the 2018 Cozen Memorandum did not appear on Interamerican's privilege logs, Interamerican falsely informed the Court that Rivera "simply didn't have" the Cozen Memorandum "as of the time this case was initiated" in

To the extent Interamerican responds to any of these incidents of obfuscation and obstruction, Interamerican has little to say.  And what little it does say is either quibbling or beside the point.  (*See* Opp. at 19-20.)  In sum, there is ample evidence of intent and bad faith.  Interamerican did not put a document hold in place at the time its obligation to do so attached.  Rivera directed his attorney to discard his phone after it had been returned by the government.  Interamerican's explanations for the Missing Documents – as to both mobile messages and emails – have changed over time, and none of them have been credible.  No plausible explanation exists for the Missing Documents other than intentional deletion by Rivera.  Interamerican has repeatedly dissembled about the extent and relevance of the Missing Documents.  Under these circumstances, the Court easily can infer an intent to deprive.  *See StoneX Group*, 2024 WL 1509346, at *11-13 (recognizing that intent to deprive may be inferred from a variety of circumstances, including where the spoliating party significantly fails in its obligation to preserve and collect ESI; has offered no credible explanation for the loss of ESI; or has made false statements about the lost ESI); *Hice v. Lemon*, No. 19-CV-4666, 2021 WL 6053812, at *5-6 (E.D.N.Y. Nov. 17, 2021) (stating that "[a] court may infer that a party acted with intent to deprive on the basis of circumstantial evidence," and inferring, in the case at

---

May 2020.  (Dkt. 233-3 at 12:11-20; *see also id.* at 15:1-8.)  As proof of falsity, PDV USA references a September 2024 Affidavit in which Rivera stated that in "late 2021," a year after the instant lawsuit was initiated, he "provide[d] a copy of the memorandum" to Nuhfer.  (Mem. at 19 (quoting Sullivan Decl. Ex. 11 ¶ 7).)  Rivera's statement in the affidavit, however, can reasonably be read as consistent with Rivera's not having the Cozen Memorandum at the time the suit was commenced and never having provided it to Nuhfer because she asked for it at a time after Rivera no longer had it.  (*See* Sullivan Decl. Ex. 11 ¶ 7 ("I did not provide a copy of the memorandum to Nuhfer, since she never requested one until late 2021 in connection with grand jury matters.").)

hand, intent to deprive based on contradictory statements and evidence of attempts to hide unfavorable evidence).

Based on the foregoing, the Court finds that PDV USA has satisfied its burden to show by a preponderance of the evidence that Interamerican spoliated evidence with the intent of depriving PDV USA of that evidence in this litigation. The Court also finds that PDV USA has demonstrated by clear evidence that Interamerican acted in bad faith. Sanctions thus are warranted under both Rule 37(e) and the Court's inherent power.

### E.    The Appropriate Sanction

"The sanctions available under Rule 37(e)(1) – on a showing of prejudice – … may be 'no greater than necessary to cure the prejudice.'" *Keurig*, 341 F.R.D. at 497 (quoting Fed. R. Civ. P. 37(e)(1)).  If the prejudice incurred is additional time and expense in obtaining discovery, "monetary sanctions may be a sufficient cure." *Id*. at 497-98 (quoting *Doubleline Capital*, 2021 WL 1191527, at *5).  "More 'serious measures'" may be imposed, however, including "preclusion of evidence, 'permitting the parties to present evidence and argument to the jury regarding the loss of information,' and instructions to the jury as to how to consider such evidence." *Id*. (quoting Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend.).

The "particularly harsh" sanctions available under Rule 37(e)(2) for intentional spoliation, *Lokai Holdings*, 2018 WL 1512055, at *8, include (a) presuming that the lost information was unfavorable to the party; or (b) instructing the jury that it may or must presume the information was unfavorable to the party; or – the ultimate sanction – (c) dismissing the action or enter a default judgment.  Fed. R. Civ. P 37(e)(2).  "In addition to any other sanctions imposed under Rule 37(e), 'a court has the discretion to award

47

attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation.'" *Keurig*, 341 F.R.D. at 498 (quoting *Lokai Holdings*, 2018 WL 1512055, at *9).  "As the Second Circuit has explained, 'a party that disregards its [discovery] obligations may create a reasonable suspicion that further investigation is warranted, and thereby imposes costs on its adversary that would never been incurred had the party complied with its obligations in the first instance[,]' and an award of monetary sanctions compensates the adversary 'for costs it should not have had to bear.'" *Id.* (quoting *Klipsch Group, Inc. v. ePro E-Communications Ltd.*, 880 F.3d 620, 634 (2d Cir. 2018)).

