**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| PDV USA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>INTERAMERICAN CONSULTING INC.,<br><br>Defendant. | : | Case No. 20-cv-3699 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST INTERAMERICAN'S COUNTERCLAIMS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1
STATEMENT OF FACTS ....................................................................................4
I. Under the Guise of a "Consulting" Agreement with PDV USA, the Venezuelan Government Funnels Tens of Millions of Dollars to David Rivera and His Co-Conspirators to "Normalize Relations" with the United States ....................................................................................5
II. Rivera Drafts a Phony "Amendment" to Mask Additional Payments from the Venezuelan Government ....................................................................................13
III. Rivera Signs More Bogus Contracts with His Co-Conspirators to Falsely Document Their Four-Way Split of Payments From the Venezuelan Government ....................................................................................15
IV. Rivera Fabricates "BS" "Progress Reports" for His "Consulting" Work ....................16
V. Interamerican Nevertheless Claims to Have Performed $50 Million of Consulting Services for Citgo ....................................................................................17
ARGUMENT ....................................................................................17
CONCLUSION ....................................................................................23

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N. J., Inc.*,
448 F.3d 573 (2d Cir. 2006)....................................................................................18

*Casa del Caffe Vergnano S.P.A. v. Italflavors, LLC*,
816 F.3d 1208 (9th Cir. 2016) ..................................................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...................................................................................................20

*Comprehensive Habilitation Serv., Inc. v. Com. Funding Corp.*,
No. 05 Civ. 9640(PKL), 2009 WL 935665 (S.D.N.Y. Apr. 7, 2009).......................................18

*Doe v. Alsaud*,
224 F. Supp. 3d 286 (S.D.N.Y. 2016).......................................................................17

*SBIW, Inc. v. Gen. Elec. Co.*,
No. 10 Civ. 7812(PGG), 2013 WL 5338525 (S.D.N.Y. Sep. 24, 2013) ...............................22

*SEC v. Genovese*,
553 F. Supp. 3d 24 (S.D.N.Y. 2021).........................................................................17

*SEC v. LaGuardia*,
679 F. Supp. 3d 34 (S.D.N.Y. 2023)....................................................................17, 18

*Tasini v. AOL, Inc.*,
851 F. Supp. 2d 734 (S.D.N.Y. 2012).......................................................................23

**Other Authorities**

Fed. R. Civ. P. 56(a) ..........................................................................................................17

Restatement (Second) of Contracts § 18, cmt. c (1981) ..................................................19

Plaintiff and Counterclaim-Defendant PDV USA, Inc. ("PDV USA"), by its undersigned counsel, hereby respectfully requests that the Court enter summary judgment dismissing Defendant and Counterclaim-Plaintiff Interamerican Consulting, Inc.'s ("Interamerican") counterclaims (ECF 111).

## PRELIMINARY STATEMENT

Earlier this year, following a six-week trial, a jury in the Southern District of Florida found former U.S. Congressman David Rivera guilty of violating the Foreign Agents Registration Act ("FARA"), money laundering, and related conspiracy charges based on his conduct in connection with the "consulting" agreement at issue in this litigation (the "Agreement"). Rivera was remanded into custody and faces a lengthy prison sentence.

The evidence at trial proved what the government alleged in its indictment and what this Court surmised long ago: the three-month, $50 million Agreement was a sham instrument of illegality. The purpose of the Agreement was to create the appearance of consulting work when, in reality, the Maduro regime was paying tens of millions of dollars (Rivera code word: "la luz") to Rivera to "normalize relations" between Venezuela and the United States, including by enticing Exxon Mobil ("Exxon") to bring its business back into Venezuela. For the first $20 million, during the nominal term of the Agreement, Rivera worked his connections with a high-ranking Congressman from Texas ("Texas Congressman") to attempt to broker a meeting between Venezuela's then-Minister of Foreign Affairs Delcy Rodriguez and Exxon senior management, but ultimately Exxon declined. The "client" (i.e., the Venezuelan government) "fired" Rivera because they were "angry," having "paid [$]20" million and "only one meeting was held."

Upon receiving "la luz" from Venezuela, Rivera immediately turned around and sent 75% of it to (1) Raul Gorrin, a Venezuelan billionaire with ties to the Maduro regime, and now a fugitive twice indicted in the U.S. for a massive bribery scheme involving PDVSA; (2) Hugo Perera, a

convicted drug trafficker turned Florida entrepreneur; and (3) Rivera's long-time associate in Florida (and criminal co-defendant), Esther Nuhfer. On behalf of the Maduro regime, Gorrin sought out Rivera based on his political contacts and offered him the $50 million "contract." The four of them agreed to split the money four ways. Rivera later documented the four-way payments with backdated "consulting" "subcontracts" that even Rivera admits were a sham.

To further maintain the fiction of legitimate consulting work, Rivera drafted bogus "progress" reports for PDV USA, as nominally required by the Agreement. In emails that Rivera spoliated in this case, but that the FBI had previously recovered, Rivera and Nuhfer joked about how the progress reports were "BS." Rivera described the vague and meaningless reports as a "Michelangelo work of art" and once quipped: "for only $5 million. [$]10,000 per word. What a bargain!"

Around the same time he was ginning up "BS" progress reports, Rivera concocted yet another phony contract: an "amendment" to change the Agreement from $50 million to $60 million. The jury heard evidence, and Rivera testified in this action, that the amendment, like the Agreement, had nothing to do with consulting services, and was drafted merely to facilitate more payments from Venezuela, this time in exchange for Rivera helping relieve a Maduro family member from U.S. sanctions. For these efforts, Rivera received another $5 million from a PDVSA bank account in Russia.

