**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PDV USA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>INTERAMERICAN CONSULTING, INC.,<br><br>Defendant. | No. 20-cv-03699-JGK |

**PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (WITH DEFENDANT RESPONSES)**

Pursuant to Local Rule 56.1, PDV USA, Inc. ("PDV USA") respectfully states that the following are material facts as to which there is no genuine issue to be tried. The sources cited in the footnotes of this Statement align with the exhibits identified in the Declaration of Brady Sullivan (July 17, 2026).

1. Following a six-week trial, a jury in the Southern District of Florida found former U.S. Congressman David Rivera guilty of one count conspiracy to violate the Foreign Agents Registration Act ("FARA"), one count of violating FARA, one count conspiracy to commit money laundering, and four counts of engaging in transactions in criminally derived property, based on his conduct in connection with the $50 million "consulting" agreement at issue in this litigation (the "Agreement").

**RESPONSE:** Disputed in part. Defendant disputes the Plaintiff's summary characterization as "based on his conduct in connection with the $50 million "consulting" agreement at issue it his litigation (the "Agreement").

2. In the criminal indictment against Mr. Rivera and his co-conspirator Esther Nuhfer ("Indictment"), the government alleged that the purpose of the Agreement was to "create[e] the false appearance" that

Rivera and his co-conspirators "were providing consulting services to PDV USA," when in fact they were attempting to "garner political support in the United States for a normalization of relations between the United States and Venezuela, to include resolving a legal dispute between [Exxon] and Venezuela[.]"[1] The government also alleged that Rivera and Nuhfer conspired to engage in financial transactions involving more than $10,000 in criminally derived property, knowing the funds represented proceeds of their unregistered lobbying on behalf of the Venezuelan government, and that they used these funds for purposes including paying off a home equity line of credit, funding a campaign account, and purchasing real estate.[2]

**RESPONSE:** Disputed in part. Defendants disputes the characterization of the record, particularly non-quoted statements of alleged fact.

3. The Agreement, its origins, its true purpose, and what exactly Mr. Rivera did (or did not do) during the nominal term of the Agreement and in exchange for the money received pursuant to the Agreement, were all key issues litigated throughout the criminal trial, featuring in both sides' opening and closing arguments to the jury, the jury instructions, and in extensive witness testimony.[3]

**RESPONSE:** Disputed. Defendant disputes Plaintiff's characterization of the record.

[1] Ex-20 at 5-6.

[2] Ex-20 at 28-29.

[3] *See, e.g.*, Ex-11 at 95:5-9 (jury instructions); Ex-11 at 160:21-22, 165:22-25 (United States closing argument); Ex-12 at 28:24-25 (defense closing argument); Ex-5 at 30:5-31:8 (Perera testimony); Ex-2 at 115:17-116:13, 157:10-20 (Arcay testimony).

4. Interamerican Consulting, Inc. ("Interamerican") is a one person Florida corporation owned and operated exclusively by David Rivera.[4]

**RESPONSE:** Not disputed.

5. In 2016, the year prior to the Agreement, Interamerican earned a total of $9,500.[5]

**RESPONSE:** Not disputed.

6. At the time of the Agreement:

a. PDV USA was a wholly owned, indirect subsidiary of PDVSA.[6]

**RESPONSE:** Disputed in part. Defendant admits PDV USA was wholly owned by PDV Holding which was owned by PDVSA.

b. PDVSA was the Venezuela state-owned oil company.[7]

**RESPONSE:** Not disputed.

c. The government of Venezuela was led the regime of then-president Nicolas Maduro.