"In situations where sanctions are warranted, district courts have broad discretion in crafting a proper sanction for spoliation." *Keurig,* 341 F.R.D. at 497 (internal quotation marks and brackets omitted)*; see Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991) (collecting cases describing courts' "wide discretion" to select appropriate sanctions).  "The Second Circuit has listed four factors for district courts to consider in exercising this discretion: '(1) the willfulness of the non-compliant party or the reason for the noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance.'" *Id.* (quoting *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)).  "[T]hese factors are not exclusive and they need not each be resolved against the sanctioned party." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group*, 328 F.R.D. 100, 120 (S.D.N.Y. 2018).  The Court may consider "the full record in the case in order to select the appropriate sanction." *Southern New England Telephone*, 624 F.3d at 144 (citation

48

omitted).   The Court also bears in mind that "it is always preferable for issues to be adjudicated on the merits, rather than pursuant to discovery sanctions." *Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*, 330 F.R.D. 134, 139 (S.D.N.Y. Jan. 18, 2019) (quoting *Black v. Bowes*, No. 05-CV-108, 2006 WL 3771097, at *7 (S.D.N.Y. Dec. 21, 2006)); *accord Keurig*, 341 F.R.D. at 487.

At oral argument, Interamerican repeatedly framed the issue before the Court as whether it should impose "the most severe" sanction of terminating the case and entering judgment in favor of PDV USA.  (Tr. 14:24-15:05, 35:25-36:11.)  Indeed, PDV USA seeks that very relief:   default judgment against Interamerican on PDV USA's claims and dismissal of Interamerican's counterclaims with prejudice.  (Mem. at 22-23.)  Absent terminating sanctions, PDV USA asks that Interamerican be precluded from introducing into evidence any document, and Interamerican's interpretation of that document, that Interamerican failed to produce to PDV USA prior to the case being stayed regardless of whether PDV USA recovered the document from other parties.  (Mem. at 23-24.)   PDV USA also asks for an adverse inference instruction, specifically that:

> Defendant Interamerican spoliated evidence concerning the Agreement contained on Mr. Rivera's mobile phone (including WhatsApp messages), email accounts, and other electronic devices.   Interamerican spoliated this evidence because it knew that the substance of the documents and communications would have tended to prove PDV USA's claims and defenses, and to disprove Interamerican's counterclaims and defenses.

(Mem. at 24.)  Last, PDV USA requests monetary sanctions reimbursing PDV USA for the legal fees and costs it expended in its efforts to obtain the Missing Documents and making the instant motion.  (Mem. at 24-25.)

49

Terminating sanctions are overly severe and not commensurate with the circumstances. Despite Interamerican's spoliation, PDV USA recovered "a substantial body" of the Missing Documents, albeit by force of its own efforts, and PDV USA has not persuaded the Court that lesser sanctions would not be effective. For the same reason, Interamerican should not be precluded from introducing ESI into evidence or providing its interpretation of that evidence even if PDV USA was able to recover it from others.

The Court finds instead that an adverse inference instruction is the appropriate sanction to redress the loss of relevant information that likely would have been helpful to PDV USA. *See, e.g.*, *Oakley v. MSG Networks, Inc.*, 792 F. Supp.3d 377, 393 (S.D.N.Y. 2025) (declining to impose terminating sanctions for spoliation and instead granting adverse inference instruction because, as "[t]he Second Circuit has noted … an adverse-inference instruction may better serve 'prophylactic, punitive, and remedial rationales'") (quoting *Kronisch*, 150 F.3d at 126); *Ottoson*, 268 F. Supp.3d at 584 (finding that "[a]n adverse inference instruction is warranted here because Defendants have provided sufficient evidence that additional communications between Plaintiff and her witnesses likely existed, were not produced, and were relevant"); *Sekisui American Corp.*, 945 F. Supp.2d at 509-10 (reversing magistrate judge's denial of sanctions for destruction of ESI, and instead granting sanctions including adverse inference instruction).