Notwithstanding that a jury has now found beyond a reasonable doubt that the Agreement was a sham, this action remains pending, solely because Rivera refuses to drop Interamerican's counterclaims. In its counterclaims, Interamerican takes the position that the Agreement was a legitimate consulting agreement and that Rivera earned his full $50 million. Specifically, Interamerican alleges that PDV USA agreed to pay Rivera $50 million for Rivera "to develop an

independent identity for Citgo and to disengage [Citgo] from its Venezuelan parent" company, PDVSA, the Venezuela state-owned oil company. Interamerican claims that it fully performed those services—allegedly culminating in the delivery of a "strategic plan" for Citgo that no one has ever seen—and therefore is owed the unpaid balance of the Agreement ($30 million, plus interest).

Under principles of collateral estoppel, the guilty verdict is dispositive of Interamerican's counterclaims for at least three reasons.

***First***, courts will not enforce sham contracts or contracts designed to conceal illegal activity. The government alleged, and the jury found, that the $50 million Agreement was a false front to conceal unregistered foreign lobbying in violation of federal law. Rivera did not even try to observe the formalities of the Agreement. By his own words, Rivera needed a U.S. contract with a U.S. entity because publicly disclosing the true source of his newfound wealth would be a "monumental scandal." By his own words, the "original intent of the contract" had nothing to do with consulting, but instead was to "normalize relations" between Venezuela and the U.S. To further paper over his clandestine dealings with the Maduro regime, Rivera drew up (and backdated) phony subcontracts, amendments, and progress reports.

***Second***, even if the Agreement were somehow enforceable as Interamerican claims, the verdict is fundamentally incompatible with Interamerican's theory of performance as pled. Interamerican alleges that, during the term of the Agreement, Rivera was paid for advising Citgo on how to "disengage" Citgo from its (indirect) parent PDVSA and the government of Venezuela and create an "independent identity" for Citgo in the United States. Yet, the jury found and the evidence proved that, during the nominal term of the Agreement, Rivera was paid to try to "normalize relations" between Venezuela and the U.S., including bringing Exxon back to

Venezuela. In fact, Rivera's own defense lawyer acknowledged to the jury that Venezuela and PDVSA were behind the Agreement and argued repeatedly that the Agreement's *sole* purpose was bringing Exxon back to Venezuela for the benefit of the Venezuelan government. The problem for Interamerican in this case is that none of this has anything to do with separating Citgo from its Venezuelan parent company. In fact, the two are fundamentally at odds. It is not remotely plausible that the Venezuelan government, using PDVSA funds, paid Rivera $20 million to help Venezuela's "pride and joy" asset (Citgo) stage a coup against PDVSA. Moreover, there was (and is) no evidence—including from the trial testimony of three Citgo witnesses—suggesting that Rivera provided consulting services of any kind to Citgo (or anyone), which independently warrants summary judgment.

***Third***—again, assuming the Agreement is enforceable—the verdict established beyond a reasonable doubt that Interamerican broke the law during the nominal term of the Agreement, which means Interamerican materially breached the compliance with law and "registration" representations in the Agreement. Those breaches, as well as others, excused PDV USA's nonperformance.

In addition, even without the collateral estoppel effect of the jury verdict, the evidence at the trial, the vast majority of which is admissible in this case, overwhelmingly demonstrates that there is no genuine dispute of material fact on any issue relevant to Interamerican's counterclaims.

## STATEMENT OF FACTS

In the criminal indictment, the government alleged that the purpose of the Agreement was to "create[e] the false appearance" that Rivera and his co-conspirators "were providing consulting services to PDV USA," when in fact they were attempting to "garner political support in the United States for a normalization of relations between the United States and Venezuela, to include

resolving a legal dispute between [Exxon] and Venezuela[.]" Ex-20[1] at 5-6 ("Indictment"). The government alleged that, because Rivera was lobbying on behalf of a foreign government, he was required to but did not register as a foreign agent in violation of FARA. Ex-20 at 11. The evidence at trial overwhelmingly supported the government's theory and the jury found Rivera and Nuhfer guilty on all counts.

## I. UNDER THE GUISE OF A "CONSULTING" AGREEMENT WITH PDV USA, THE VENEZUELAN GOVERNMENT FUNNELS TENS OF MILLIONS OF DOLLARS TO DAVID RIVERA AND HIS CO-CONSPIRATORS TO "NORMALIZE RELATIONS" WITH THE UNITED STATES

The $50 million scheme originated at a meeting on Fisher Island in early 2017 between Gorrin, Rivera, Perera, and Nuhfer. Gorrin was a Venezuelan billionaire with close ties to Minister Rodriguez and Maduro. Ex-4 at 85:21-86:13, 89:15-22, 90:15-91:15 (Perera testimony); Ex-25 at 9. Perera was a convicted cocaine trafficker who sought to reinvent himself as an entrepreneur in South Florida after being released from prison. Ex-5 at 42:14-44:1 (Perera testimony). Perera had met Gorrin in 2016 in Miami. Ex-4 at 69:5-71:17 (Perera testimony). Nuhfer was a Florida political fundraiser and marketer, and long-time associate of Rivera's; she met Perera at his restaurant in Florida. Ex-13 at 224:10-225:6 (Rivera deposition); Ex-4 at 58:17-59:24 (Perera testimony).