**RESPONSE:** Not disputed.

d. Delcy Rodriguez was the Foreign Minister of Venezuela. [8] She was also a Vice President of PDVSA.[9]

**RESPONSE:** Not disputed.

[4] ECF 111, ¶ 12.
[5] Ex-13 at 50:17-25, 51:1-17 (Rivera deposition).
[6] Ex-1 at 144:8-23, 146:2-147:6 (Coon testimony).
7 Ex-1 at 142:15-18 (Coon testimony).
[8] Ex-13 at 107:24-108:3 (Rivera deposition).
[9] Ex-33.

e. PDV USA had no independent business operations; its purpose was to provide shareholder support services for PDVSA in the United States.[10]

**RESPONSE:** Disputed in part. PDV USA also engaged Interamerican to assist with Citgo.

f. Because PDV USA had no independent employees, Citgo, which was also owned (indirectly) by PDVSA at the time, managed PDV USA's administrative functions in the United States.[11]

**RESPONSE:** Not disputed.

g. Esther Nuhfer was a Florida political fundraiser and marketer, and long-time associate of Rivera's; she met Perera at his restaurant in Florida.[12]

**RESPONSE:** Not disputed.

h. Raul Gorrin was a Venezuelan billionaire with close ties to Minister Rodriguez and Maduro.[13] In 2018 and 2024, Gorrin was indicted in the Southern District of Florida for his role in a $1.2 billion scheme to launder funds corruptly obtained from PDVSA

in exchange for hundreds of millions in bribe payments to Venezuelan officials.[14] He is a fugitive who remains at large.[15]

**RESPONSE:** Disputed. Plaintiff relies upon hearsay statements of Perera.

[10] Ex-1 at 146:2-18 (Coon testimony).
[11] Ex-1 at 146:19-147:22 (Coon testimony).
[12] Ex-13 at 224:10-225:6 (Rivera deposition); Ex-4 at 58:17-21 (Perera testimony).
[13] Ex-4 at 85:21-86:13, 89:15-22, 90:15-91:15 (Perera testimony).
[14] Superseding Indictment, ECF No. 44, *United States v. Raul Gorrín Belisario, et al.*, No. 9:18-cr-80160-WPD (S.D. Fla. Dec. 16, 2018); Indictment, ECF No. 1, *United States v. Raul Gorrín Belisario*, No. 24-20468-CR-Altman/Lett (S.D. Fla. Oct. 23, 2024); *Gorrín Belisario, Raul Antonio De La Santisima T: Wanted for violation of foreign corrupt practices act, money laundering*, U.S. IMMIGR. AND CUSTOMS ENF'T. (July 30, 2025), https://www.ice.gov/most-wanted/Gorrín-belisario-raul-antonio-de-la-santisima-t
[15] *Venezuelan Television News Network Owner Charged in Alleged $1.2B Money Laundering Scheme*, U.S. DEP'T OF JUSTICE (Oct. 23, 2024), https://www.justice.gov/archives/opa/pr/venezuelan-television-news-network-owner-charged-alleged-12b-money-laundering-scheme.

i. Hugo Perera was a convicted cocaine trafficker living in Florida.[16]

**RESPONSE:** Disputed. Plaintiff relies upon hearsay statement of Perera, and other unsubstantiated sources.

j. "Texas Congressman" was a senior ranking Republican Congressman, whose district included Exxon's headquarters.[17]

**RESPONSE:** Not disputed.

7. In or around March 4, 2017, Rivera, Gorrin, Perera, and Nuhfer had a meeting in Fisher Island.[18] Around the same time, the four began communicating via an encrypted WhatsApp thread called "MIA" (for Miami).[19]

**RESPONSE:** Not disputed, except that was not the sole means of communication.

8. At the meeting, Gorrin told the group that he could obtain a "contract" for $50 million on behalf of the Venezuelan government to "improve the relationship between the United States and Venezuela" including to help convince Exxon to bring its business back to Venezuela.[20]

**RESPONSE:** Disputed. Plaintiff relies upon hearsay statements of Perera.

[16] Ex-5 at 40:2-20, 43:10-19 (Perera testimony).
[17] Ex-10 at 15:21-16:7; 23:8-13, 36:11-15 (Texas Congressman testimony).
[18] Ex-5 at 29:12-30:4 (Perera testimony); Ex-4 at 85:3-20 (Perera testimony); Ex-25 at 4.
[19] Ex-25 at 1-4
[20] Ex-4 at 85:17-93:5 (Perera testimony); Ex-25 at 4-14.