Specifically, the Court endorses adopting PDV USA's proposed instruction to the jury, modified to recognize that some, although not all, of the spoliated evidence was recovered. The Court does not, however, definitively prescribe the terms of the instruction. The District Judge overseeing trial will be in the best position to fashion an

instruction after the parties have filed their submissions for trial.[24]  At least at the current juncture, an appropriate instruction would be:

> Sometime after 2017 and before the end of 2022, Defendant Interamerican deleted or otherwise disposed of evidence concerning the Agreement contained on Mr. Rivera's mobile phone (including WhatsApp messages), email accounts, and other electronic devices.  Interamerican deleted this evidence because it knew that the substance of the documents and communications likely would have been advantageous to PDV USA in proving its claims and defenses to Interamerican's counterclaims, and disadvantageous to Interamerican in proving Interamerican's counterclaims and defenses.  During discovery in this case, PDV USA was able to recover some but not all of the deleted material from third parties.

*See Dorchester Financial Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014) (granting adverse inference instruction for spoliation: "The factfinder will be compelled to infer that Dorchester destroyed electronic evidence, including emails and metadata, favorable to BRJ's claim that it did not participate in the transactions at issue in this action"); *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp.2d 409, 443 (S.D.N.Y. 2009) ("allowing the adverse inference that the spoliated evidence would have been unfavorable to Defendants, with respect to the contentions Plaintiffs seek to advance, should serve the remedial function of restoring Plaintiffs to the same position they would have been in absent the wrongful destruction of evidence by Defendants").

In addition to an adverse inference instruction, monetary sanctions also are warranted.  PDV USA has been prejudiced economically.  Because of Interamerican's

---

[24] "[A]lthough a district court may reserve for the jury questions of fact related to adverse inference instructions under Rule 37(e)(2), it is also proper for a district court to make those factual determinations."  *Hoffer*, 128 F.4th at 441.

spoliation, PDV USA has been forced to incur legal fees over a period of more than two years that it would not have had to incur absent Interamerican's spoliation. Among other things, PDV USA has had to litigate obtaining and continuing the stay that was put in place precisely for the purpose of giving PDV USA the opportunity to recover the spoliated ESI. PDV USA also has had to engage in substantial motion practice to obtain the unpreserved documents produced by the government. And, PDV USA has incurred the cost of moving for sanctions. All of those are compensable economic prejudice for which an award of fees and costs should be given. *See, e.g.*, *Oakley*, 792 F. Supp.3d at 389-90 (awarding "attorneys' fees and costs expended in prosecuting this spoliation motion and pursuing discovery related to [defendant]'s loss of text messages," such as by pursuing discovery from third parties); *Lokai Holdings*, 2018 WL 1512055, at *17 (awarding attorney's fees and costs incurred in "(a) raising with Defendants and the Court the issue of ESI not initially produced …; (b) seeking to obtain substitute discovery via subpoenas served on third parties; and (c) bringing both its original and current motions for sanctions").

## Conclusion

For the reasons set forth above, PDV USA's motion for sanctions is GRANTED IN PART and DENIED IN PART. Plaintiff PDV USA is entitled to an adverse inference instruction as set forth above. In addition, PDV USA is entitled to monetary sanctions in the amount of reasonable legal fees and costs it has expended to address Interamerican's spoliation, including by obtaining the lost ESI from other sources and litigating sanctions. PDV USA's request for additional remedies is denied. PDV USA shall file a fee application within 30 days of this Decision and Order. Any opposition to the amount of

fees sought shall be filed within 30 days after PDV USA's filing.  Any reply shall be filed within 14 days of the opposition's filing.  To the extent not discussed above, the Court has considered the parties' arguments and found them to be either moot or without merit.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 262.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: January 27, 2026
           New York, New York

Copies transmitted this date to all counsel of record.