At Gorrin's request, Perera—who had met Rivera through their mutual connection Nuhfer—introduced Rivera to Gorrin and the four formed a "partnership" and began

[1] Citations to Exhibits ("Ex") refer to the exhibits attached to the Declaration of Brady Sullivan (July 17, 2026).

communicating via an encrypted WhatsApp thread called "MIA" (for Miami).[2] Ex-4 at 77:25-82:1, 92:13-16, 118:13-121:16 (Perera testimony); Ex-25 at 1-4. The four met on Fisher Island in Gorrin's apartment on or around March 4, 2017. Ex-5 at 29:12-30:4 (Perera testimony); Ex-4 at 85:3-20 (Perera testimony); Ex-25 at 4. At the meeting, Gorrin told the group that he could obtain "a contract for $50 million" on behalf of the Venezuelan government to "improve the relationship between the United States and Venezuela." Ex-4 at 85:17-93:5 (Perera testimony); Ex-25 at 4-14. Maduro had told Gorrin and Perera that "he wanted to reinvent himself as like China, and that he wanted to improve relations with the United States . . . and that the oil companies would come to Venezuela. Since Venezuela was a very rich country, they had [a] lot of reserves. But without the American technology, they couldn't do anything." Ex-4 at 100:14-102:8 (Perera testimony); Ex-25 at 64. Specifically, "Maduro wanted Exxon to return to Venezuela." Ex-4 at 96:21-97:18 (Perera testimony); Ex-25 at 38. Exxon had previously been expelled from Venezuela by the Chavez administration—the subject of a then-ongoing arbitration between Exxon and Venezuela. Ex-3 at 162:9-164:4 (Morris testimony).

The four agreed to move forward and split the $50 million in equal parts, 25% each. Ex-4 at 81:6-25, 92:24-93:5 (Perera testimony); Ex-13 at 159:23-160:1 (Rivera deposition). Shortly thereafter, Rivera emailed Gorrin a one-page "contract for services" between Citgo and Rivera's company Interamerican Consulting for $50 million, as well as a $5 million "Citgo Invoice Number One" for "Consulting Services." Exs-39, 40.

---

[2] As this Court previously found, Interamerican intentionally and in bad faith spoliated the MIA chat in this litigation, but the FBI was able to recover it in late 2017. ECF 297 at 7-8, 31-32, 40-47.

Meanwhile, Gorrin was messaging Minister Rodriguez to facilitate the contract and payments to Rivera. Ex-25 at 9; Ex-30 at 1-2. On March 8, the PDVSA Board of Directors met in Caracas and issued a resolution, with a copy to Minister Rodriguez (who was also a PDVSA Vice President), "approv[ing] the hiring of international legal and counseling services for strategic issues of the Corporation" and "authorize[d] . . . the affiliate PDV USA, Inc. to hire . . . Interamerican Consulting, Incorporated for the sum of USD50MM." Ex-33. PDVSA was the Venezuela state-owned oil company. Ex-1 at 142:15-18 (Coon testimony). PDV USA was a wholly owned, indirect subsidiary of PDVSA. Ex-1 at 144:8-23, 146:2-147:6 (Coon testimony). At the time, PDV USA had no independent business operations; it provided shareholder support services for PDVSA in the United States. Ex-1 at 146:2-18 (Coon testimony). Because PDV USA had no independent employees, Citgo, which was also owned (indirectly) by PDVSA at the time, managed PDV USA's administrative functions in the U.S. Ex-1 at 146:19-147:22 (Coon testimony). After the Board resolution, PDVSA issued additional written instructions to Citgo to divert $50 million of funds that Citgo owed to PDVSA to Interamerican through PDV USA. Ex-1 at 170:5-171:1 (Coon testimony); Ex-34. In other words, the $50 million was funded entirely by PDVSA. Ex-1 at 197:6-19 (Coon testimony). On March 10, Gorrin messaged Rivera: "they should call you today to sign the contract and send the first invoice." Ex-30 at 3.

Although Rivera initially drafted a one-page contract with Citgo, Citgo rejected it because PDV USA, not Citgo, was the correct counterparty to the transaction, consistent with the PDVSA board directive and the fact that Citgo never used PDV USA to engage third parties for Citgo. Ex-2 at 97:6-100:1 (Arcay testimony). Eduardo Orsoni, General Counsel for PDVSA and Vice President of Legal Affairs for Citgo, using a Gmail account and a pseudonymous name, emailed Rivera a revised draft of the Agreement, this time between PDV USA and Interamerican, but with

the "scope of services" section blank. Ex-41. Rivera—after consulting FARA filings for precedents (Exs-42, 43)—filled in the "scope of services" section with what he described at deposition as "generic consultant speak" and sent the revised draft back to Orsoni. Ex-15 at 618:1-25-622:11 (Rivera deposition); Ex-44.[3] On March 21, Gorrin messaged Rivera: "Hi David, don't worry, tomorrow at the latest you will have the contract signed and the first 5 [million]." Ex-25 at 17. That day, PDV USA and Interamerican (Rivera) executed the Agreement. Ex-35.

The Agreement states that "during the term of this Agreement," March 21, 2017 to June 21, 2017, "PDV USA shall pay CONSULTANT," defined as Interamerican, "as compensation for the completion of the Services, to PDV USA's sole satisfaction." "Services" are defined to include "strategic consulting services to the CLIENT" (not defined in the Agreement), such as "organize and implement a multi-faceted strategy to reinforce CLIENT's standing among important public officials and opinion leaders." Ex-35. It states that Interamerican must provide a "bi-weekly report detailing the activities that it has carried out during that period . . . as well as a final report integrating all work product[.]" Invoices must include "all supporting documentation, and set out adequate and complete details of the Services rendered." Section 17 requires Interamerican to "comply with all federal, state and local laws, regulations and ordinances." Ex-35 at 4. And in Section 7, Interamerican warranted that it is "properly registered and licensed to perform the Services hereunder and shall maintain any such registration and licenses during the term of this Agreement." Ex-35 at 2.

[3] Rivera's sworn interrogatories falsely state that "PDV USA drafted the entirety of the Consulting Agreement." Ex-17 at 3.