9. Exxon had previously been expelled from Venezuela by the Chavez administration—the subject of a then-ongoing arbitration between Exxon and Venezuela,[21] and, according to Gorrin, "Maduro wanted Exxon to return to Venezuela."[22]

**RESPONSE:** Disputed in part. Defendant objects to Plaintiff's citing the testimony of Perera and citing the testimony of Gorrin reflecting on Maduro's state of mind.

10. Venezuela wanted the "contract"; they wanted it for Exxon, and they were "desperate".[23]

**RESPONSE:** Disputed in part. Statements of legal counsel are not evidence. Moreover, Venezuela indirectly owned Citgo, and nothing would have been wrong with its wanting Citgo to have more business.

11. At all times, Rivera understood that his "client" was the Venezuelan government and Delcy Rodriguez.[24]

**RESPONSE:** Disputed in part. Defendant object to Plaintiff's characterization of the record.

12. The "original intent of the contract" was to "work toward normalizing relations" between Venezuela and the United States.[25]

**RESPONSE:** Disputed. Plaintiff mischaracterizes the subject of "normalization relations."

[21] Ex-3 at 162:9-164:4 (Morris testimony).
[22] Ex-4 at 96:21-97:18 (Perera testimony).
[23] Ex-12 at 40:10-15 (defense closing argument).
[24] Ex-25 at 39.
[25] Ex-54 at 2.

13. There was never any discussion about providing, or intention to provide, services (of any kind) to Citgo.

**REPSONSE:** Disputed. Plaintiff offers no proofs to support this statement.

14. Rivera, Perera, Gorrin, and Nuhfer formed a "partnership" and agreed to move forward and split the $50 million in equal parts, 25% each.[26]

**RESPONSE:** Disputed in part. Defendant disputes the characterization of a "partnership."

15. Around the same time, Gorrin messaged with Rodriguez about facilitating the contract with Rivera.[27]

**RESPONSE:** Not disputed.

16. On March 8, 2017, the PDVSA Board of Directors met in Caracas and issued a resolution, with a copy to Minister Rodriguez, "approv[ing] the hiring of international legal and counseling services for strategic issues of the Corporation" and "authorize[d] . . . the affiliate PDV USA, Inc. to hire . . . Interamerican Consulting, Incorporated for the sum of USD50MM."[28]

**RESPONSE:** Not disputed.

17. After the Board resolution, PDVSA issued additional written instructions to Citgo to divert $50 million of funds that Citgo owed to PDVSA to Interamerican through PDV USA.[29]

**RESPONSE:** Not disputed.

[26] Ex-4 at 74:3-8, 81:6-25, 92:24-93:5 (Perera testimony); Ex-13 at 159:23-160:1 (Rivera deposition).
[27] Ex-25 at 9; Ex-30 at 1-2.
[28] Ex-33.
[29] Ex-1 at 170:5-171:1 (Coon testimony); Ex-34.

18. Thus, the $50 million was funded entirely by PDVSA.[30]

**RESPONSE:** Disputed in part. Defendant objects to Plaintiff's characterization as "funded entirely by PDVSA."

19. Although Rivera initially drafted a contract with Citgo, Citgo rejected the one-page "contract for services" he prepared because PDV USA, not Citgo, was the correct counterparty to the transaction and because Citgo never used PDV USA to engage third parties.[31]

**RESPONSE:** Disputed in part. Defendant objects to Plaintiff's characterization of the testimony.

20. On March 20, 2017, Eduardo Orsoni, General Counsel for PDVSA and Vice President of Legal Affairs for Citgo, using a Gmail account and a pseudonymous name, emailed Rivera a revised draft of the Agreement, this time between PDV USA and Interamerican, but with the "scope of services" section blank.[32]

**RESPONSE:** Not disputed.

21. Rivera—after consulting FARA filings for precedents[33]—filled in the "scope of services" section of the draft Agreement with "generic consultant speak" and sent the revised draft back to Orsoni.[34]

**RESPONSE:** Not disputed.

22. On March 21, 2017, PDV USA and Interamerican executed the Agreement.[35]

**RESPONSE:** Not disputed.

---

[30] Ex-1 at 197:6-19 (Coon testimony).
[31] Ex-2 at 97:6-100:1 (Arcay testimony).
[32] Ex-41.
[33] Ex-42; Ex-43.
[34] Ex-15 at 620:3-25-621:3-20, 622:1-11 (Rivera deposition); Ex-44; Ex-25 at 17.
[35] Ex-35.