At first, Rivera set out to organize meetings with the Texas Congressman, Minister Rodriguez, and Venezuela opposition leader Julio Borges. Thus, immediately after signing the Agreement, Rivera sent it to Gorrin, Nuhfer, and Perera and wrote in the MIA chat: "Now I am just waiting for the first [$5 million] retainer in order to call [the Texas Congressman] and confirm the appointment in Dallas for hopefully this weekend. We need to confirm the schedules and availability of the Foreign Minister [Rodriguez] and [Julio] Borges at some point." Ex-45. According to contemporaneous draft letters shared in the MIA chat, the purpose of the meeting was for the Maduro regime and the Venezuelan opposition to "engage in discussions with the United States Government in furtherance of democracy and normalizing the relationship between Venezuela and the United States[.]" Ex-25 at 32. On March 24, PDV USA paid Interamerican the first $5 million installment. Ex-21. Almost immediately thereafter, as he did with subsequent payments, Rivera divided the money four ways—approximately 25% each for himself, Gorrin, Nuhfer, and Perera. Exs-22, 23, 24. Ultimately, Rivera arranged for the Texas Congressman meetings with Rodriguez and Borges to occur on April 2 in New York.[4] Ex-47; Ex-25 at 17, 20-33. The Texas Congressman testified that, during his meeting with Minister Rodriguez, she "pivoted" to the topic of Exxon, and told him the Venezuelan government was "interested in finding a way to do business again with Exxon." Ex-10 at 34:1-18.

Thereafter, through the end of the nominal term of the Agreement, Rivera focused his efforts exclusively on arranging a meeting between Minister Rodriguez—and, later, Maduro Oil Minister and PDVSA President Nelson Martinez—Exxon senior executives, and the Texas

[4] At deposition in this action, Rivera falsely testified that he was not "compensated" for the New York meetings. Ex-15 at 628:4-18 (Rivera deposition).

Congressman, the purpose of which was to bring Exxon back to Venezuela and potentially facilitate a joint venture between Exxon and PDVSA. Ex-7 at 16:20-18:21 (Perera testimony); Ex-12 at 40:3-41:1 (defense closing argument); Ex-25 at 63. On April 4, Gorrin informed Rivera: "They just wrote me from Venezuela. When you're ready, they will see Exxon. Everything through me. Direct instructions from the president [Maduro]." Ex-25 at 36-37. That same day, Rivera sent a WhatsApp message to the Texas Congressman: "Raul just got word from Foreign Minister [Rodriguez] that the President and First Lady [Maduro and his wife] have sent down orders that all EX [Exxon] activity is to be coordinated between Raul and you only." Ex-27.

In exchange for the next $5 million, Rivera organized an initial meeting between just the Texas Congressman and Exxon senior management. Thus, on April 8, Rivera wrote in the MIA chat: "I spoke with [the Texas Congressman]. The meeting with EX is on Monday at 3:00. I am going to Dallas on Monday to negotiate details with EX. I think it's about time they pay the second invoice." Ex-25 at 38-39. On April 10, PDV USA paid Interamerican the second invoice ($5 million). Ex-21. Each of Interamerican's invoices contained a total of three words: "strategic consulting services." Exs-36, 46, 49, 52, 64. That same day, April 10, Rivera emailed "[Texas Congressman] Talking Points" to Bertica Cabrera, an Orlando-based consultant, who also received a payment from Rivera. Ex-37; Ex-3 at 40:6-25, 41:1-12, 62:5-63:9 (Morris testimony). The talking points read: "I am working with individuals who have initiated efforts and have been designated by the Government of Venezuela at the highest level to serve as liaisons in facilitating the transfer of Exxon Mobil's assets back to Exxon Mobil." Ex-37. The initial meeting took place on April 10 at Exxon headquarters in Dallas, after which Rivera boasted to Gorrin that "[the Texas Congressman], and even so important, we[] are fulfilling our commitment to the Chancellor/client [Rodriguez] in transmitting the position of V [Venezuela] to the highest level at EX, the CEO,

Darren Woods." Ex-25 at 39. The Texas Congressman, however, testified that the meeting failed, because Exxon General Counsel Randy Ebner immediately indicated that if Venezuela wanted to negotiate with Exxon, they would have to do so through outside counsel in connection with the ongoing arbitration. Ex-10 at 39:2-40:10.

In the following days, Rivera convinced Gorrin that he needed more money from Venezuela to arrange the targeted meeting among the Texas Congressman, Minister Rodriguez, and Exxon leadership. Ex-25 at 40-44. On April 11, Rivera told Gorrin in the MIA Chat: "The entrance to the concert is $15, not 20 like we spoke last night." Ex-25 at 40. Perera testified that these messages were code for payments from Venezuela.[5] Ex-5 at 90:25-92:7 (Perera testimony). On April 17, Rivera messaged the MIA group: "It is essential that we meet this Thursday to prevent the inva[s]ion of troops of Trump in Venezuela. And now I have to send the third invoice! I'm in Orlando today with [Texas Congressman] tonight." Ex-25 at 42. That same day, Rivera also wrote to Gorrin in the MIA group: "Remind your wife that it's 15 for the entrance to Thursday's dance. [The Texas Congressman] already prepared everything so that they will receive [Minister Rodriguez] with a red carpet." Ex-25 at 42-43.[6]

On April 17 and 18, Rivera asked Gorrin in the MIA group when Rivera should send the next invoice, and on April 19, Rivera sent the third $5 million invoice to PDVSA's Pio Gonzalez in Caracas, the "authorized representative" under the Agreement, as he did for the other invoices.

---

[5] At deposition in this action, Rivera testified that he did not know what the "concert" message referred to. Ex-14 at 449:18-450:1 (Rivera deposition).