23. There were never any negotiations over the commercial terms of the Agreement, such as the dollar amount, the term, or the scope of services.

**RESPONSE:** Disputed. Plaintiff offers to proofs to support this statement.

24. At first, Rivera set out to organize meetings with the Texas Congressman, Minister Rodriguez, and Venezuela opposition leader Julio Borges.[36]

**RESPONSE:** Not disputed.

25. On March 24, 2017, PDV USA paid Interamerican the first $5 million installment.[37] Almost immediately thereafter, as he did with subsequent payments, Rivera divided the money four ways—approximately 25% each for himself, Gorrin, Nuhfer, and Perera.[38]

**RESPONSE:** Not disputed.

26. Rivera arranged for the Texas Congressman meetings with Rodriguez and Borges to occur on April 2, 2017, in New York.[39]

**RESPONSE:** Not disputed.

27. Through the end of the nominal term of the Agreement, Rivera focused his efforts exclusively on arranging a meeting between Minister Rodriguez—and, later, Maduro Oil Minister and PDVSA President Nelson Martinez—Exxon senior executives, and the Texas Congressman, the purpose of which was to bring Exxon back to Venezuela and potentially facilitate a joint venture between Exxon and PDVSA.[40] This was the *only* thing Rivera did during the nominal term of the Agreement in exchange for the payments under the Agreement—other than assisting with the April 2 meeting.[41]

**RESPONSE:** Disputed in part. Defendant objects to Plaintiff's characterization of the record.

[36] Ex-45; Ex-25 at 32.
[37] Ex-21.
[38] Exs-22, 23, 24.
[39] Exs-47, 25 at 17, 20-33; Ex-10 at 34:1-18 (Texas Congressman testimony).
[40] Ex-7 at 16:20-18:21 (Perera testimony); Ex-12 at 40:3-15 (defense closing argument); Ex-25 at 36-37; Ex-27.
[41] Ex-12 at 10:7-18:9, 40:3-41:7 (defense closing argument).

28. On April 10, 2017, PDV USA paid Interamerican the second invoice ($5 million).[42]

**RESPONSE:** Not disputed.

29. Every invoice that Interamerican sent to PDV USA in connection with the Agreement contained a total of three words describing the "services" rendered: "strategic consulting services."[43]

**REPSONSE:** Not disputed.

30. On April 10, Rivera drafted talking points for an initial meeting between the Texas Congressman and Exxon senior management.[44]

**RESPONSE:** Not disputed.

31. That initial meeting took place on April 10 at Exxon headquarters in Dallas.[45]

**RESPONSE:** Not disputed.

32. The initial meeting failed because Exxon General Counsel Randy Ebner immediately indicated to the Texas Congressman that if Venezuela wanted to negotiate with Exxon, they would have to do so through their lawyers in connection with the ongoing arbitration.[46]

**RESPONSE:** Not disputed.

33. In the following days, Rivera communicated to Gorrin that he needed more money from Venezuela to arrange the targeted meeting among the Texas Congressman, Minister Rodriguez, and Exxon leadership.[47]

**RESPONSE:** Disputed in part. Defendant objects to Plaintiff's use of Perera's hearsay testimony.

---

[42] Ex-21.
[43] Exs-36, 46, 49, 52, 64.
[44] Ex-37.
[45] Ex-25 at 39.
[46] Ex-10 at 39:2-40:10 (Texas Congressman testimony).
[47] Ex-25 at 40-44, Ex-5 at 90:25-92:7 (Perera testimony).