[6] When asked at deposition if he could explain the meaning of the "dance" message, Rivera testified "no." Ex-15 at 745:12-15 (Rivera deposition).

Ex-25 at 43-44; Exs-48, 49. PDV USA paid the invoice on April 19, having then paid a total of $15 million to Interamerican. Ex-21. On April 20, Rivera sent the fourth and fifth invoices (totaling another $10 million) to Pio Gonzalez. Exs-50, 53 at 3. On April 21, Rivera sent the Texas Congressman a draft message addressed to Exxon General Counsel Randy Ebner, signed by Rodriguez, which stated that Rodriguez and "Energy Minister Nelson Martinez" desired to meet with Exxon in Dallas. Ex-51.

During the first few weeks of May, Rivera continued to pressure Gorrin for even more "la luz,"[7] falsely insinuating that the Texas Congressman needed to be compensated to set up the meeting with Exxon, Minister Rodriguez, and Minister Martinez in Dallas: "I already spoke to [the Texas Congressman]. He is waiting for my call to tell him that The Light ["la luz"] is on her way to Orlando. As soon as there is Light in Orlando he will be ready to create Light in Dallas!" Ex-25 at 53; Ex-6 at 42:21-43:22 (Perera testimony). At this point, Perera urged Rivera: "David, erase all those texts don't use names." Ex-25 at 53. Gorrin assured Rivera that "The Light is being processed." Ex-25 at 53. On May 25, Nuhfer received $3,750,000 (75% of $5 million) from a bank account associated with Raul Gorrin's wife. Ex-25 at 53-60. Rivera received $1,250,000 of the payment (25% of $5 million). Ex-5 at 101:23-102:5 (Perera testimony); Ex-15 at 833:17-834:2 (Rivera deposition).

By late May, despite having now received $20 million, Rivera and his associates still had not secured the desired meeting with Exxon, and Rivera's "client," whom Rivera himself referred

[7] "La Luz" was code for money. Ex-6 at 28:3-7, 30:7-18 (Perera testimony). At deposition in this action, Rivera testified that he did not know what "la luz" referred to, and said that it might have been a reference to "Lucy." Ex-14 at 474:16-475:5 (Rivera deposition).

to as Minister Rodriguez (Ex-25 at 39), was losing patience. On May 29, Rivera sent Nuhfer a "draft" email to Gorrin, in which Rivera wrote, "I understand all of the concerns and frustrations expressed by the client" and suggested that he and the group "return our focus to the **original intent of the contract which was to work toward normalizing relations**." Ex-54 at 2.

Other messages from the same time confirm that the "client" was not satisfied. Perera informed Rivera: "With the Exxon thing we're looking REALLY BAD"; "[t]hey are complaining to me that they sent 20 and there was only a single meeting." Ex-31 at 13; Ex-29 at 7. Gorrin, too, was starting to catch on: "They are pissed off and with good reason, which is why I pressed them to send The Light, since David asked him several times if The Light arrived on Thursday, the meeting could be held on Friday." Ex-25 at 62.

On June 7, Exxon declined the meeting in writing. Ex-38 at 6. On June 12, Rivera again learned from Perera, who had met with "the lady," Minister Rodriguez, that the client was "very disappointed by our management. . . . [T]hey have paid a fortune, [but] there has only been one meeting and there is no progress." Ex-29 at 20. In the words of Rivera's defense lawyer at trial, Rivera was "fired," (Ex-12 at 13:24-14:5), and the Agreement nominally terminated on June 21, 2017. Ex-35 at 1.

## II. RIVERA DRAFTS A PHONY "AMENDMENT" TO MASK ADDITIONAL PAYMENTS FROM THE VENEZUELAN GOVERNMENT

Beginning in or around late August 2017, Rivera, Nuhfer, and Perera hatched another scheme: they would charge Venezuela to have certain Maduro allies removed from the U.S. Specially Designated Nationals ("SDN") List. Ex-6 at 31:7-33:14 (Perera testimony); Ex-25 at 93-99. On August 30, 2017, Rivera summarized the terms in the MIA chat: "5 melons of retainer," and further tens of millions of dollars, in connection with "resolv[ing] the crisis" and lifting U.S. sanctions against senior Venezuelan officials, including the nephew of Maduro's wife, Eric

Malpica Flores.[8] Ex-25 at 95. Thereafter, Rivera took steps to obtain sanctions relief for Malpica Flores. Exs-58, 59, 60, 62.

To facilitate the additional payments, Rivera orchestrated an "amendment" to the Agreement. The amendment changed the total amount from $50 million to $60 million. Exs-55, 56. As with the original draft of the Agreement, Rivera sent the amendment to Gorrin (not to PDV USA). Ex-55; *see also* Ex-25 at 13-14 (March 14 message from Rivera stating that the "contract" (i.e., the Agreement) is "only for Raul, in case he needs it he can use it.").[9] At deposition, Rivera readily admitted that he proposed the amendment "in connection with facilitating payment" to remove Malpica Flores from the U.S. sanctions list, which Rivera agreed had "nothing to do with the scope of services from" the original Agreement. Ex-15 at 847:6–850:21 (Rivera deposition). In other words, it was a phony amendment, just like the Agreement itself.

Meanwhile, PDV USA had been asking Rivera to assign the original Agreement to PDVSA. Rivera declined, explaining to Gorrin and the MIA group that having an agreement with PDVSA would compromise the fiction of working for a U.S. company:

> [A] contract with PDVSA Caracas requires registering with FARA . . . which my attorney has told me is currently illegal due to Trump's sanctions on PDVSA, and not to touch it with a 50-foot pole, but it would be a scandal of monumental proportions. I have no problem allocating contract payments at PDV USA's discretion, to give you flexibility in payment sources, but to have a contract with PDVSA Caracas would make our efforts impossible.