34. In discussing these matters in the MIA chat, the group used code words.

a. "La luz" ("the light") stood for money (i.e., payments from Venezuela);[48]

**RESPONSE:** Not disputed.

b. "Dark" or "darkness in Doral" meant that money had not arrived to Interamerican's bank account;[49]

**RESPONSE:** Not disputed.

c. "Melones," referred to millions;[50]

**RESPONSE:** Not disputed.

d. The phrase "the entrance to the concert" was used as code for the price or fee for arranging meetings;[51]

**RESPONSE:** Not disputed.

e. Nicolás Maduro was the "guaguero," or bus driver;[52]

**RESPONSE:** Not disputed.

f. The Texas Congressman was called "Sombrero";[53]

**RESPONSE:** Not disputed.

[48] Ex-6 at 28:3-7, 30:7-18 (Perera testimony).
[49] Ex-4 at 130:15–131:4 (Perera testimony).
[50] Ex-5 at 92:15–21 (Perera testimony).
[51] Ex-5 at 90:25-92:4 (Perera testimony).
[52] Ex-15 at 842:3-10 (Rivera deposition).
[53] Ex-5 at 95:1-11 (Perera testimony).

35. On April 19, 2017, Rivera sent the third $5 million invoice to PDVSA's Pio Gonzalez in Caracas (the "authorized representative" under the Agreement).[54]

**RESPONSE:** Not disputed.

36. On April 19, 2017, PDV USA paid the third invoice, having then paid a total of $15 million to Interamerican.[55]

**RESPONSE:** Not disputed.

37. On April 20, 2017, Rivera sent the fourth and fifth invoices (totaling another $10 million) to Pio Gonzalez.[56]

**RESPONSE:** Not disputed.

38. During the first few weeks of May, Rivera continued to pressure Gorrin for even more "la luz."[57]

**RESPONSE:** Disputed in part. Defendant objects to Plaintiff's characterization of the referenced communications.

39. On May 25, 2017, Nuhfer received $3,750,000 (75% of $5 million) from a bank account associated with Raul Gorrin.[58]

**RESPONSE:** Not disputed.

40. Gorrin advanced this additional payment in furtherance of the attempted Exxon meeting.[59]

**RESPONSE:** Disputed. Defendant objects to Plaintiff's characterization of the record.

---

[54] Exs-48, 49.
[55] Ex-21.
[56] Exs-50, 53 at 3.
[57] Ex-25 at 53; Ex-6 at 42:21-43:22 (Perera testimony).
[58] Ex-25 at 53-60.
[59] Ex-25 at 53, 57-61; Ex-4 at 99:22-25-100:1-17 (Perera testimony).

41. Rivera received $1,250,000 of the payment (25% of $5 million).[60]

**RESPONSE:** Disputed in part. Plaintiff does not specify they payment.

42. By late May, despite having now received $20 million, Rivera and his associates still had not secured the desired meeting with Exxon, and Rivera's "client," i.e., Minister Rodriguez, was not satisfied.[61]

**RESPONSE:** Not disputed.

43. On June 7, 2017, Exxon declined the meeting in writing.[62]

**RESPONSE:** Not disputed.

44. Subsequently, Rivera was "fired,"[63] and the Agreement nominally terminated on June 21, 2017.[64]

**RESPONSE:** Disputed in part. Defendant objects to Plaintiff's characterization of the record.

45. Pursuant to their prior agreement, Rivera, Gorrin, Nuhfer, and Perera split the payments received from PDV USA in roughly four equal parts.[65] Rivera paid Gorrin's share to a yacht company in Florida that managed Gorrin's yachts.[66]

**RESPONSE:** Not disputed.

46. Beginning in or around late August 2017, Rivera, Nuhfer, and Perera discussed obtaining more payments from Venezuela to have certain Maduro allies, including the nephew of Maduro's wife, Eric Malpica Flores, removed from the U.S. Specially Designated Nationals ("SDN") List.[67]

**RESPONSE:** Disputed in part. Defendant objects to Plaintiff's characterization of the record. Also, there are no corresponding page cites for Ex. 25 referenced.