Ex-25 at 99.

---

[8] Perera testified that "melons" referred to millions of dollars from Venezuela. Ex-5 at 92:15-21 (Perera testimony). At deposition, Rivera testified that he was not sure what "melons" meant. Ex-15 at 846:10-19 (Rivera deposition).

[9] PDV USA never signed the amendment.

On October 16, 2017, Nuhfer wrote to Rivera: "They better hurry & drop that light in Doral [meaning Interamerican] before Eric [Malpica Flores] is fkd." Ex-32 at 10. On October 27, 2017, PDVSA paid Interamerican another $5 million, this time from a Russian bank account, in exchange for efforts to remove Malpica Flores from the sanctions list—which ultimately failed. Ex-21; Ex-8 at 67:9-69:8 (Perera testimony); Ex-9 at 146:16-148:10 (forensic accountant testimony).[10]

## III. RIVERA SIGNS MORE BOGUS CONTRACTS WITH HIS CO-CONSPIRATORS TO FALSELY DOCUMENT THEIR FOUR-WAY SPLIT OF PAYMENTS FROM THE VENEZUELAN GOVERNMENT

As noted, during the term of the Agreement, Rivera systematically funneled 75% of his fees to Gorrin, Nuhfer, and Perera in equal parts. Many months after doing so, in late 2017 and early 2018, in connection with preparing his tax return, Rivera documented these payments with sham "subcontract" agreements. Specifically, Interamerican signed "subcontract" agreements with Nuhfer's company Communication Solutions and Perera's company PGA, and Rivera attempted to have Gorrin's yacht manager, Interglobal Yacht Management ("IYM")—through whom Rivera had paid Gorrin his 25% cut—sign a subcontract. Ex-66; Ex-14 at 360:12-363:8 (Rivera deposition). The subcontracts stated that PGA, Communication Solutions, and IYM would act as subcontractors to Interamerican in connection with Interamerican's "consulting" services to PDV USA, in exchange for 25% of the fees that Interamerican received from PDV USA. Ex-66. Rivera backdated the subcontracts to March 20, 2017. Ex-7 at 57:19-23 (Perera testimony); Ex-14 at 337:4-340:7, 351:3-353:14, 359:13-360:14 (Rivera deposition). At trial, Perera testified that the subcontracts were "not valid," i.e., they were a sham, which was consistent with Rivera's

[10] Rivera denied under oath that this payment was made "in connection with [Rivera's] efforts regarding Mr. Malpica." Ex-15 at 647:24-649:2 (Rivera deposition).

testimony at deposition that the agreements were "invalid" and "null and void." Ex-7 at 58:6-25, 59:1-5 (Perera testimony); Ex-14 at 340:23-341:9, 353:20-25 (Rivera deposition); Ex-18 at 2.

## IV. RIVERA FABRICATES "BS" "PROGRESS REPORTS" FOR HIS "CONSULTING" WORK

In November 2017—five months after the purported term of the Agreement—Nuhfer drafted progress reports supposedly documenting Interamerican's "consulting" work.[11] Per the terms of the Agreement, Interamerican was supposed to submit bi-weekly progress reports. Ex-35 at 6. Instead, Nuhfer and Rivera drafted the progress reports months after the Agreement expired, as counsel for Rivera readily admitted at trial. Ex-12 at 11:24-12:7 (defense closing argument). Thus, on November 2, 2017, Nuhfer sent Rivera draft "May 16 & May 30 reports" with vague references to meetings with a "private sector organization," and conversations with "important policymakers." Ex-57. In response, Rivera wrote to Nuhfer: "Wow! This is a Michaelangelo work of art. Hemingway could not have written a better masterpiece. And for only $5 million. $10,000 per word. What a bargain!!!" Ex-57. Nuhfer responded: "Exactly, that is my going rate these days. Should I BS more, or is this fine? Should I work on the other 2?" Ex-57. Then, in December 2017, Nuhfer sent Rivera the "next report" for "June," which referenced meeting with "key public officials." Ex-61. Rivera responded: "Wow! You just earned another slice! And it took you a whole fifteen minutes. Not a bad gig." Ex-61. Rivera revised the draft reports from Nuhfer, (Ex-63), and delivered them to Pio Gonzalez on December 31, 2017. Ex-65.

---

[11] At deposition, Rivera testified "never" and "no" when asked whether Nuhfer "draft[ed] reports for you to supply to PDV USA" or whether Nuhfer "draft[ed] reports for you to supply to anyone in connection with the consulting agreement." Ex-15 at 852:17-853:10 (Rivera deposition).

## V. INTERAMERICAN NEVERTHELESS CLAIMS TO HAVE PERFORMED $50 MILLION OF CONSULTING SERVICES FOR CITGO

Notwithstanding all of the above and the guilty verdict, Interamerican is suing PDV USA for the unpaid balance on the Agreement—which it claims is $30 million—on the theory that the Agreement was a legitimate consulting contract and that Interamerican fully performed its obligations thereunder. ECF 111 at 19–23. Interamerican claims that it was paid to "develop a strategic plan to create a separate and distinct identity" for Citgo in the U.S. and to "disengage [Citgo] from its ultimate parent [company]," PDVSA. ECF 111 at 19. It claims to have "provided all the consulting services contemplated under the Agreement," which requires performance to PDV USA's "sole satisfaction." ECF 111 at 22; Ex-35 § 3.

## ARGUMENT

PDV USA seeks summary judgment only against Interamerican's counterclaims.