[60] Ex-15 at 833:17-834:2 (Rivera deposition).
[61] Ex-54; Ex-31 at 14; Ex-29 at 7; Ex-25 at 62.
[62] Ex-38 at 6.
[63] Ex-12 at 13:24-14:5 (defense closing argument); *see also* Ex-29 at 20.
[64] Ex-35 at 1.
[65] Exs-22, 23, 24.
[66] Ex-14 at 362:15-19 (Rivera deposition); Ex-22.
[67] Ex-6 at 31:7-33:14 (Perera testimony); Ex-25 at 93-99; Ex-25 at 95.

47. To facilitate the additional payments, in late September 2017, Rivera sent Gorrin a one-page "amendment" to the Agreement, which changed the total amount from $50 million to $60 million.[68] The amendment, which was signed by Interamerican but not PDV USA, did not make any other changes to the Agreement.

**RESPONSE:** Not disputed.

48. Rivera proposed the amendment "in connection with facilitating payment" to remove Malpica Flores from the U.S. sanctions list, which had "nothing to do with the scope of services from" the original Agreement.[69]

**RESPONSE:** Not disputed.

49. In November and December 2017, Rivera took steps to obtain sanctions relief for Malpica Flores.[70]

**RESPONSE**: Disputed in part. Defendant objects to Plaintiff's characterization of the record.

50. On October 27, 2017, PDVSA paid Interamerican $5 million, this time from a Russian bank account, in exchange for efforts to remove Malpica Flores from the sanctions list—which ultimately failed.[71]

**RESPONSE:** Disputed.

51. PDV USA asked Rivera to assign the original Agreement to PDVSA. Rivera declined because having an agreement with PDVSA would compromise the fiction of working for a U.S. company.[72]

**RESPONSE:** Disputed in part. Defendants disputes Plaintiff's characterization of the referenced communications.

---

[68] Ex-55.
[69] Ex-15 at 847:6–850:21 (Rivera deposition).
[70] Exs-58, 59, 60, 62.
[71] Exs-58, 59, 60, 62; Ex-21; Ex-8 at 67:9-69:8 (Perera testimony); Ex-9 at 146:16-148:10 (forensic accountant testimony).
[72] Ex-25 at 99.

52. In October 2017, Rivera refused to assign the Agreement to PDVSA because Rivera did not want to have a contract with a foreign entity, which would have been "a scandal of monumental proportions."[73]

**RESPONSE:** Not disputed.

53. In late 2017 and early 2018, in connection with preparing his tax return, Rivera documented the four-way-split payments to Gorrin, Nuhfer, and Perera with "subcontract" agreements.[74]

**RESPONSE:** Not disputed.

54. Rivera backdated the subcontracts to March 20, 2017.[75]

**RESPONSE:** Not disputed.

55. None of the parties to the "subcontract" agreements performed (or intended to perform) the services set forth in those agreements.[76]

**RESPONSE:** Disputed in part. Defendant objects to Plaintiff's characterization of the record.

Dated: August 7, 2026

Respectfully Submitted,

*s/ Tucker H. Byrd*
**Tucker H. Byrd**
Florida Bar No. 381632
**BYRD CAMPBELL, P.A.**
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
Facsimile: (407) 392-2286
Primary Email: TByrd@ByrdCampbell.com
Secondary Email: Paralegal@ByrdCampbell.com
*Counsel for Defendant*

---

[73] Ex-13 at 246:3-247:2 (Rivera deposition); Ex-25 at 99.
[74] Ex-66; Ex-14 at 362:2-363:8 (Rivera deposition); Ex-7 at 58:6-25, 59:1-5 (Perera testimony); Ex-14 at 340:23-25, 341:9-25-352:1-2 (Rivera deposition); Ex-14 at 337:4-25-338:7-10 (Rivera deposition).
[75] Ex-7 at 57:19-23 (Perera testimony); Ex-14 at 337:4-340:7, 351:3-353:14, 359:13-360:14 (Rivera deposition).
[76] Ex-7 at 58:6-25, 59:1-5 (Perera testimony); Ex-14 at 340:23-341:9, 353:20-25 (Rivera deposition); Ex-18 at 2.