Summary judgment should be entered where there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Summary judgment is appropriate in a civil action where a parallel criminal proceeding results in a conviction and the conviction has collateral estoppel effect in the civil action. *See, e.g.*, *SEC v. LaGuardia*, 679 F. Supp. 3d 34 (S.D.N.Y. 2023). "A criminal conviction . . . is conclusive proof of its underlying facts in a subsequent civil action and collaterally estops a party from relitigating the issue." *Doe v. Alsaud*, 224 F. Supp. 3d 286, 292 (S.D.N.Y. 2016). Criminal convictions have collateral estoppel effect in civil actions under a four part test: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *SEC v. Genovese*, 553 F. Supp. 3d 24, 41 (S.D.N.Y. 2021).

Here, the issues litigated and decided in the criminal trial include the same issues relevant to Interamerican's counterclaims: what was the purpose of the Agreement, and what (if anything) did Interamerican do in exchange for tens of millions of dollars? As set forth above, the jury found beyond a reasonable doubt what the government alleged in the indictment: the Agreement was a false front (i.e., a sham), and the Venezuelan government paid Rivera tens of millions of dollars to "normalize relations" with the United States, including enticing Exxon to bring its business back to Venezuela, although those efforts failed. *Compare* Ex-20 at 3-8 *with* ECF 111 at 19-22; *LaGuardia*, 679 F. Supp. 3d at 40 ("In order to determine whether the issues are identical for collateral estoppel purposes, courts routinely compare the criminal indictment with the civil complaint."). The jury also found that the $20 million Interamerican received under the guise of the Agreement was "criminally derived property." Ex-20 at 29-30. These findings were essential to the jury's conclusion that Rivera was acting as a foreign agent of the Venezuelan government and that he committed money laundering. Rivera had every opportunity to (and did) vigorously defend himself at trial, where he was represented by counsel.

The guilty verdict compels summary judgment against Interamerican's counterclaims for the following three reasons—both because the jury verdict has collateral estoppel effect on each of these three issues, and because the evidence at trial overwhelmingly demonstrates there is no genuine dispute of material fact as to each.

***First***, Interamerican's breach of contract Counterclaim must be dismissed because the Agreement was a sham instrument of illegality. A contract is not valid or enforceable if it is in furtherance of an illegal purpose or contrary to public policy. *See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N. J., Inc.*, 448 F.3d 573, 580 (2d Cir. 2006); *Comprehensive Habilitation Serv., Inc. v. Com. Funding Corp.*, No. 05 Civ. 9640(PKL), 2009 WL 935665, at *18

(S.D.N.Y. Apr. 7, 2009) ("[A]greement to conceal assets and evade tax liability would be void and unenforceable under New York law"). Likewise, "[w]here all the parties to what would otherwise be a bargain manifest an intention that the transaction is not to be taken seriously, there is no . . . manifestation of assent[.]" Restatement (Second) of Contracts ("Restatement") § 18, cmt. c (1981). Thus, courts will not enforce "sham" agreements where the parties had no intention to be bound and the agreement is designed merely to create the appearance of a legitimate business transaction. *See, e.g.*, *Casa del Caffe Vergnano S.P.A. v. Italflavors, LLC*, 816 F.3d 1208, 1212-13 (9th Cir. 2016) ("[I]t is plain that the Commercial Contract was nothing more than a sham agreement designed as a ploy to aid Hector Rabellino's visa application.").[12]

Here, the Agreement is unenforceable because its purpose was to create the "false appearance that [Rivera and Nuhfer] were providing consulting services to PDV USA." Ex-20 at 5. In Rivera's own words, the "original intent" of the contract had nothing to do with consulting, but instead was to "normalize[e] relations" between Venezuela and the U.S. Ex-54 at 2. The parties never intended to and never did observe any of the formalities of the Agreement, such as bi-weekly progress reports, or invoices with supporting details. *Supra* Secs. I, IV.

To be clear, the validity of the Agreement was a central issue for both sides at trial and a necessary component of the guilty verdict, especially because Rivera needed the jury to find that the Agreement was a bona fide commercial transaction in order to avail himself of an affirmative

[12] The Court may consider parol evidence when determining whether a valid contract exists. *See* Restatement § 214 cmt. c ("[w]hat appears to be a complete and binding integrated agreement may be a forgery, a joke, a sham . . . or it may be illegal. Such invalidating causes need not and commonly do not appear on the face of the writing.").

defense under the FARA statute. *See* Ex-11 at 95:5-9 (jury instructions); *compare* Ex-11 at 160:21-22 (United States closing argument: "the 50 million consulting agreement was a sham") and Ex-11 at 165:22-25 ("'Bona fide' means an arm's length honest transaction. That wasn't the case here, ladies and gentlemen. They were consultants for no one. They were lobbyists for the regime.") *with* Ex-12 at 28:24-25 (defense closing argument: "Ladies and gentlemen, that contract was perfectly legal."). The jury sided with the government, and so the legitimacy of the Agreement has been fully litigated.

Likewise, and because the Agreement was a sham, there was no manifestation of assent to the terms of the Agreement. As shown above, the principals to the Agreement—Interamerican, Minister Rodriguez, and the PDVSA Board—never intended for Interamerican to perform strategic consulting services for anyone, let alone to PDV USA's "sole satisfaction."

Equally dispositive is what the jury did *not* see; that is, evidence of *any* of the hallmarks of a legitimate consulting agreement, such as:

- negotiations over the commercial terms of the Agreement;
- a commercial solicitation process; Interamerican, a company that made a total of $10,000 the year prior, was offered a $50 million consulting agreement out of the blue by a later-indicted Venezuelan billionaire, *see* Ex-13 at 51:7-25 (Rivera deposition);
- a single document or piece of written work product reflecting consulting services performed by Rivera for anyone, such as PowerPoints, spreadsheets, memoranda, or the like.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (in cases where the non-moving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case").

***Second***, even accepting Interamerican's position that the Agreement is enforceable, the verdict and the evidence at trial are fundamentally inconsistent with Interamerican's theory of

"performance" under the Agreement in this case. The verdict and the evidence established that, during the term of the Agreement, Rivera was working *for* and *in support of* the Venezuelan government to bring Exxon back to Venezuela. In fact, on this issue, there was no dispute even at the trial. Rivera's own lawyers told the jury in closing: "**We're not running from the fact that PDVSA was behind this contract, but Venezuela wanted it. But they wanted it for Exxon. They were desperate**. That $50 million contract was less than one half of one percent of the low end of what Venezuela would have made by getting Exxon back into Venezuela under any theory." Ex-12 at 40:10-15. *See also id.* (defense closing argument: the contract "quickly, within days, became **exclusively about a commercial endeavor**, Exxon, which didn't involve lobbying or any other policy"). If the Agreement was *exclusively* about bringing Exxon back to Venezuela, the Agreement could not also have been about separating Citgo from PDVSA, and Interamerican should be estopped from claiming as much. Not only does one have nothing to do with the other, it is not remotely plausible that the Venezuelan government would use PDVSA funds to finance a rebellion by Citgo, the "pride and joy" of Venezuela and a (indirect) subsidiary of PDVSA, (Ex-10 at 27:20-22 (Arcay testimony)), so that Citgo could separate from PDVSA.

Moreover, just as there is no evidence of legitimate consulting services at all, there is certainly no evidence that Rivera consulted *for Citgo*. In fact, the only testimony from Citgo witnesses on this issue confirmed that Citgo did not receive any consulting services from Rivera. Ex-2 at 173:7-11 (Arcay testimony). No one has ever seen the "strategic plan" Rivera supposedly created to help Citgo "disengage" from PDVSA. ECF 111; Ex-14 at 269:3-272:7 (Rivera deposition); Ex-15 at 630:5-633:4 (Rivera deposition); Ex-19 at 3; Ex-16 at 5-9. When asked to describe the "strategic plan" and other supposed work Interamerican claims to have done for Citgo, Interamerican swore that, other than a brief text message exchange with Julio Borges (Ex-26 at 1)

and a few messages with Orsoni about setting up the Exxon-Rodriguez meeting, (Ex-28) "there are no other responsive documents describing in detail the 'strategic plan[.]'" Ex-16 at 9. And, in all cases, there is no evidence that Interamerican performed services (for anyone) to PDV USA's "sole satisfaction," as the Agreement requires; in fact, the evidence concerning the "client's" satisfaction proves that the client was *not* satisfied. Ex-35; *supra* Section I. Even Rivera's counsel told the jury that Rivera was "fired" after the Exxon meeting fell through. Ex-12 at 13:24-14:5.

***Third***—again, if somehow the Agreement is enforceable—the verdict and the evidence at trial established Interamerican's breach of the Agreement. As noted, the jury found that Rivera violated federal law by failing to register under FARA in connection with conduct that Rivera's attorneys claimed at trial was the *exclusive* source of his compensation under the supposedly legitimate Agreement. Ex-12 at 10:7-18:9, 40:3-41:7 (defense closing argument). That constitutes a direct and material breach of the Agreement's provisions requiring Interamerican to "comply with all federal, state and local laws, regulations and ordinances" and be "properly registered and licensed to perform the Services hereunder." Ex-35. A plaintiff's material breach excuses the defendant's non-performance. *SBIW, Inc. v. Gen. Elec. Co.*, No. 10 Civ. 7812(PGG), 2013 WL 5338525, at *12 (S.D.N.Y. Sep. 24, 2013). Therefore, PDV USA has no obligation to make further payments to Interamerican under the Agreement.

The evidence established other material breaches that excuse PDV USA's non-performance. In breach of Section 3 of the Agreement, Interamerican failed to provide "supporting documentation" and "adequate and complete details of the Services rendered" with all invoices submitted. In breach of Section 3, Interamerican failed to provide bi-weekly reports "detailing the activities that [Interamerican] has carried out during that period," as well as a "final report integrating all work product including recommendations for monitoring and following up on the

strategies implemented." And in breach of Section 18, Interamerican entered into subcontracts without the prior written consent of PDV USA.

* * *

For these same reasons, Interamerican's unjust enrichment and declaratory judgment claims should also be dismissed. There is no evidence that PDV USA was enriched by Interamerican, nor can Interamerican establish that equity and good conscience necessitate that PDV USA pay it $30 million. *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 741 (S.D.N.Y. 2012). Interamerican's declaratory judgment claim mirrors its breach of contract claim (ECF 111 at 24) and therefore should be dismissed as well.

## CONCLUSION

For the reasons set forth above, the Court should enter summary judgment in favor of PDV USA against Interamerican's Counterclaims.

Dated: July 17, 2026
New York, New York

**WILLKIE FARR & GALLAGHER LLP**

By: */s/ Brady M. Sullivan*
Jeffrey B. Korn
Brady M. Sullivan
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000
JKorn@willkie.com
BSullivan@willkie.com

Michael J. Gottlieb (admitted *pro hac vice*)
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3111
MGottlieb@willkie.com

*Attorneys for Plaintiff PDV USA, Inc.*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for Plaintiff PDV USA certifies, pursuant to Section III.E of Your Honor's Individual Practices in Civil Cases and Local Civil Rule 7.1, that the foregoing brief contains 6954 words, excluding the parts of the brief exempted by Section III.D, according to the Word Count feature of Microsoft Word.

Dated: July 17, 2026

By: *<u>/s/ Brady M. Sullivan</u>*
Brady M. Sullivan